# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No. & Year:

_____/_____

———————————————————————————————x

Kevin J. Meehan

                Plaintiff,

    -against-

VIPKid; VIPKids International, Inc. aka VIPKid International,
Inc. aka VIPKid; Beijing Dami Technology Co., Ltd. aka
Beijing Da Mi Technology Co., Ltd. aka VIPKid; Beijing Dami
Future Technology Co., Ltd. aka Beijing Da Mi Future
Technology Co., Ltd.; Tencent Holdings Ltd.; Cloud & Smart
Industries, Tencent Holdings Ltd. aka Cloud & Smart Industries
at Tencent Holdings Ltd.; Tencent America LLC; Tencent
Cloud LLC; China Renaissance Holdings Ltd. aka China
Renaissance Securities aka China Renaissance; Sequoia Capital
Operations LLC; VIPKID HK Limited; VIPKID Class HK
Limited; and VIPTeach Inc.

                Defendants.

Date Index No. Purchased:

_____

**SUMMONS**

———————————————————————————————x

To the Persons Named as Defendants above:

      PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the
complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the
address indicated below within twenty (20) days after the service of this Summons (not counting
the day of service itself), or within thirty (30) days after service is complete if the Summons is
not delivered personally to you within the State of New York.

      YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be
entered against you by default for the relief demanded in the complaint.

**Dated**: November 13, 2020
**County**: Nassau County, New York
**Basis of venue:** Plaintiff is a domiciliary of Nassau County and a citizen of New York who has
worked for Defendant from Nassau County and other locations.

**By:** _____

Lakshmi Gopal
Muciri Law PLLC
43 W 43rd Street, Suite 226
New York, NY 10036
(202) 956 8009

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

—————————————————————————x

Kevin J. Meehan

               Plaintiff,

     -against-

VIPKid; VIPKids International, Inc. aka VIPKid International,
Inc. aka VIPKid; Beijing Dami Technology Co., Ltd. aka
Beijing Da Mi Technology Co., Ltd. aka VIPKid; Beijing Dami
Future Technology Co., Ltd. aka Beijing Da Mi Future
Technology Co., Ltd.; Tencent Holdings Ltd.; Cloud & Smart
Industries, Tencent Holdings Ltd. aka Cloud & Smart Industries
at Tencent Holdings Ltd.; Tencent America LLC; Tencent
Cloud LLC; China Renaissance Holdings Ltd. aka China
Renaissance Securities aka China Renaissance; Sequoia Capital
Operations LLC; VIPKID HK Limited; VIPKID Class HK
Limited; and VIPTeach Inc.

             Defendants.

—————————————————————————x

Index No. & Year:

_____/_____

Date Index No. Purchased:

_____

**COMPLAINT**

## COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiff ("Plaintiff") by his attorney, on his own behalf and on behalf of all others similarly

situated ("Plaintiffs"), complains against VIPKID and (or as) the above-listed Defendants jointly

and severally ("VIPKID"), alleging, as follows:

## INTRODUCTION

1.  While once the world spoke of the path of the American dream as paved in gold, today, it is

    well known across the globe that this same path is buried in expense.

2.  In the United States, today, costs associated with building a career leave most Americans in

    hundreds of thousands of dollars of education and education-related debt—well before they

    ever start earning a regular income.

3.  Costs of becoming a working professional in America are varied, and spread across all facets

    of life. They include the cost of school tuition, the cost of living, the cost of foregoing

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 613283/2020

NYSCEF DOC. NO. 1 Case 2:20-cv-06370-JS-LGD Document 1-1 Filed 12/30/20 Page 4 of 132 PageID #: RECEIVED NYSCEF: 11/18/2020

12

income to pursue education, the cost of the accoutrements of professional life (e.g., books, professional attire, professional tools, technology, equipment, and other resources), and many other costs, all significant and substantial.

4. With the majority of Americans being priced out of professional life, it should come as no surprise, that when a high-profile multi-million dollar foreign "company" offers high-quality professional online teaching positions with in-built professional development and networking opportunities to anyone legally eligible to work in the United States and in possession of a bachelors degree, that tens of thousands of Americans would sign-up and work hard to realize these "opportunities"—no matter how much they found themselves exploited.

5. This case is brought by Plaintiff, Kevin J. Meehan, a young man and a father of three from Long Island who dreams of supporting his family through a career teaching online.

6. In pursuit of this dream, from September 2016 to June 2020, Plaintiff worked for VIPKID as a "VIPKID Teacher" from various locations including and especially Nassau County.

7. It would take Plaintiff four years living an Orwellian nightmare to realize that he had been the victim of a sophisticated fraud deliberately crafted to exploit people like him—Americans in search of affordable paths to dignified careers.

8. Plaintiff files this class and collective action complaint on behalf himself and all other VIPKID Teachers seeking all relief that governing laws and this Court deem appropriate to redress VIPKID's willful and malicious fraud as well as its other tortious conduct.

## JURISDICTION AND VENUE

9. The Court has general and original subject-matter jurisdiction over this action since Plaintiff alleges damages of at least 12,794,000 US dollars (estimating at least $2,000 in economic

and non-economic damages and injuries per class taught by Plaintiff), with the final amount
to be fully determined through trial.

10. The Court has personal jurisdiction over VIPKID.

11. VIPKID is a New York-based commercial enterprise and/or activity and/or is provided by
individuals and entities domiciled within New York State.

12. In the alternative, VIPKID activities and interaction in New York State were and remain both
significant and unqualifiedly commercial in nature such that even if VIPKID were to be
considered a non-domiciliary it would satisfy requirements for jurisdiction as set out under
N.Y. C.P.L.R. § 302:

    i.   VIPKID transacts business in the state by recruiting, hiring, and employing people within
the state of New York under the VIPKID brand.

    ii.   Specifically, VIPKID recruits, hires, and employs hundreds, if not thousands, of
"VIPKID Teachers" in New York State. [EXHIBIT A-2]

    iii.   VIPKID has published advertisements offering VIPKID Teacher jobs that are listed as
being located in New York State. [EXHIBIT A-1]

    iv.   VIPKID lists an office in New York City at 450 Lexington Avenue, New York, NY
10017-3904 (New York County) and has registered Shuoqiu Gu (Registration # 5442843)
as in-house counsel for "VIPKIDS International, Inc." [EXHIBIT D-2]

    v.   On around October 2020, on its LinkedIn page, VIPKID advertised a job posting seeking
a New-York-based legal counsel. [EXHIBIT A-1-1]

    vi.   According to the job description posted by VIPKID on its VIPKID LinkedIn page, the
New York Counsel "report[s] to the U.S. Legal Director and is based in New York City."

vii. Further, according to LinkedIn, VIPKID employs or has employed close to 600 people in New York State. [EXHIBIT A-2]

viii.Thus, VIPKID transacts business within the state and contracts to supply goods and/or services in the state.

ix. VIPKID actively runs and/or supports various social media accounts run by its VIPKID Teachers living and working from New York State.

   a. For example, there is a Facebook Group page dedicated to VIPKID Teachers who are living in and working for the company from New York. The group had several hundred members as of November 2020. [EXHIBIT A-3]

x. VIPKID has publicly advertised VIPKID events, taking place in New York City for VIPKID employees to its New York-based employee base on its website [EXHIBIT A-4] and through mass emails sent out on its listservs.

xi. VIPKID maintains active websites ("VIPKID Website" or "Website"), an exclusive technology platform used by VIPKID Teachers to deliver all VIPKID content ("Teaching Platform," or "Platform"), and other VIPKID software applications ("apps")—all of which are actively accessed and used from within New York State. [EXHIBIT C]

xii. VIPKID Teachers in New York State use the VIPKID Platform for administrative work and to connect with students from within the state.

xiii.Performance of the job of a VIPKID Teacher from New York requires downloading, accessing, and entering the VIPKID Teaching Platform.

xiv.Use of the VIPKID Platform from within New York State causes VIPKID and its hundreds of VIPKID employees located within and across the state to knowingly and

repeatedly transmit computer files (including reports, videos, emails, messages and other correspondence, scheduling actions, and session materials) over the Internet between, to, and from New York.

13. Venue is proper in Nassau County pursuant to CPLR § 503 because Plaintiff Meehan is a domiciliary of Nassau County, where he was born and raised and from where he has worked for VIPKID.

14. As detailed in the Factual Allegations Section herein, no valid agreement to arbitrate exists between the parties and Plaintiff has not waived his rights to a jury.

## PARTIES

### Plaintiff:

#### Plaintiff Meehan:

15. Plaintiff Meehan is an American citizen who was born and raised in Nassau County, New York and has remained a domiciliary of Nassau County and a citizen of the state of New York for his entire life.

16. Plaintiff was employed by VIPKID at various times from approximately October 2016 to June 2020—working remotely from various locations, including and especially from Nassau County.

17. Plaintiff was employed by VIPKID though classified as an independent contractor at all times and for all work done for VIPKID. [EXHIBIT B]

18. Plaintiff's FLSA Consent to Sue is annexed hereto as APPENDIX 1.

#### VIPKID Teachers:

19. VIPKID claims that, "VIPKID connects teachers *in* the United States and Canada with children throughout China for real-time English immersion learning online." (VIPKID, *VIPKid Introduction*, https://blog.vipkid.com/wp-content/uploads/2020/05/VIPKid-Introduction.pdf, (emphasis added)) [EXHIBIT C-1]

20. VIPKID claims that it connects, via its online video-enabled Platform, over 700,000 paying students mainly located in China, on VIPKID's count, to over 100,000 VIPKID Teachers "in the United States and Canada." [EXHIBIT C-1]

21. These over 100,000 US and Canadian VIPKID employees are referred to by VIPKID as "VIPKID Teachers."

22. VIPKID Teachers are assigned students by VIPKID's Teaching Platform.

23. Exclusively on this Teaching Platform, VIPKID Teachers deliver 25-minute English-as-a-second-language sessions by reading directly from 25 to 50 strictly prescribed slides.

24. VIPKID Teachers read from these slides while using tightly prescribed hand-gestures, intonation, body language, and teaching props (Total Physical Response "TRP") [EXHIBIT E-1]

25. VIPKID only allows individuals who are legally permitted to work in the United States and Canada to become VIPKID Teachers.

26. VIPKID employs VIPKID Teachers who are domiciled in New York State, hundreds of whom make it known publicly that they work for VIPKID from within the state. [EXHIBIT A-3]

**Defendants**

27. Plaintiff brings this suit against VIPKID and (or as) all entities that, "provide" VIPKID,
jointly and severally.

### VIPKid ("VIPKID")

28. Holding itself out as being headquartered in Beijing and San Francisco, VIPKID is and/or is
responsible for an online technology platform that offers remote English-as-a-second-
language instruction ("sessions") to a Chinese customer base. (VIPKID, www.vipkid.com.cn,
[accessed Nov. 12, 2020]) [EXHIBIT C-4-1]

29. VIPKID is a New York Employer under N.Y. Exec. Law § 292(5) and functions by and
through various anonymous supervisors, staff, and potentially third-party entities—all
dutifully acting out VIPKID's policies and practices.

30. On its principal English-language Website, VIPKID represents itself as follows:
"VIPKID [is] provided by VIPKID HK Limited and its parents, subsidiaries, representatives,
and affiliates (collectively 'VIPKid,' 'we,' 'us,' or 'our')." (VIPKID, *Terms of Use,* https://
www.vipkid.com/teach/terms-of-use [accessed November 10, 2020]) [EXHIBIT C-4-2]

31. After extensive research of publicly available records, Plaintiff names the following entities
as "providing" VIPKID, while seeking leave from this Court to amend its list/description of a
Defendant/Defendants as more information becomes available about "VIPKID" through trial.

### VIPKids International, Inc. aka VIPKid International, Inc. aka VIPKid ("VIPKIDS Int'l, Inc.")

32. Upon information and belief, VIPKIDS Int'l, Inc. "provide[s]" VIPKID.

33. VIPKIDS Int'l, Inc. is an American company operating in and across at least three U.S.
states: New York, California, and Delaware.

34. VIPKIDS Int'l, Inc. is one of two named VIPKID entities on purported agreements governing VIPKID Teachers' "use of VIPKID's website and technology platform," the other entity being VIPKID HK Limited. [EXHIBIT B]

35. VIPKIDS Int'l, Inc. is listed as an express beneficiary to purported agreements between VIPKID HK Limited and VIPKID Teachers that govern VIPKID "Teacher's use of VIPKID's website and technology platform." [EXHIBIT B]

36. However, VIPKIDS Int'l, Inc. is more than a mere beneficiary of VIPKID.

37. On public forums, VIPKIDS Int'l, Inc. holds itself out as identical to VIPKID. [EXHIBIT D-1]

38. Often VIPKIDS Int'l, Inc. is identified as VIPKID and as the same as the VIPKID Website. [EXHIBIT D-1]

39. On all publicly available records, VIPKIDS Int'l, Inc. uses—as it's own and to display its own name—the same trademarks used on VIPKID's Website [EXHIBIT D-1]

40. VIPKIDS Int'l, Inc., also places advertisements in its own name using the same trademarks and brands used by VIPKID on the VIPKID Website. [EXHIBIT D-1]

41. For example, advertisements have been placed on edweek.org that state that "VIPKID International, Inc. is hiring teachers and administrators for the upcoming school year 2019-2020." [EXHIBIT D-1]

42. These advertisements for VIPKID Int'l, Inc. published on edweek.org use the same VIPKID trademarks published on the VIPKID Website. [EXHIBIT D-1-1]

43. VIPKIDS Int'l, Inc. operates in at least three locations in the United States:

### VIPKids International, Inc., New York aka VIPKid International, Inc., New York aka VIPKid ("VIPKIDS NY")

44. Upon information and belief, VIPKIDS NY "provide[s]" VIPKID.

45. VIPKIDS NY has in-house counsel Shuoqiu Gu (5442843) registered in New York at the address at 450 Lexington Avenue, New York, NY 10017-3904 (New York County). [EXHIBIT D-2]

46. Plaintiff re-alleges paragraph 11 as if fully written herein.

### VIPKids International, Inc., Delaware aka VIPKid International, Inc., Delaware aka VIPKid ("VIPKIDS DL")

47. Upon information and belief, VIPKIDS DL "provide[s]" VIPKID.

48. VIPKIDS DL is a Delware corporation established in 2015. [EXHIBIT D-3]

49. With a registered corporate agent at "Corporation Trust Center 1209 Orange Street, Wilmington, DC 19801," VIPKID**S** DL was originally registered in Delaware as "VIPKI**D** International, Inc." [EXHIBIT D-3]

### VIPKIDS International, Inc., San Fransisco aka VIPKid ("VIPKIDS CA")

50. Upon information and belief, VIPKIDS CA "provide[s]" VIPKID.

51. VIPKIDS CA is a Delaware corporation registered as a California foreign corporation with California address of 311 7th Avenue, San Mateo, CA 94401 and/or 301 Howard Street Suite 910, San Francisco, CA 94105. [EXHIBIT D-4]

### Beijing Dami Technology Co., Ltd. aka Beijing Da Mi Technology Co., Ltd. aka VIPKid ("BDT")

52. Upon information and belief, BDT "provide[s]" VIPKID.

10 of 88

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO.: 1

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 12 of 132 PageID
#: 20

INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

53. BDT is headquartered in Beijing, China, possibly at:

Xinzhonguan Bldg Tower B 19 Xinzhongguancun Ave Beijing, 100085 China. [EXHIBIT
D-5-1]

54. BDT is publicly affiliated with the website www.vipkid.com. [EXHIBIT D-5-1]

55. BDT is listed as the owner of at least nine VIPKID apps on the Apple App Store, including

the app for the VIPKID Teaching Platform. (Beijng Da Mi Technology Co., Ltd., App Store

Preview, https://apps.apple.com/us/developer/beijing-da-mi-technology-co-ltd/id1114459948

[accessed Nov. 10, 2020]) [EXHIBIT D-5-1]

56. BDT is the registered owner, in the United States, of all of the trademarks used on the

VIPKID website. [EXHIBIT D-5-1]

### Beijing Dami Future Technology Co., Ltd. aka Beijing Da Mi Future Technology Co., Ltd. ("BDFT")

57. Upon information and belief, BDFT "provide[s]" VIPKID.

58. BDFT is headquartered in Beijing, China, possibly at:

2114, 2/F, Building 23,18, Qinghe Anningzhuang East Road, Haidian District, Beijing
100085

59. BDFT is publicly affiliated with the website www.vipkid.com.cn [EXHIBIT D-5-2]

### Tencent Holdings Limited ("Tencent")

60. Upon information and belief, Tencent "provide[s]" VIPKID and has been leading VIPKID in

the online education, artificial intelligence and cloud services sectors. [EXHIBIT D-6]

61. Tencent is a Chinese multinational technology conglomerate holding company and a leading

provider of Internet value added services in China. [EXHIBIT D-6]

62. Tencent is headquartered at 2747 Park Boulevard, Palo Alto, CA 94306, United States of America 94306. [EXHIBIT D-6]

63. In July 2020, Tencent unveiled a comprehensive blueprint for the development of its Artificial Intelligence technologies at the 2020 World Artificial Intelligence Conference (WAIC) in Shanghai. [EXHIBIT D-6]

64. Upon information and belief, Tencent has poured tens of millions (if not hundreds of millions) of dollars worth of funds and investments into VIPKID and it's development of artificial intelligence technology.

### Cloud & Smart Industries, Tencent Holdings Ltd. aka Cloud & Smart Industries at Tencent Holdings Ltd. ("CSIG")

65. Upon information and belief, CISG "provide[s]" VIPKID.

66. Upon information and belief, CSIG is a Chinese subsidiary of Tencent responsible for promoting the company's cloud and industry Internet strategy. (Tencent, *About us,* https://www.tencent.com/en-us/about.html [accessed Nov. 10, 2020])

67. In 2019, as published on the Berkshire Hathaway publication, businesswire, Dowson Tong, CISG President, represented CISG's interests in VIPKID:

"Tech for Good is Tencent's future vision and mission, and education plus technology aligns with this perfectly. VIPKid has been continuously improving its products and services, upgrading its management all while maintaining an unwavering focus on the long-term development of the education industry. We are pleased to help VIPKid expand its market leadership in China and in global markets, and to empower the future of education via technology in order to benefit even more students and their parents. This will make the entire industry even more prosperous and

dynamic."[1] [EXHIBIT D-7]

### Tencent America LLC ("Tencent America")

68. Upon information and belief, Tencent America "provide[s]" VIPKID.

69. Tencent America is a foreign limited liability company registered in New York (DOS ID# 5546026).

70. Tencent America has a registered agent, "Paracorp Incorporated," with address at 2140 S Dupont Highway, Camden DE, 19934.

### Tencent Cloud LLC ("Tencent Cloud")

71. Upon information and belief, Tencent Cloud "provide[s]" VIPKID.

72. Tencent Cloud is a Delaware limited liability company (File Number 6384087), with a registered agent, "Paracorp Incorporated," with address at 2140 S Dupont Highway, Camden DE, 19934.

### China Renaissance Holdings Ltd. aka China Renaissance Securities aka China Renaissance ("CRS")

73.  Upon information and belief, CRS "provide[s]" VIPKID. [EXHIBIT D-8]

74. CRS is a New York domestic business corporation registered in 2012 and headquartered in New York City at:

600 Fifth Avenue, 21st Floor, Rockefeller Plaza,

New York, NY 10020, USA

---

[1] businesswire: A Berkshire Hathaway Company, *VIPKid Partners with Mastercard to Offer New Payment Option for the 100,000 Online Teachers on the VIPKid Platform in the U.S. and Canada*, https://www.businesswire.com/news/home/20200908005929/en/VIPKid-Partners-with-Mastercard-to-Offer-New-Payment-Option-for-the-100000-Online-Teachers-on-the-VIPKid-Platform-in-the-U.S.-and-Canada [accessed Nov. 19, 2020].

75. CRS provides administrative and other services to various CRS entities.

76. In 2019, as published on the Berkshire Hathaway publication, businesswire, Wang Lixing,

    Managing Director and Head of CRS represented CRS's interests in VIPKID as follows:

"With important factors such as its huge market size, strong product demand and an increasing
online penetration rate, China Renaissance is optimistic for the long-term success of online
education and VIPKid is the market leader. VIPKid has redefined and innovated the concept of
the global classroom. It has also built enormous brand awareness and a passionate and dedicated
teacher community that sets them apart as an industry leader. China Renaissance is very honored
to be a capital markets partner and accompany VIPKid on this journey to explore the boundaries
and possibilities of online education together."[2] [EXHIBIT D-7]

### Sequoia Capital Operations LLC ("Sequoia")

77. Upon information and belief, Sequoia "provide[s]" VIPKID. [EXHIBIT D-9]

78. Sequoia Capital Operations LLC is a venture capital firm incorporated in the state of

    Delaware and headquartered in Menlo Park at 2800 Sand Hill Road, Suite 101 Menlo Park,

    California 94025, mainly focused on the technology industry.

79. Sequoia publishes its affiliation with VIPKID on its own website. (Sequoia, VIPKID, https://

    www.sequoiacap.com/china/en/companies/vipkid/ [accessed Nov. 10, 2020]). [Exhibit D-9]

80. Upon information and belief, VIPKID is affiliated with one or more sub-divisions of

    Sequoia, including Sequoia Capital; Sequoia China Sector Group; possibly including Sequoia

    Capital China Growth Partners Fund IV, L.P. of Cayman Islands (CIK 0001666130); Sequoia

    Capital China Growth IV Principals Fund, L.P. of Cayman Islands (CIK 0001666132);

    Sequoia Capital China Growth Fund IV, L.P. of Cayman Islands; Sequoia Capital China

    Principals Seed Fund I, L.P. of Cayman Islands (CIK 0001757559); Sequoia Capital China

    Growth V Principals Fund, L.P. of Cayman Islands (CIK 0001757559); Sequoia Capital

---

[2] Id.

China Venture Partners Fund VII, L.P. of Cayman Islands (CIK 0001753158); Sequoia

Capital China Growth Partners Fund V, L.P. of Cayman Islands (CIK 0001753066); Sequoia

Capital China Venture VII Principals Fund, L.P. of Cayman Island (CIK 0001752997).

### VIPKid HK Limited ("VIPKIDS HK")

81. Upon information and belief, VIPKIDS HK "provide[s]" VIPKID by managing the VIPKID

    Website and other technology platforms. [EXHIBIT D-10]

82. VIPKIDS HK (CR. 2117782) is a private company limited by shares. [EXHIBIT D-10]

83. VIPKIDS HK was incorporated in Hong Kong in 2018 with a registered office at Room 804,

    Building 14 4th Zone of Cao Qiao Xin Yuan Fengtai District Beijing, China. [EXHIBIT

    D-10]

84. VIPKID HK is one of two named VIPKID entities on purported agreements governing a

    VIPKID Teacher's "use of VIPKID's website and technology platform," the other entity

    being VIPKID Int'l Inc. [EXHIBIT D-10]

### VIPKid Class HK Limited ("VIPKIDS Class")

85. Upon information and belief, VIPKIDS Class "provide[s]" VIPKID.

86. VIPKIDS Class (CR. No. 2765775) is a private company limited by shares. [EXHIBIT D-11]

87. VIPKIDS HK was incorporated in Hong Kong in 2018 with a registered office at Room

    1903, 19/F Lee Garden One 33 Hysan Avenue Causeway Bay, Hong Kong. [EXHIBIT D-11]

### VIPTeach Inc. ("VIPTeach")

88. Upon information and belief, VIPTeach "provide[s]" VIPKID and is provided for by VIPKID

    through, for example, use of VIPKID Teachers to staff VIPTeach programs. [EXHIBIT D-12]

89. VIPTeach is a California-based "501(c)(3) public charity located at 301 Howard Street, San
    Francisco, CA 94105 and founded in 2019 by Cindy Mi, former teacher and Founder and
    CEO of VIPKid, a global education technology company." (VIPTeach, https://vipteach.org
    [accessed Nov. 10, 2020]) [EXHIBIT D-12]

## FACTUAL ALLEGATIONS

90. Plaintiff hereby re-alleges and incorporates by reference all allegations in all preceding
    paragraphs as if fully rewritten herein.

## I.    VIPKID Fraudulently Misrepresents VIPKID and VIPKID Teachers

91. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

92. In 2016, the VIPKID Website represented VIPKID as follows:

    "VIPKID provides the North American elementary school experience to Chinese children –

    all from the comfort of their home. Our sophisticated virtual classroom streams native

    English speaking teachers into Chinese homes, linking the world through

    education." [EXHIBIT C-4-3]

93. With reference to VIPKID Teachers, the Website promised that,

    "Teachers feel supported before, during and after class. At VIPKID, we provide lesson plans,

    a real-time tech support team and a large operations team to meet our teachers'

    needs." [EXHIBIT C-4-3]

94. The current Website features two prominent credos: "Teach Every Child" and, placed with
    equal prominence, "Enable Every Teacher." VIPKID, https://www.vipkid.com [accessed
    Nov. 10, 2020] [EXHIBIT C-4-4]

95. The Website elaborates that, "Enabl[ing] Every Teacher" means that VIPKID:

"pride[s] [itself] in finding educators in the U.S and Canada who are knowledgeable, passionate, and ready to make an impact. We provide the curriculum, and they teach English online on their own schedule." (VIPKID, https://www.vipkid.com [accessed Nov. 10, 2020] ) [EXHIBIT C-4-4]

96. Further, the Website claims:

"Our innovative online platform enables an unprecedented exchange of knowledge. Fluent English-speaking teachers connect with students online around the world to provide them with a learning and cultural experience as they become global citizens (in pint-sized form)." (VIPKID, https://www.vipkid.com [accessed Nov. 10, 2020]) [EXHIBIT C-4-4]

97. The Website represents its teaching population as global leaders:

"VIPKid is a cutting-edge, global education platform that's changing lives around the world —not to get too braggy—and our teachers are an expansive community of professionals, parents, school teachers, retirees, and digital leaders." (VIPKID, https://www.vipkid.com [accessed Nov. 10, 2020])

98. In particular, the Website provides detailed representations about what it is like to work as a

VIPKID Teacher. The Website's "Frequently Asked Questions" answers the question "What

does teaching with VIPKID look like?" with the following response:

"Check out our blog, where current teachers share their experience. Here's a short piece

about Kate's first day with us." [EXHIBIT C-4-5]

99. The so-called "Blog" on the VIPKID Website is an extensive collection of curated articles,

polished photographs, and edited videos about working as a VIPKID Teacher, all focused

around the image of a handful of alleged VIPKID Teachers presented as celebritiesBlog—all

written, edited, curated, and published by VIPKID.

100. The Blog is under the complete control of VIPKID

101. The Blog is completely controlled, edited, and curated by VIPKID.

102. While VIPKID represents the Blog as the place "where current teachers share their

experiences," the Blog is purely for recruitment and/or marketing purposes. (VIPKID, Day

One, https://blog.vipkid.com/day-one-my-first-day-as-vipkid-teacher/, [accessed Nov. 10,

2020])

103. As such, the Blog is another piece of the VIPKID marketing strategy and presents carefully

selected and curated experiences of a small number of purported VIPKID Teachers.

104. In making detailed representations about working for VIPKID, the Website cultivates a cult-

like language when discussing VIPKid Teachers, referring to them as, e.g. "Teacher Martha,"

"Teacher Ashley," or "Teacher Edison," presenting a vibrant and active community of

teachers building stable economic and professional lives—courtesy the opportunities

afforded to them by and through the Website. (See, e.g., VIPKID, Meet Teacher Martha,

https://blog.vipkid.com/meet-teacher-martha/, [accessed Nov. 10, 2020]; VIPKID, Meet

Teacher Ashley, https://blog.vipkid.com/meet-vipkid-teacher-ashley/, [accessed Nov. 10,

2020])

105. While targeting recruitment exclusively at North Americans, the Website represents itself as

"serving" a growing community of global teachers by affording them a stable and reliable

economic opportunity to work as a VIPKID Teacher. VIPKID, *VIPKid Introduction*, https://

blog.vipkid.com/wp-content/uploads/2020/05/VIPKid-Introduction.pdf, (emphasis added)

106. VIPKID represents the opportunity to work as a VIPKID Teacher as including opportunities

for professional development, the promise of job satisfaction, valuable provision of

administrative support, and membership in a large and global professional community of

teachers. [EXHIBIT C]

107. Further, VIPKID has increasingly placed representations of "teaching" with VIPKID as an

improvement on and potential alternative to the traditional "9 to 5," at the front and center of

18 of 88

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 20 of 132 PageID #: 28

all of its communications and marketing efforts directed at current and prospective VIPKID Teachers.

108. For example, in a post on its Website titled "7 Best Perks of Teaching Online From Home," VIPKID represents "Teaching online" as "the most exciting work opportunity for teachers this century." (VIPKID, *7 Best Perks of Teaching Online From Home*, https:// blog.vipkid.com/7-best-perks-of-teaching-online-from-home/ [accessed Nov. 10, 2020])

109. This potential, according to VIPKID, amounts to giving VIPKID Teachers an "ability to cater to one's lifestyle [that] allows mothers and educators…much-needed flexibility." (VIPKID, Finding a New Passion Through Online Teaching, https:// blog.vipkid.com/finding-a-new-passion-through-online-teaching/ [accessed Nov. 10, 2020])

110. The Website gives any reasonable viewer the impression that VIPKID values, prioritizes, and celebrates its VIPKID Teachers.

## II. VIPKID deliberately concealed the reality of what it is like to work as a VIPKID Teacher

### The Fraud of High-Quality One-to-One Classes:

111. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

112. VIPKID represents the ability to teach one-to-one classes as an advantage of working with the company.

113. Most of the time classes were not one-to-one because parents were present for and actively involved in classes.

114. Often, students took classes accompanied by their parents, who would be learning English along with them

19 of 88

115. In many classes parents would shout out responses for students, often these responses would be incorrect.

116. Very often, Plaintiff found himself teaching both students and their parents while being paid for teaching one-on-one classes.

117. Parents were often recording Plaintiff openly with their phones while Plaintiff was teaching.

118. Plaintiff does not recall having ever agreed to being recorded by class participants and feels anxious knowing that he has no clue about how those recordings were/are being used.

119. At times, Plaintiff had to keep teaching while his students were defecating in their toilets.

120. Parents would take their children to the bathroom in the middle of classes.

121. Plaintiff complained to the support staff during such incidents.

122. Sometimes, he was told he could wait for them to finish going to the bathroom before teaching again. At other times, he was told that he had to keep teaching because the students had paid for the 25-minute class session.

123. Often Parents would hit students during the class or smack them under the table in the presence of Plaintiff.

124. Such regular occurrences made classes extremely uncomfortable and were (and continue to be) a cause of mental anguish for Plaintiff.

125. In other cases, students who were quite clearly too sick for class were forced to go to class— some could not answer questions or respond to Plaintiff in any cogent manner because they were too sick to participate in the lesson.

126. In addition to teaching both parents and children, Plaintiff has taught classes to more than one child on multiple occasion—and was never compensated for this.

20 of 88

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 22 of 132 PageID
#: 30
INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

127. Plaintiff would "enter" digital classrooms to find multiple students waiting to be taught.

128. Plaintiff would try to ensure sessions remained one-to-one by asking students to put on headphones or by reaching out to VIPKID support services.

129. In response to his complaints, often, parents would simply move one student "off-camera."

130. At other times, student cameras were turned off for the duration of the class or lighting was made deliberately dim.

131. As a result of such strategies and circumstances, Plaintiff was left without any knowledge of who or how many people he was teaching. This was a great source of anxiety for Plaintiff.

132. In such situations, VIPKID, was in the practice of instructing Plaintiff to keep the VIPKID customers happy to avoid bad reviews.

133. As such, Plaintiff often knew that he taught several students while being paid for teaching a single student.

134. Plaintiff has had to "teach" students taking classes at family gatherings at restaurants, or while students were with others driving in a car.

135. In such public settings, the tablet that the student was using to access the sessions would be passed around from person-to-person through out the family.

136. Whenever Plaintiff's video presence was passed around (on a tablet to strangers in public spaces in a foreign country) family members would point and laugh at Plaintiff.

137. As a result, Plaintiff was forced to work in all kinds of uncomfortable and hostile situations.

138. Plaintiff found himself often managing multiple "students" at a time or multiple people in a variety of uncontrollable and humiliating situations—and never received due compensation

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
INDEX NO. 613283/2020
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 23 of 132 PageID
#: 31
RECEIVED NYSCEF: 11/18/2020

for the additional time, energy, and effort Plaintiff had to expend to continue his work under such unprofessional circumstances.

139. The constant fear of the unknown during sessions was a source of considerable anxiety and mental anguish for Plaintiff.

### VIPKID Teachers received no support and were subject to constant harassment

140. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

141. In Plaintiff's nearly four years of working with the company, Plaintiff has never met a single VIPKID staff member of representative in-person.

142. In the course of four years spent working for the company, Plaintiff has had fewer human interactions than he can count on one hand.

143. Mostly, Plaintiff spent nearly four years corresponding via e-mail and chat messages, in exchanges that often left him wondering whether he was dealing with an actual human beings or software.

144. Under these Orwellian circumstances, eliciting any kind of support from VIPKID was unreliable, stressful, and time-consuming.

145. While teaching his classes, Plaintiff could request the support of what VIPKID referred to as "Firemen."

146. Plaintiff would interact with these so-called "Firemen" via text in a chat box in the "digital classroom" "where" VIPKID sessions would take place on the VIPKID Teaching Platform.

147. To seek help during his classes, Plaintiff would hit a support button and would receive an automated responses.

22 of 88

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1

Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 24 of 132 PageID
#: 32

INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

148. Ostensibly, to interact with a purported human, Plaintiff would have to wait ten to fifteen minute of a 25-minute class before getting a text response in the chat box.

149. Plaintiff's most horrific memories include interacting with a young girl who was sitting in a room high up in a tall apartment building. Plaintiff remembers that while Plaintiff was teaching the class, the young girl was completely unsupervised and began to climb out the window of the apartment that was quite clearly located on a very high floor. The experience was traumatic for Plaintiff because he felt as though he was watching a young girl who was about to die and he felt helpless to do anything. After a frightening delay, Plaintiff was finally able to get in touch with the so-called Firemen and persuaded them to alert the young girl's parents. In the interim, Plaintiff, himself a father of three, experienced extraordinary fear and stress.

150. Another experience imprinted in Plaintiff's mind was the experience of teaching a class with a young female student who was dressed in strange make-up and located, ostensibly, in a basement of a building.

151. Plaintiff's memory of that young student—especially her condition and the conditions she was in—remain horrific for Plaintiff.

152. During all of these occasions, VIPKID support staff would usually ask Plaintiff to continue "teaching".

**VIPKID wages: Hard-to-Earn and Easy-to-Lose**

153. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

154. Plaintiff was required to do off-the-clock work simply to get paid for work already completed.

23 of 88

155. For example, after each class session and for each and every class session he taught, Plaintiff was required to submit detailed "Class Feedback" ("CF") and/or "Unit Assessment" ("UA") reports within twelve hours.

156. VIPKID Teachers were never paid for the time they spent completing these reports.

157. Nonetheless, if a VIPKID Teacher did not complete these and other such tasks, he or she would be subject to wage deductions up to 100% from wages already earned— and potentially even higher liquidated damages for these and other acts.

158. Even if Plaintiff submitted the report more than twenty-four hours after the class, he would still get paid nothing for the class.

159. Similarly, if a student failed to attend class, Plaintiff would receive only half his salary.

160. Further, if any technical difficulties interfered with more than three minutes of class time, Plaintiff would be forced to forfeit one hundred percent of his wages for the class.

161. VIPKID rarely took responsibility for any service failures caused by its software and was in the habit of attributing any and all technical difficulties to Plaintiff—without proffering any evidence or basis for such decisions.

162. Plaintiff was charged liquidated damages on top of these other illegal deductions.

163. For example, Plaintiff would be charged $10.00 if he failed to show up for a class without cancelling or for cancelling a class with less than two hours notice.

164. According to the VIPKID policy, charging liquidated damages are appropriate under these circumstances because "actual damages are not reasonably ascertainable." [EXHIBIT B]

165. Opportunities for certification and advancement as a VIPKID Teacher were arbitrary, sporadic, retaliatory, and/or discriminatory

166. A new VIPKID Teacher has permission to deliver a limited set of classes, only— mostly classes for absolute beginners.

167. Plaintiff was automatically certified for the first two levels of English sessions and was required to spend his own time and energy to receive further certification that would allow him to deliver more advanced classes.

168. Plaintiff was never paid for the time and effort he spent trying to get certified.

169. Each certification process required reading a short passage, watching a short video and answering ten to thirty multiple choice questions.

170. More recently, the certification process was changed. Upon information and belief the process was completely automated to avoid any need for human contact between VIPKID and VIPKID Teachers.

171. Based on Plaintiff's experience and upon information and belief, Teachers are now required to answer multiple choice questions and watch videos before "entering" a digital practice room where they are asked to record a video of themselves "teaching" a demonstration class to an imaginary student for ten minutes.

172. The demonstration video is submitted to VIPKID for review. This review determines whether a VIPKID Teacher receives certification to deliver a similar class for pay.

173. Plaintiff was never given any clear guidelines for when and how VIPKID reached its decisions on certification.

174. Plaintiff was never paid for the time and effort he spent trying to get certified.

175. The most that Plaintiff would earn for all of the work associated with teaching a 25-minute class was around $12.

176. This sum would include Plaintiff's $8 base rate pay, incentives for teaching a high volume of classes, and incentives for taking on a class on short-notice.

177. The time required to become eligible for incentives went well beyond Plaintiff's 25-minute class time.

178. To make this $12, Plaintiff had to essentially dedicate his entire schedule to VIPKID and make VIPKID his first professional (and often personal) priority.

**VIPKID decides what, how, and where VIPKID Teachers work**

179. The entire system, including fraudulent representations about VIPKID Teachers, was deliberately designed to make Plaintiff servile and compliant—and that is what he became, for a time.

180. VIPKID Teachers were never given anything that resembled a "lesson plan."

181. To deliver sessions , VIPKID Teachers read from a script made up of a collection of slides provided to them by VIPKID.

182. For VIPKID Teachers, preparing for a session, therefore means being ready and able to cover materials specifically attached to and assigned for the session at an average pace of one minute to thirty-seconds per assigned slide.

183. VIPKID emphasized completing the materials over student comprehension.

184. Plaintiff was highly advised that he should complete all of the material within the session.

185. Plaintiff was advised that if he did not complete all of the material in this prescribed manner his students' parents would give him bad ratings and would write negative comments about Plaintiff on his professional profile on the VIPKID Teaching Platform—comments that VIPKID never takes down, even when they are found to be baseless.

26 of 88

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 28 of 132 PageID #: 36

186. Plaintiff had no ability to teach freely, or even in a style that felt comfortable to him.

187. Plaintiff's work was constantly surveilled and supervised by VIPKID agents and/or software who/that constantly and continuously monitored and recorded his classes.

188. VIPKID dictated the exact manner of Plaintiff's performance by sending him live instruction on exactly how content was to be delivered.

189. Through software on his computer and phones VIPKID would monitor many aspects of VIPKID Teacher behavior and, for example, send VIPKID Teachers reminders and notifications.

190. VIPKID dictated the exact place of Plaintiff's performance by requiring Plaintiff to work, exclusively, on the VIPKID Teacher Platform.

**VIPKID practices and policies keep VIPKID Teachers working on the VIPKID Teaching Platform for as many hours as possible**

191. VIPKID claims that Plaintiff had the freedom to work whenever he wanted, as much or as little as he chose.

192. However, VIPKID deliberately conceals the various aspects of its practices and policies developed to pressure VIPKID Teacher to teach as much as possible.

193. VIPKID constantly pressured Plaintiff to be available for classes at all times possible— through a barrage of constant emails, notifications, incentives, penalties, booking request, and structural features/functions embedded in the VIPKID Teaching Platform and other software.

194. As a part of the VIPKID incentive structure, VIPKID Teacher received "tokens" for good behavior.

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 30 of 132 PageID #: 38

203. Plaintiff could not change, adjust, or amend the schedule that VIPKID set for him.

204. If Plaintiff were unable to make any one of the hundreds of session scheduled for him by VIPKID weeks in advance, he would have to "cancel" that session.

205. VIPKID Teachers were subject to a tight cancellation policy regardless of whether they were sick or facing some urgent personal crisis.

206. Despite the fact that Plaintiff was scheduled to teach several hundred classes over the course of months, Plaintiff was only allowed six cancellations on his record before triggering VIPKID's right to terminate Plaintiff.

207. In addition to the risk of termination, VIPKID unlawfully deducted money from Plaintiff's earned wages if Plaintiff cancelled any sessions with less than 24 hours notice.

208. As a result of this and other policies, for example, Plaintiff remembers feeling forced to conduct classes for four hours straight while experiencing severe throat inflammation because he was too afraid of the consequences of cancelling his classes.

209. To add to this pressure, Plaintiff was sent a list of "Booking Requests" on a weekly basis.

210. These "Booking Requests" were requests for Plaintiff to take additional classes outside the hours of his Availability.

211. Plaintiff was not expressly required to accept such booking requests.

212. However, he was constantly directed to accept them.

213. As a result, Plaintiff felt constant pressure to accept these additional hours of work.

214. Plaintiff felt pressure because it was difficult for Plaintiff to refuse such last minute requests given the pressure on Plaintiff to maintain good relationships with repeat customers, to promote good ratings, and to please VIPKID.

215. Moreover, VIPKID classes would not stop automatically at the 25-minute mark, when they were scheduled to end.

216. As a practical matter, this meant that VIPKID customer preference decided when classes ended because when customers requested some additional minutes of instruction, Plaintiff had to comply or face the threat of bad ratings and negative comments.

217. Despite the fact that Plaintiff faced serious consequences for arriving late to any subsequent classes, Plaintiff almost always taught more than 25 minutes to please his students and VIPKID and to preserve his positive ratings.

218. The practical consequence was that if Plaintiff wanted to, as VIPKID promised, work as much as he wanted, he would have to do so without a break by working back to back.

219. Even though any additional time Plaintiff taught was logged and recorded by the VIPKID, Plaintiff was never paid for any of the extra minutes he spent in addition to the 25-minutes allotted.

### The VIPKID Rating System was used to control VIPKID Teachers

220. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

221. Plaintiff's performance was rated by student and parent who could also attach comments to their ratings.

222. Parents and student ratings created a single rating score for Plaintiff.

223. Plaintiff was given the option of appealing against any unfair or abusive ratings or comments.

224. However, even in cases where Plaintiff was notified that VIPKID had accept Plaintiff's appeal, VIPKID would never remove or erase these successfully appealed comments from Plaintiff's professional profile.

225. Successfully appealed comments remain visible to anyone who accesses a VIPKID Teacher's professional profile and potentially in other locations unknown to Plaintiff.

226. VIPKID has not taken any steps to prevent or discourage its customers from posting false, retaliatory, and defamatory comments against VIPKID Teachers on their VIPKID professional profiles.

227. Not only would VIPKID's refusal to create a fair rating system impact Plaintiff's self-confidence and self-esteem but it would also impact how Plaintiff was perceived, treated, and rated by current and subsequent students.

228. This in turn would impact Plaintiff's class interactions and Plaintiff's chances of acquiring new students.

229. Given that VIPKID never removed unfounded comments from Plaintiff's professional profile, Plaintiff found the rating system, especially its blatant lack of any fairness and accuracy, as a source of incredible anxiety—and as another tool that VIPKID used to ensure complete compliance from Plaintiff and other employees similarly situated.

230. While VIPKID's rating system does not directly "control" VIPKID Teacher behavior, it is specifically designed, like China's ranking system, to ensure blind obedience through the constant threat of humiliation. This constant threat of humiliation exercised and exercises a type of control over VIPKID Teachers that is far deeper and far more inescapable than any written law or instruction could effect.

**Willful and Deliberate Misclassification of Employees as Independent Contractors**

231. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

232. In the course of almost four years, Plaintiff 's work was allegedly attached to at least six documents purportedly executed between Plaintiff and VIPKID—each with a duration of six months.

233. Under these agreements, Plaintiff was represented as an independent contractor. [EXHIBIT B]

234. Plaintiff was never given a clear factual basis for his classification as an independent contractor.

235. On or around February 2017, Plaintiff asked VIPKID via email for a letter explaining that he was working for VIPKID as an independent contractor for his personal records.

236. VIPKID refused this request and did not explain the basis of his classification as such.

### III. VIPKID Aggressively Targets American Workers

237. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

238. Through its policies, practices, and its focus on the image of the VIPKID Teacher, VIPKID is particularly aggressive in its efforts to attract, recruit, and retain Americans, in particular, and people legally able to work in either the United States or Canada, in general.

239. VIPKID's entire English-language Website is a recruiting site used exclusively to recruit American and Canadian VIPKID Teachers.

240. VIPTeach, VIPKID's shell charity recruits Americans, exclusively, to work as so-called Teaching Fellows. [EXHIBIT C-6]

Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 34 of 132 PageID #: 42

**The Website Willfully and Deliberately Frames Expatriation from the United States**

**as a natural and beneficial part of the VIPKID lifestyle:**

241. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

242. VIPKID represents the benefits of the flexibility of working online in the context of a

narrative about teaching with VIPKID as a gateway to life outside North America—as an

expatriate.

243. The Website and its Blog makes several claims about the prospects of achieving financial

stability through work as a teacher with VIPKID—presenting as representative a teacher who

was able to consider moving to Asia, allegedly because of the economic flexibility and

stability afforded to him by working as a VIPKID Teacher:

"But there have been other, less obvious doors opened to Edison through his teaching. Since
forever, Asia has had a strong draw on him, but only once he began teaching with VIPKid did
the notion of moving to Asia as a teacher occur. The freedom and flexibility afforded by his
role as a VIPKid teacher have allowed him to actively start imagining eating dumplings
between classes in the heart of Beijing or munching on an edamame bean before starting
class in Kyoto." (VIPKID, *Opening New Doors: Meet Teacher Edison*, https://
blog.vipkid.com/opening-new-doors-meet-teacher-edison/ [accessed Nov. 10, 2020])

244. This image of working as a VIPKID Teacher as a gateway to life as a digital nomad is

reinforced across various materials on the Website.

245. On a page on its Website titled "Teachers Around the World with VIPKid," VIPKID

highlights the experience of its teachers located all across the world,[3] as though there were no

difference between an American citizen who works for the company domiciled in Cambodia

and one domiciled in California or New York. (VIPKID, *Teachers Around the World with*

*VIPKid*, https://blog.vipkid.com/teachers-around-the-world/ [accessed Nov. 10, 2020])

---

3

246. Through this and other such messages, VIPKID directly represents that moving abroad to "teach" benefits VIPKID Teachers.

247. This message is/has been amplified by any number of VIPKID affiliate websites, some of which are encouraged and/or remunerated by VIPKID.

248. On these affiliated websites, VIPKID Teachers or other VIPKID affiliates generate (or have generated) income through referring VIPKID Teachers to apply to work for VIPKID—using the narrative about the benefits of living outside the United States.

249. These companion sites also aggressively encourage teaching from abroad.

250. Specific claims and representations made on the VIPKID Website enable and magnify the language about living abroad made on affiliated and other websites.

251. Highlighting this theme further through its broader message, VIPKID similarly claims that, "Teaching with VIPKID means many things to many people: financial freedom, flexibility, the fulfillment of a lifelong dream to shape young minds." (VIPKID, *Doing the Unexpected: Meet Teacher Lori*, https://blog.vipkid.com/doing-the-unexpected-meet-teacher-lori/ [accessed Nov. 10, 2020])

252. Emphasizing and highlighting its representations, VIPKID quotes a VIPKID Teacher as saying the following:

"This past year I've had opportunities I never thought I'd have, including starring in a commercial for VIPKid!…I also went to the Journey Event in Utah. I never thought I would do any of these things, which is a really fun aspect of working with VIPKid. We never know where life is going to take us!" (*Id.*)

253. VIPKID omits from all these representations of the allures of teaching from Asia any disclaimers, whatsoever, of the significant legal implications that being domiciled outside of the United States creates for the average American worker.

254. Many U.S. laws, regulations, and procedural rules view United States citizens domiciled abroad as, *de facto*, stateless.

255. VIPKID has deliberately drafted its agreements with VIPKID Teachers to take advantage of this treacherous gap in American law.

256. Over the course of four years, VIPKID has structured (and re-structured at least twice) its agreements with VIPKID Teachers to ensure that, as far as possible, any claims that VIPKID Teachers might have against VIPKID are governed by jurisdictions where VIPKID Teachers cannot exercise the full force of the protection they would enjoy had they been working in and from the United States—for example jurisdictions like Thailand. [EXHIBIT B]

**VIPKID Trades on the Fraudulent Misrepresentations it has made about VIPKID Teachers**

257. Upon information and belief, VIPKID has a higher market valuation and attracts more customers and investments than its competitors because the entity has deliberately built a reputation for hiring high-quality teachers, for placing a high value on these so-called VIPKID Teachers, and giving these VIPKID Teachers significant support to do their job. [EXHIBIT D-8]

258. VIPKID's reputation for "empowering" VIPKID Teachers was and continues to be created through a deliberate marketing strategy that includes projecting "a shared fervor" among VIPKID Teachers on the VIPKID Website and in press events. Business Insider, *A 35-year-*

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
INDEX NO. 613283/2020
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 37 of 132 PageID
RECEIVED NYSCEF: 11/18/2020
#: 45

*old who dropped out of high school had a vision of a utopian future for China, the US, and the world — and it's led her to the forefront of a tech startup worth $3 billion*, https://www.businessinsider.com/inside-vipkid-cindy-mi-and-3-billion-startups-teacher-community-2018-8 [accessed Nov. 10, 2020]

259. VIPKID has used this reputation to fraudulently induce, on its own count, over 100,000 VIPKID Teachers to work for VIPKID using the false promise of rewards that were never intended and that VIPKID lacks and has always lacked the capacity to deliver.

260. VIPKID has used its fraudulent reputation to attract hundreds of millions of dollars of investment and donations from businesses and private individuals, alike.

261. VIPKID has even gone to the extent of monetizing this reputation through the creation of a shell charity, VIPTeach. [EXHIBIT C-6]

262. Upon information and belief, the non-profit VIPTeach's only significant activity is running a "VIPTeach Global Online Teaching Fellowship." [EXHIBIT C-6]

263. The work of VIPTeach Global Online Teaching Fellows is similar if not identical to the VIPKID Teacher position. [EXHIBIT C-6]

"The VIPTeach Global Online Teaching Fellowship is a virtual service and professional learning program designed to equip early and mid-career professionals with technology, pedagogical, and cross-cultural skills required of 21st century education leaders." [EXHIBIT C-6]

264. The VIPTeach represents that VIPTeach Fellows lead 25-minute classes scheduled between the hours of 8:30 AM and 12 PM China Standard Time. [EXHIBIT C-6]

265. The minimum requirements for the Fellowship are very similar to the minimum requirements for a VIPKID Teacher. As with VIPKID Teachers, Fellows must have a Bachelor's degree. [EXHIBIT C-6]

266. Unlike with VIPKID Teachers Fellows must be eligible to work in the United States only. By contrast, VIPKID Teachers can be eligible to work in either the United States or Canada. [EXHIBIT C-6]

267. VIPTeach "Fellows" or volunteers work either for a nominal stipend or for free. [EXHIBIT C-6]

268. According to the VIPTeach website, Fellows receive a fellowship stipend of $2,000 ($1,000 per semester). [EXHIBIT C-6]

269. According to the VIPTeach Website, Fellows "[p]rovide access to quality online instruction to underserved classrooms around the world." [EXHIBIT C-6]

270. VIPTeach does not provide any information about where and how they serve such underserved classrooms.

271. VIPKID and VIPTeach do not provide any information as to whether VIPKID and/or VIPKID Teach provide these services for free or whether they or any VIPKID provider and/or affiliate receives some kind of remuneration and/or benefit-in-kind in exchange for VIPTeach activities.

272. VIPKID Teachers can work in VIPTeach classrooms. However, they can only do so for free —on a volunteer bases.

273. Further, VIPKID even uses its fraudulent image of supporting VIPKID Teachers to profit directly from VIPKID Teachers as consumers:

274. VIPKID's marketing efforts include a small number of highly publicized events branded "Journey". [EXHIBIT D]

275. For example, at their own expense, around 250 of the over 100,000 VIPKID Teachers (less than 0.0025%) travelled to attended a "Journey" event in Salt Lake City, where it was reported that attendees ended up purchasing at least $7,000 worth of VIPKid merchandise, including mugs, T-shirts, and stuffed animals. (Business Insider, *A 35-year-old who dropped out of high school had a vision of a utopian future for China, the US, and the world — and it's led her to the forefront of a tech startup worth $3 billion*, https://www.businessinsider.com/inside-vipkid-cindy-mi-and-3-billion-startups-teacher-community-2018-8 [accessed Nov. 10, 2020])

276. According to news reports, VIPKID earns money from other products sold during these Journey conferences.

277. Upon information and belief, VIPKID earns additional income through these events by sponsorship deals and other incentives.

**IV. VIPKID uses recordings of American VIPKID Teachers delivering classes to Develop Artificial Intelligence Technology without their knowledge, without their consent, and without compensation**

278. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

**VIPKID's rhetoric about its emphasis on teaching and on creating human connections does not match its operations**

279. In 2018, VIPKID Founder Cindy Mi was quoted as saying that there were only 27,000 qualified English teachers from North America in China, "hardly enough for the country's

nearly 300 million young people." (Business Insider, *A 35-year-old who dropped out of high school had a vision of a utopian future for China, the US, and the world — and it's led her to the forefront of a tech startup worth $3 billion*, https://www.businessinsider.com/inside-vipkid-cindy-mi-and-3-billion-startups-teacher-community-2018-8 [accessed Nov. 10, 2020])

280. In 2014, China recorded 260 million students—excluding graduate education institutions. (UNFPA State of World Population Report 2019).

281. The following example illustrates the magnitude of potential demand for online English-as-a-second-language instruction in China:

Suppose each of these 260 million student were to take just one, one-to-one 25-minute VIPKID session *per week*, then VIPKID would need to serve, on average, around 37 million students per day. This would mean serving over 1.5 million students *per hour* during every 24 hour cycle.

282. Since VIPKID offers only one-to-one sessions, this means that, on average, 1.5 million VIPKID Teachers would need to be working simultaneously on the VIPKID Platform, at any given point in a 24-hour period, simply to serve this present potential demand in China.

283. At its current rate of productivity, VIPKID would need a total cohort of nearly 20 million teachers to be able to offer just one single 25-minute class per week to each student in China —or 10 million teachers to offer just one single 25-minute session to half this market.

284. To achieve an even more modest goal, to be able to serve a customer base of a mere 1% of the current Chinese student population, VIPKID would need to hire nearly 2.5 million more teachers—all of whom, under current VIPKID policies, would have to be eligible to legally work in the United States or Canada.

285. In other words, under its current policies, VIPKID would have to hire a cohort approximately the size of 0.5% of the United States population to adequately serve just 1% of the Chinese student population, alone.

286. VIPKID's current capacity limits its potential customer base to 0.02% of China's student population—"hardly enough for the country's nearly 300 million" students identified by VIPKID founder Cindy Mi. (*Id.*)

287. Upon information and belief, VIPKID has far fewer than the 100,000 VIPKID Teachers it claims as members of the world's largest teaching community.

288. There is no evidence whatsoever that VIPKID is making any efforts to even remotely mobilize the human resources and organizational capacity to expand its current VIPKID Teacher population—whatever it may be.

289. To the contrary, upon information and belief, VIPKID is deliberately scaling down its recruitment efforts and has put in place policies to restrict hiring new VIPKID Teachers from certain jurisdiction including California. [EXHIBIT C-4-5]

290. Although, it is making no effort to expand what is purported to be its primary activity, namely delivering real time, person-to-person, one-on-one English-as-a-second-language sessions, VIPKID is valued at 1.3 billion US dollars as of October 2020. (netimperative, China's most valuable brands grow 12%, http://netimperative.com/2020/10/16/chinas-most-valuable-brands-grow-12-moutai-rises-as-alibaba-dominates/ [accessed Nov. 10, 2020].)

**VIPKID's preferred teaching style, TPR, is well-suited for Development of Artificial Intelligence and Other Technology Capabilities**

291. VIPKID requires its VIPKID Teachers to use a method called "Total Physical

Response," (TPR) a slow, deliberate, and exaggerated style of speaking and gesturing ideal

for recording and capturing human speech and movements for analysis and study.

292. According to the VIPKID Blog:

"'TPR', is a listen-and-respond technique borne out of extensive research into how language
is conveyed. It is a method in which coordinated movements are used to mimic the meaning
of words and concepts." (VIPKID, *TPR and Physical Modeling*, https://blog.vipkid.com/tpr-and-physical-modeling/ [accessed Nov. 10, 2020]) [EXHIBIT E-1]

293. The Blog details further:

"To understand this better, let's look at what Total Physical Response really means: Just like
a good ol' country line dance, the key lies in 2 steps:
Step 1: the teacher engages the student while using their body language to reinforce
understanding. For example, the teacher says "I see you" whilst first pointing at themselves
("I"), then their eyes ("see") and finally at the student ("you"). Simple.
Step 2: the teacher then encourages the student to copy not only the phrase but the actions
too. This is the "response" part.
From the above example, you can see that Total Physical Response occurs because the
teacher uses a full range of physical actions to explain a concept, and the student responds in
kind." (*Id.*) [EXHIBIT E-1]

294. As a part of TPR, the Blog also represents "Classroom Commands" as follows:

"Classroom commands are a type of physical modeling and instead of teaching key concepts,
it allows you to better communicate student expectations. For example, immediately after
you ask a student a question, cupping your hand to your ear in a listening motion helps the
student understand that you are listening for their response. Essentially, you can use
"physical modeling" to show the student how to complete a task." (*Id.*) [EXHIBIT E-1]

295. The use of TPR by VIPKID Teachers makes session recordings useful for development of

artificial intelligence and other technologies.

**VIPKID is developing Sophisticated Artificial Intelligence Capabilities—including**

**high-level facial recognition technologies**

296. This insistence on a slow and physical approach to teaching should be considered in light of the fact that VIPKID has been represented by its founders as far more than just an online English learning platform.

297. According to VIPKID founders, VIPKID is a tech company, and a big data company that is actively using and developing artificial intelligence capabilities. (CGTN, *AI in Education*, https://news.cgtn.com/news/304d444d35454464776c6d636a4e6e62684a4856/share_p.html [accessed Nov. 10, 2020]) [EXHIBIT E-2]

298. Zhang Qi, A VIPKID Founder has been quoted as saying that VIPKID is far more than just an online English learning platform--it is a tech company, and a big data company. (*Id.*) [EXHIBIT E-2]

299. Zhang Yanjing, Vice-President of Technology at VIPKID publicly agreed with this statement, adding that VIPKID has collected tens of millions of hours of students' speaking samples, and have been training their AI model to understand facial expressions. (*Id.*) [EXHIBIT E-2]

300. Zhang Yanjing, continues,

"Interactivity and involvement are crucial in online education. We developed a complicated algorithm to analyze students' eyes and how they move. And we train the model through deep learning. Each student has different ways to express feelings, so the feedback could be very different." (*Id.*) [EXHIBIT E-2]

301. Upon information and belief, VIPKID uses its artillery of tens of thousands of American VIPKID Teachers to inform the development of advanced artificial intelligence capabilities.

302. VIPKID possesses hundreds of millions of hours of footage of American VIPKID Teachers.

42 of 88

303. VIPKID possesses hundreds of millions of hours of footage of American VIPKID Teachers giving very clear, very slow, very discrete, and very simple directions to students as they read from and go through standardized and uniform material.

304. Upon information and belief, VIPKID has amassed recorded materials adequate to create digital teaching robots that look and sound human.

305. Upon information and belief, technology to create digital teaching robots using artificial intelligence technology is already widespread and well-known in China and use of such technology has been advertised by online English-as-a second-language providers. (See the popular Chinese advertisement (below) created by VIPKID competitor Liulishuo to advertise its artificial intelligence-powered online classes)



(YOUTUBE, Liulishuo AI Teacher, https://youtu.be/AuBs954_Rrw [accessed Nov. 16, 2020])

306. Such capabilities would mean that eventually VIPKID would be able to offer an infinite number of sessions with content controlled by them but apparently "taught" by Native-English-Speaking "American" Teachers—all without hiring a single American employee.

43 of 88

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 45 of 132 PageID
#: 53
INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

307. Upon information and belief, VIPKID already uses artificial intelligence-powered digital robots to deliver its basic level sessions.

308. Upon information and belief, VIPKID's artificial intelligence-powered digital robots are designed to resemble white monkeys.

309. Upon information and belief, "white monkey" is that a term used in China to describe foreigners who teach English-as-a-second-language.

310. Upon information and belief, VIPKID is developing capacity in artificial intelligence that will allow the company to increasingly use digital robots to deliver sessions.

311. Upon information and belief, the tens of millions of sessions that VIPKID records, surveils, and supervises, taught largely by American teachers are used to develop and inform VIPKID's artificial intelligence technology.

312. VIPKID has provided VIPKID Teachers with no information about its work in the field of artificial intelligence.

313. VIPKID has provided no information whatsoever on whether it will put the materials and capacities that it is building in this arena to uses other than education in the future.

314. If VIPKID, for example, were to sell its millions and millions of hours of recordings of Americans slowly repeating a constant set of materials, these recordings could easily arrive in the wrong hands.

315. There are no safeguards in place under the current agreements between VIPKID and VIPKID Teachers to ensure that any such material will not be used to further cyber warfare by, for example, tampering with elections by using the same materials to create a YouTube

44 of 88

channel featuring apparently "American" video-bloggers programmed to make deliberately inflammatory remarks.

316. VIPKID understands the power of the materials they possess, particularly VIPKID co-conspirator global giant, Tencent.

317. Tencent has invested millions of US dollars (potentially hundreds of millions) into VIPKID with the specific aim of developing VIPKID's artificial intelligence capabilities.

318. While VIPKID understands the power that it wields it has taken no steps to provide the transparency necessary to ensure its technologies—and particularly materials used to develop this technology—are only used for good and not for evil purposes.

319. In this context, it is a cause of significant concern that VIPKID never clearly identifies "who" or "what" it is.

## V.  PLAINTIFF IS NOT BOUND TO ARBITRATE:

320. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

321. No valid or actionable arbitration agreement exists between VIPKID and Plaintiff.

322. Between 2016 and 2020, VIPKID issued six legal agreements to Plaintiff. ("Agreements")

323. Agreements were produced serially upon termination of the agreement prior, with each stating a term of six months and with each prior agreement superseded by a subsequent agreement leaving only one surviving agreement, or in the alternative, two surviving agreements. [EXHIBIT B]

324. The first agreement had an effective start date of October 10, 2016. ("First Agreement").

325. This agreement was superseded by a second ("Second Agreement"), a "Consulting Contract," with a start date of May 5, 2017. The Second Agreement was superseded by a

45 of 88

third with a start date of November 1, 2017. ("Third Agreement"). The Third Agreement was

then supersede by a fourth contract with a start date of May 1, 2018. ("Fourth Agreement").

[EXHIBIT B-1]

326. The Second, Third, and Fourth Agreements were all identical in form and substance.

("Template A") They were all "governed by and constructed in accordance with the laws of

the state of Delaware," [EXHIBIT B-1 (Section 11, Subsection d)] and "supersede[d] any

prior or contemporaneous oral or written understanding on the subject" [EXHIBIT B

(Section 10, Subsection g)].

327. Template A agreements also included broad language superseding any prior arbitration

agreements, in particular:

"This is the complete Agreement of the parties on the subject of arbitration of disputes. This

Arbitration Agreement supersedes any prior or contemporaneous oral or written

understanding of the subject." [EXHIBIT B-1 (Section 11, Subsection d)]

328. Template A did not include *any* waiver of the right to trial by jury.

329. Plaintiff has not waived his right to a jury under Template A Agreements.

330. Plaintiff approaches this Court to invoke his Seventh Amendment rights to trial by jury of

his peers and that of others similarly situated.

### VIPKID committed fraud in the execution of Template B Agreements

331. Any agreements executed using Template B are invalid and *void ab initio* as they are based

on a false premise:

332. In or around June 2019, VIPKID asked Plaintiff to click on a link to e-sign an agreement

with effective date in July 2020. ("Fifth Document")

46 of 88

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 48 of 132 PageID
#: 56

333. Subsequently, in January 2020, Plaintiff e-signed an agreement with effective date in January 2020. ("Sixth Document")

334. The Fifth and Sixth Documents ("Template B") were not drafted as executed between Plaintiff and VIPKID. [EXHIBIT B-2]

335. Template B agreements were executed between VIPKID and a disclosed independent business enterprise. [EXHIBIT B-2]

336. The Template B agreements were executed "between two co-equal, independent business enterprises that are separately owned and operated." [EXHIBIT B-2 (Section 3, Subsection A)].

337. As drafted by VIPKID, Template B is to be signed by a VIPKID Teacher as agent for a disclosed and non-existent principal—a principal essentially imagined by VIPKID and completely unknown and out of the realm of understanding or imagination of Plaintiff.

338. In Template B, Plaintiff is figured as an agent for this disclosed and imaginary entity.

339. To Plaintiff's knowledge, no such co-equal enterprise exists or has ever existed, nor was Plaintiff ever informed about any obligation under Template B agreements, to establish any such entity.

340. Despite remaining in constant communication with Plaintiff prior to and during the alleged execution of Template B agreements, VIPKID never brought to Plaintiff's notice Template B's novel obligation to establish a business entity.

341. Nor was this obligation evident from the form or language of the Template B Agreements, which merely assumed the existence of two business entities in language framed to sound like legal jargon—and therefore framed to be dismissed by a lay reader.

342. As Template B is based on a false premise, and therefore invalid and *void ab initio,* no agreement could have ever been formed between Plaintiff and VIPKID using any Template B forms.

### Plaintiff has Never Waived his Right to Trial by Jury

343. No language across any of the six agreements so much as suggests that Plaintiff has ever waived his rights to a jury.

344. Plaintiff never waived his rights to a jury trial in any purported agreements with VIPKID.

345. The word "jury" appears in only one clause across all six Agreements, in the phrase "jury trial" in Section 13, Subsection of the Template B, couched in a section titled "Arbitration of Claims:"

"This Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration…and not by way of court or jury trial, or by way of …."

346. The mere reference, in Template B to a "jury trial" (mid-sentence, buried in a sea of legal jargon, and crammed into a clause on arbitration) would not cause a reasonable person to understand that they were waiving their constitutional right to a jury under the Agreement.

347. "Given this context," the phrase is "most plausibly read as an explanation of the rights that the parties are giving up in agreeing to arbitrate disputes, and not as an independently effective waiver of the right to pursue a class action outside the arbitration context." *Meyer v. Kalanick*, 185 F. Supp. 3d 448, 453-54 (S.D.N.Y. 2016) (emphasis in original)

348. Moreover, Plaintiff had never waived his right to a jury trial, in any manner, in any prior course of dealings with VIPKID.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 50 of 132 PageID
#: 58
INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

349. Even if inclusion of the phrase "jury trial" in Template B were found to convey an ambiguous meaning, Plaintiff would still retain his right to a jury as the ambiguity would have to be read against the drafter of the agreement, namely VIPKID.

350. In addition, course of dealings and circumstances leading up to the signing of the Template B Documents also speak to a lack of effective waiver:

351. Plaintiff was never given any occasion or permission to negotiate any contracts, despite his best efforts. Plaintiff was often met with a wall of silence or automated non-responsive emails every time he tired to negotiate. Plaintiff had tried to negotiate with VIPKID back in 2016. This effort was met with clear refusal by VIPKID to negotiate. Subsequently, over the course of years, any and all efforts made by the Plaintiff to negotiate were met with displeasure, silence, or automated non-responsive messages from VIPKID.

352. Further, Plaintiff was not represented by counsel when reviewing any of the agreements presented to him by VIPKID.

353. All in all, Plaintiff had no bargaining power as against VIPKID.

354. Plaintiff also lacked any of the indicia of possessing the kind of "Business Acumen" that New York courts recognize as favorable towards concluding effective waiver under the circumstances. Amongst other things, Plaintiff possess no legal training and has no business experience.

355. The mere inclusion of the phrase "jury trial," in one of several writings, especially given the course of dealings between the parties and the allegations of fraud against VIPKID, does not amount to a waiver of any constitutional right.

**The Arbitration Clauses are an essential part of VIPKID's fraudulent scheme**

49 of 88

356. VIPKID deliberately locked Plaintiff into Arbitration as part of a fraudulent scheme.

357. There was a substantial relationship between VIPKID's arbitration provision and its fraudulent scheme.

358. Plaintiff was locked into not just one but several evolving arbitration clauses as part of the defendants scheme to defraud.

359. Plaintiff was asked to sign six separate agreements in the course of less than four years. The arbitration clause in each agreement was deliberately changed thrice across these six agreements—with the narrow and deliberate intention of insulating VIPKID from any interaction with U.S. Court—particularly the Courts of New York and California.

360. Furthermore, VIPKID's language in its Template B agreements is deliberately ambiguous.

361. In Template B agreements, VIPKID determine the substantive law governing any disputes resolved in arbitration based on "place" of performance. However, in the cyberspace context "place" is an ambiguous concept.

362. Especially when VIPKID Teachers are acting *pro se*, deliberate ambiguities in the contract have allowed VIPKID to resolve dispute in arbitration under the substantive law most beneficial to VIPKID's interests.

363. Deliberate ambiguities in Template B agreements are specifically designed to ensure that the lawful claims of American citizens, ostensibly living abroad, never see the light of day.

364. Under Template A agreements, this same secrecy was accomplished by using JAMS, Inc. ("JAMS") as the forum for dispute resolution. JAMS and other forums are in the practice of enforcing binding and non-negotiable confidentiality requirement. By forcing mistreated employees into confidential arbitration, including with forums such as JAMS, Defendant

50 of 88

aims at achieving its ultimate goal of concealing its fraudulent behavior toward its employees.

365. In confidential arbitration, mistreatment of VIPKID employees is shielded from the public eye.

366. This helps VIPKID ensure that key facts that could unravel its fraudulently positive and philanthropic public image do not collect in the public eye.

367. Hence, there is a substantial relationship between the constantly changing language across VIPKID's Agreements, the confidentiality requirement implicit in arbitration clauses, and the fraudulent scheme of the Defendant who uses the arbitration clause to conceal fraudulent claims.

368. In addition, the significant alterations to the arbitration clauses during the course of the several contracts were not communicated to Plaintiff by VIPKID.

369. This lack of notice shows an intention on the part of VIPKID to force Plaintiff into arbitration proceedings that are more favorable to VIPKID.

370. Due to these surprising modifications of Plaintiff's options to seek legal protection, the fraudulent scheme of inducing Plaintiff into a fraudulent contract is furthered significantly.

371. These facts attest that the agreement was not the result of an arm's length negotiation and that the arbitration clause was inserted into the contract to accomplish a fraudulent scheme.

## VI. **PLAINTIFF Should be granted the RIGHT TO CLASS OR COLLECTIVE ACTION**

372. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

373. Template A was superseded by Template B and Template B is "*void ab initio.*"

374. Therefore, no agreement binds VIPKID (jointly or severally) and VIPKID Teachers.

375. Under Template B documents, "disputes regarding the validity, enforceability, revocability, conscionability, scope or breach of the Class Action may be resolved only by a court and not by an arbitrator." [EXHIBIT B]

376. A class or collective action is appropriate because it would allow the full extent of VIPKID's fraud to be revealed through facts alleged together in a single action in front of a single judge and upon a singular record.

377. Requiring Plaintiff and/or VIPKID Teachers to waive their class and collective action rights would further VIPKID's scheme of fraud.

## CLASS ACTION ALLEGATIONS

378. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

379. Plaintiff brings the below-detailed causes of action under Section 901 of the New York Stat Civil Practice Law Rules (CPLR § 901), on behalf of himself and a class of persons, pending any modifications necessitated by discovery, preliminarily defined as:

All current and former VIPKID Teachers. ("VIPKID Class")

380. Excluded from the VIPKID Class are Defendants, Defendant's legal representatives, officers, directors, assigns, and successors or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any members of the Judges' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the VIPKID Class.

381. The members of the VIPKID Class are so numerous that joinder of all members is impracticable.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 54 of 132 PageID
#: 62
INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

382. Upon information and belief, the size of the VIPKID Class is over 100,000 individuals. The facts on which the calculation of the precise number of VIPKID Teachers depends are presently within the sole control of VIPKID.

383. VIPKID has acted or has refused to act on grounds generally applicable to the VIPKID Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the VIPKID Class, as a whole.

384. Common questions of law and fact exist as to the VIPKID Class that predominate over any questions only affecting them individually and include, but are not limited to, the following:

   (a) whether VIPKID committed fraud-in-the-inducement to induce prospective job applicants to work as VIPKID Teachers;

   (b) whether VIPKID perpetuated that fraud through the course of the employment of each and every VIPKID Teacher;

   (c) whether VIPKID engaged in unfair or deceptive practices and policies that caused harm and/or injury to the VIPKID Teachers;

   (d) whether the activities of VIPKID constitute a conspiracy entered into to defraud VIPKID Teachers;

   (e) whether VIPKID violated the privacy rights of VIPKID Teachers through misuse portraits, pictures, images and/or voices of VIPKID Teachers

   (f) the nature and extent of class-wide injury and the measure of damages for those injuries.

385. The claim or defenses of the representative parties are typical or the claims or defenses of the VIPKID class.

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 55 of 132 PageID #: 63

386. Plaintiff will fairly and adequately represent and protect the interests of the members of the VIPKID Class:

(i) Plaintiff and all of the VIPKID Class members work, or have worked, for VIPKID as VIPKID Teachers on the VIPKid Teaching Platform.

(ii) Plaintiff and all of the VIPKID Class members were all recruited to be VIPKID Teachers using the VIPKID Website.

(iii) Plaintiff and all of the VIPKID Class members were recruited, hired, retained and/or terminated under the same practices and policies.

(iv) Plaintiff and all of the VIPKID Class members were subject to the same kinds of treatment through out their engagement with VIPKID

(v) Plaintiffs and the VIPKID Class members have all been injured due to Defendant's common policies, practices and patterns of conduct.

(vi) Plaintiff understands that as class representative, he assume a fiduciary responsibility to the class to represent its interests fairly and adequately.

(vii) Plaintiff recognizes that as class representatives, he must represent and consider the interests of the class just as they would represent and consider their own interests.

(viii) Plaintiff understands that in decisions regarding the conduct of litigations and its possible settlement he must not favor his own interests over the class.

(ix) Plaintiffs recognize that any resolution of a class action must be in the best interest of the class.

(x) Plaintiffs understand that in order to provide adequate representation, they must be informed of developments in litigation, cooperate with class counsel, and testify a deposition and/or trial.

(xi) VIPKID's unlawful conduct, as described in this Class Action Complaint, is pursuant to corporate policy and practice.

(xii) The members of the VIPKID Class have been damaged and are entitle to recovery as a result of VIPKID's violations, as well as common and uniform policies, practices, and procedures.

(xiii) Plaintiff and the VIPKID Class perform or performed the same primary duties.

(xiv) VIPKID's unlawful conduct has been widespread, repeated, and consistent

387. A class action is, therefore, superior to other methods available for the fair and efficient adjudication of the controversy.

388. Absent a class action, the members of the Class likely will not obtain redress of their injuries, and Defendants will retain the proceeds of their violations. Plaintiffs and other members of the VIPKID Class have suffered damages as a result of VIPKID's wrongful conduct.

389. Because of VIPKID's deliberate fraud and concerted efforts to deny VIPKID's access to fair remedy few, if any members of the Class would be likely to seek legal redress for the wrongs complained of herein.

390. The individual Plaintiffs lack the financial resources to conduct a thorough examination of VIPKID and to prosecute vigorously a lawsuit against VIPKID to recover such damages.

391. In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

392. This action is properly maintainable as a class action under New York State Practice Law Rule 2019. (CPLR § 901)

### **FIRST CAUSE OF ACTION: FRAUD-IN-THE-INDUCEMENT**

393. The named Plaintiff asserts his claim on behalf of himself and the VIPKID Class.

394. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

### **VIPKID Made Material Misrepresentations and Omissions of Presently Existing and Past Facts:**

395. On its Website, VIPKID made misrepresentations and omissions of presently existing and past facts include but not limited to the following:

(i) "What we do: 1-on-1 full immersion language and content classes based on the US Common Core State Standards." [EXHIBIT C-4-3]

(ii) "VIPKID's mission is to provide the international elementary school experience to Chinese children—all from the comfort of their homes. VIPKID provides one-on-one, fully immersive lessons in its online classroom. VIPKID's curriculum is proprietary and aligned to the U.S. Common Core State Standards." [EXHIBIT C-4-3]

(iii) "Set Your Own Schedule Work when you want, where you want - with no commitment or minimum hours." [EXHIBIT C-4-4]

(iv) "Flexible Hours There's no minimum hour commitment. You can teach as many hours as you'd like to. Remember, you're in the driver seat." [EXHIBIT C-4-4]

(v) "Our one-on-one English classes mean more learning (awesome) and less distraction (also awesome)." [EXHIBIT C-4-5]

(vi) "We pride ourselves in finding educators in the U.S and Canada who are knowledgeable, passionate, and ready to make an impact." [EXHIBIT C-4-5]

(vii) "We provide the curriculum, and they teach English online on their own schedule." [EXHIBIT C-4-5]

(viii) "Teach with VIPKid. Work When and Where You Want." [EXHIBIT C-4-5]

(ix) "Join the Largest Global Teaching Community" [EXHIBIT C-4-5]

(x) "Become a Teacher" [EXHIBIT C-4-5]

(xi) "Get Paid Per Class Your earnings are based on the number of classes you teach. The more classes you teach, the more you can earn. There is no limit." [EXHIBIT C-4-5]

56 of 88

(xii)"From teaching more classes to referrals, there are lots of opportunities to earn extra. In general, with incentives, a teacher can earn the equivalent of $14-22 per hour with VIPKid." [EXHIBIT C-4-5]

(xiii)"Perks Like Nowhere Else Once you become a teacher, you also get to enjoy community perks from partners like Amazon, TurboTax, ClassPass, and more. Just another reason to teach with VIPKid." [EXHIBIT C-4-5]

(xiv)"Earnings are calculated based on the number of classes you've taught and your base pay rate per class, which is $7-9 per class. Since classes are 25-minutes each, you can earn the equivalent of $14-18 per hour." [EXHIBIT C-4-5]

(xv)"How are base pay rates determined? The base pay is based on various factors, such as experience, the demo lesson, and the qualifications of the teacher." [EXHIBIT C-4-5]

(xvi)"How long is the contract? Can I take breaks during the contract? VIPKid signs 6-month contracts with teachers, and you can work as much or as little as you'd like." [EXHIBIT C-4-5]

(xvii)"As independent contractors, you are responsible for …" [EXHIBIT C-4-5]

(xviii)"25-minute Classes You teach per class. Each class is 25-minutes of active teaching time." [EXHIBIT C-4-5]

(xix)"Your Own Schedule: Set your teaching availability in advance in the VIPKid Teach App. If you change your mind on your schedule, don't worry, just give us a heads up." [EXHIBIT C-4-5]

(xx)"What kind of commitment is there? There is no commitment - you can work as much or as little as you'd like." [EXHIBIT C-4-5]

(xxi)"Can I take a break or go on vacation? Yes, you can! The world is your oyster and flexibility is one of the best perks when teaching with VIPKid. Just make sure to change your slot availability accordingly." [EXHIBIT C-4-5]

(xxii)"Is there a maximum number of hours a teacher could teach? VIPKid sets no limit on how much a teacher can teach - you have 100% control over your schedule." [EXHIBIT C-4-5]

(xxiii)"VIPKid teachers are ambassadors and mentors, bridging cultures across the globe while forming deep connections with their students." (VIPKID, Time to Celebrate: VIPKid Turns 7, https://blog.vipkid.com/vipkid-celebrates-its-7th-birthday/ [accessed Nov. 10, 2020])

**VIPKID Intended to Make Material Misrepresentations and Omissions of Presently**

**Existing and Past Facts:**

396.VIPKID misrepresentations and omissions were material by design and were made as a part

of a deliberate marketing strategy implemented by VIPKID to induce American job

applicants, including Plaintiff, into working as VIPKID Teachers.

397. VIPKID made these misrepresentations and omissions with the deliberate intention of fraudulently inducing job applicants into agreeing to work as VIPKID Teachers.

398. In the alternative, VIPKID misrepresentations and omissions were made with reckless disregard for the truth.

399. VIPKID represents its Website as the hub of VIPKID's recruiting efforts.

400. The Website is a site that prospective applicants must access in order to apply for a position as a VIPKID Teacher.

401. The Website is also the place where VIPKID Teachers are interviewed and hired.

402. VIPKID had special and exclusive knowledge about the terms, conditions, and benefits associate with becoming a VIPKID Teacher.

403. All materials on the Website were published and authored exclusively by VIPKID and VIPKID exerts complete control over the content and appearance of its Website.

404. From the start, VIPKID knew that the job of a VIPKID Teacher, as advertised, was nothing like the job in reality because VIPKID had exclusive control over both the Website and the terms and conditions of the VIPKID Teacher job.

405. VIPKID was made aware of the realities of working as a VIPKID Teacher, as follows:

(i) VIPKID has received complaints about its unlawful wage and labor practices from its teachers.

(ii) VIPKID has received complaints about its mistreatment of its VIPKID Teachers from its VIPKID Teachers.

(iii) VIPKID has received complaints about racial discrimination against VIPKID Teachers from its VIPKID Teachers.

(iv) VIPKID has received complaints about its practices and policies governing its treatment of VIPKID Teachers from its VIPKID Teachers.

406. Despite receiving complaints about its misrepresentations and significant omissions, VIPKID has never taken steps to address the gaps between VIPKID's misrepresentations about being a VIPKID Teacher and the reality of the job.

407. To the contrary, after receiving such complaints, VIPKID doubled down on its fraudulent representations—creating an even more aggressive communications campaign in or around 2018.

408. Upon information and belief, in, around, and/or before 2018, VIPKID received a series of complaints from VIPKID Teachers of color about racial discrimination occurring on the VIPKID Platform.

409. In 2018, in response, VIPKID hired a professional marketing team to update its North American Website to make VIPKID *seem* more inclusive simply by adding more images of people of color to its North American Website. (VIPKID, *VIPKid Has A New Look!*, https://blog.vipkid.com/vipkid-has-a-new-look/ [accessed Nov. 10, 2020]) [EXHIBIT A]

410. Upon information and belief, VIPKID never took any other steps to address or investigate the complaints of racial discrimination on the VIPKID Teaching Platform.

411. By contrast, VIPKID's Chinese website was being gradually changed in a way that added more images of white VIPKID Teachers, especially white males. (VIPKID, www.vipkid.com.cn, [accessed Nov. 10, 2020])

**Plaintiff reasonably relied on VIPKID's material misrepresentations and omissions in deciding to agree to work for VIPKID:**

59 of 88

412. Plaintiff reasonably relied on VIPKID's material misrepresentations and omissions in deciding to work as a VIPKID Teacher.

413. In so relying on VIPKID's representations on its Website, Plaintiff acted as every single human being who has looked for, found, and/or accepted a job—and VIPKID acted as no employer ever should.

414. VIPKID's website and related promotional materials serve as the main source of information about "what working for VIPKID looks like." (VIPKID, *Have questions? We have answers:Teachers-What does teaching with VIPKID look like?*, https://www.vipkid.com/mkt/faq/becoming-teacher [accessed Nov. 10, 2020])

415. Plaintiff was not being sold beach front property in Arizona when offered a job as a VIPKID Teacher. VIPKID's representations did not constitute some brazen and obvious dupe.

416. VIPKID's fraud was sophisticated and all-encompassing.

417. Plaintiff learned, from the official Website of what is now one of the world's biggest online education companies, that it, VIPKID, was looking to hire talented people to grow their community of international and sophisticated teachers teaching on the global stage.

418. Plaintiff learned from VIPKID that VIPKID promised freedom and flexibility and competitive wages in exchange for support, community and the opportunity for professional development.

419. These representations were well within the realm of what might have been possible—if what VIPKID represented was truly what it had intended.

420. Thus, Plaintiff reasonably relied on VIPKID's material misrepresentations and omissions in deciding to work as a VIPKID Teacher

**VIPKID's Misrepresentations and Omissions of Material Facts Damaged Plaintiff:**

421. VIPKID's misrepresentations and omissions of material facts damaged Plaintiff, directly

causing economic and non-economic damage to Plaintiff, including but not limited to lost

wages, pain and suffering, loss of enjoyment of life.

422. The nature and the full extent of these damages will be established through trial.

## SECOND CAUSE OF ACTION: COMMON LAW FRAUD

**VIPKID Committed Material False Representations and Acts of Concealment:**

423. The named Plaintiff asserts his claim on behalf of himself and the VIPKID Class.

424. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

425. On its Website, VIPKID committed material false representation and acts of concealment

including but not limited to the following:

- (i)  "What we do: 1-on-1 full immersion language and content classes based on the US Common Core State Standards." [EXHIBIT C-4-3]
- (ii) "Set Your Own Schedule Work when you want, where you want - with no commitment or minimum hours." [EXHIBIT C-4-4]
- (iii) "Flexible Hours There's no minimum hour commitment. You can teach as many hours as you'd like to. Remember, you're in the driver seat." [EXHIBIT C-4-4]
- (iv) "Our one-on-one English classes mean more learning (awesome) and less distraction (also awesome)." [EXHIBIT C-4-5]
- (v)  "We pride ourselves in finding educators in the U.S and Canada who are knowledgeable, passionate, and ready to make an impact." [EXHIBIT C-4-5]
- (vi) "We provide the curriculum, and they teach English online on their own schedule." [EXHIBIT C-4-5]
- (vii) "Teach with VIPKid. Work When and Where You Want." [EXHIBIT C-4-5]
- (viii) "Join the Largest Global Teaching Community" [EXHIBIT C-4-5]
- (ix) "Become a Teacher" [EXHIBIT C-4-5]
- (x)  "Get Paid Per Class Your earnings are based on the number of classes you teach. The more classes you teach, the more you can earn. There is no limit." [EXHIBIT C-4-5]
- (xi) "From teaching more classes to referrals, there are lots of opportunities to earn extra. In general, with incentives, a teacher can earn the equivalent of $14-22 per hour with VIPKid." [EXHIBIT C-4-5]

61 of 88

(xii) "Perks Like Nowhere Else Once you become a teacher, you also get to enjoy community perks from partners like Amazon, TurboTax, ClassPass, and more. Just another reason to teach with VIPKid." [EXHIBIT C-4-5]

(xiii) "Earnings are calculated based on the number of classes you've taught and your base pay rate per class, which is $7-9 per class. Since classes are 25-minutes each, you can earn the equivalent of $14-18 per hour." [EXHIBIT C-4-5]

(xiv) "How are base pay rates determined? The base pay is based on various factors, such as experience, the demo lesson, and the qualifications of the teacher." [EXHIBIT C-4-5]

(xv) "How long is the contract? Can I take breaks during the contract? VIPKid signs 6-month contracts with teachers, and you can work as much or as little as you'd like." [EXHIBIT C-4-5]

(xvi) "As independent contractors, you are responsible for …" [EXHIBIT C-4-5]

(xvii) "25-minute Classes You teach per class. Each class is 25-minutes of active teaching time." [EXHIBIT C-4-5]

(xviii) "Your Own Schedule Set your teaching availability in advance in the VIPKid Teach App. If you change your mind on your schedule, don't worry, just give us a heads up." [EXHIBIT C-4-5]

(xix) "What kind of commitment is there? There is no commitment - you can work as much or as little as you'd like." [EXHIBIT C-4-5]

(xx) "Can I take a break or go on vacation? Yes, you can! The world is your oyster and flexibility is one of the best perks when teaching with VIPKid. Just make sure to change your slot availability accordingly." [EXHIBIT C-4-5]

(xxi) "Is there a maximum number of hours a teacher could teach? VIPKid sets no limit on how much a teacher can teach - you have 100% control over your schedule." [EXHIBIT C-4-5]

(xxii) "VIPKid teachers are ambassadors and mentors, bridging cultures across the globe while forming deep connections with their students." (VIPKID, Time to Celebrate: VIPKid Turns 7, https://blog.vipkid.com/vipkid-celebrates-its-7th-birthday/ [accessed Nov. 10, 2020])

**VIPKID Knowingly Committed Material False Representations and Acts of**

**Concealment with intent to Defraud Plaintiff:**

426. VIPKID material false representations and acts of concealment were material by design, a part of a deliberate retention strategy to retain and grow its cohort of North American VIPKID Teachers. [EXHIBIT A]

427. VIPKID issued these misrepresentations through constant email communications with individual VIPKID Teachers and as circulated to the entire VIPKID community, through

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 64 of 132 PageID #: 72

updates and redesigns of the VIPKID Website and through high profile events and interviews featuring VIPKID Founders.

428. The image of the VIPKID Teacher presented by VIPKID was designed independently from the actual terms, conditions, and realities of the job.

429. From the start, VIPKID knew that the job as advertised was nothing like the job as practiced because VIPKID had exclusive control over both the Website and the terms and conditions of the VIPKID job.

430. VIPKID was made aware of the realities of working as a VIPKID Teacher, as follows:

(i) VIPKID has received complaints about its unlawful wage and labor practices from its teachers.

(ii) VIPKID has received complaints about its mistreatment of its VIPKID Teachers from its VIPKID Teachers.

(iii) VIPKID has received complaints about racial discrimination against VIPKID Teachers from its VIPKID Teachers.

(iv) VIPKID has received complaints about its practices and policies governing its treatment of VIPKID Teachers from its VIPKID Teachers.

431. Despite such copious complaints about VIPKID's misrepresentations and significant omissions, VIPKID has never taken steps to ensure that the representations on its Website about the experience of working as a VIPKID Teacher, reflect the reality of the job.

432. Despite receiving complaints about VIPKID's misrepresentations and significant omissions, VIPKID has never taken steps to address the gaps between VIPKID's representations about being a VIPKID Teacher and the reality of the job.

63 of 88

433. To the contrary, after receiving such complaints, VIPKID doubled down on its fraudulent representations—creating an even more aggressive communications campaign in or around 2018.

434. Upon information and belief, in, around, and/or before 2018, VIPKID received a series of complaints from VIPKID Teachers of color about racial discrimination occurring on the VIPKID Platform.

435. In 2018, in response, VIPKID hired a professional marketing team to update its North American Website to make VIPKID *seem* more inclusive simply by adding more images of people of color to its North American Website. (VIPKID, *VIPKid Has A New Look!*, https://blog.vipkid.com/vipkid-has-a-new-look/ [accessed Nov. 10, 2020]) [EXHIBIT A]

436. Upon information and belief, VIPKID never took any other steps to address or investigate the complaints of racial discrimination on the VIPKID Teaching Platform.

437. By contrast, VIPKID's Chinese website was being gradually changed in a way that added more images of white VIPKID Teachers, especially white males.

**Plaintiff justifiably relied on VIPKID's Material False Representations and Acts of Concealment:**

438. Plaintiff justifiably relied on VIPKID's material misrepresentations and omissions in deciding to continue to be a VIPKID Teacher

439. In so relying on VIPKID's representations, Plaintiff acted as every single human being who has had and who has tried to hold on to a job—and VIPKID acted as no employer ever should.

64 of 88

440. Plaintiff relied on information about his job and how to best do his job that was given to him
by his employer (by and through VIPKID agents)—one of the world's biggest online
education companies.

441. VIPKID's misrepresentations were well within the realm of what the company could have
delivered—had it invested in the necessary infrastructure and resources.

442. However, VIPKID has never taken a single step to turn their false and fraudulent
misrepresentations and deliberate omissions into any semblance of reality.

**Plaintiff suffered injury as a result of Plaintiff's reliance on VIPKID's Material**
**False Representations and Acts of Concealment:**

443. Plaintiff suffered injury as a result of VIPKID's false misrepresentation and a material
omission of fact. Plaintiff suffered economic and non-economic injury over the course of
nearly four years of working for VIPKID, which includes economic injury as well as non-
economic injury including mental anguish, humiliation, and pain and suffering.

444. The nature and the full extent of these injuries will be established through trial.

### THIRD CAUSE OF ACTION: VIOLATION OF N.Y. GEN. BUS. LAW § 349

445. The named Plaintiff asserts his claim on behalf of himself and the VIPKID Class.

446. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

447. Plaintiff is a person who has suffered actual injury by reason of a violation of N.Y. Gen. Bus.
Law § 349, which declares unlawful deceptive acts or practices in the conduct of any
business, trade or commerce or in the furnishing of any service in this state.

448. VIPKID is a business or commerce that furnishes services from within the state of New
York.

449. VIPKID has engaged in unlawful and deceptive consumer-oriented acts or practices in the conduct of its business, including running false and/or misleading statewide and national advertising campaigns directed at the public.

450. VIPKID has used these campaigns to unfairly and deceptively misrepresent its products and services so as to falsely differentiate themselves from their competition (for example, deceptively misrepresenting that VIPKID offers different or better English-as-a-second language sessions because VIPKID works with high-quality and well-supported "Teachers" in the industry).

451. VIPKID's conduct was deceptive and "likely to mislead a reasonable consumer acting reasonably under the circumstances." See *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000); *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003).

452. VIPKID's unfair deception allowed VIPKID to gain dominance in the remote/online English-as-a-second-language sector.

453. This dominance allowed VIPKID to perpetuate its illegal unfair employment practices against VIPKID Teachers and pay VIPKID Teachers less than what would get in a competitive market.

454. Plaintiff, other businesses, and members of the general public reasonably relied on VIPKID's false and/or misleading statewide and national advertising campaigns, taking various steps including investing time, energy, personal funds and/or other value or benefit, directly or indirectly, into VIPKID.

455. For example, Plaintiff and others similarly situated bought merchandise from VIPKID and/or donated to or volunteered for VIPKID's non-profit corporation, VIPTeach.

456. VIPKID's deceptive acts and practices caused actual injury to Plaintiff. These injuries include economic injuries and non-economic injuries which resulted from the manner in which VIPKID's unlawful conduct damaged and damages Plaintiff's position, well-being, worth and self-worth.

457. The nature and the full extent of these injuries will be established through trial.

### **FOURTH CAUSE OF ACTION: VIOLATIONS OF NY CIVIL RIGHTS LAW §§ 50–51**

458. The named Plaintiff asserts his claim on behalf of himself and the VIPKID Class.

459. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

460. Upon information and belief, VIPKID has been using VIPKID Teacher names, portraits, pictures, images, and/or voices to develop, enhance, or inform its artificial intelligence technology.

461. VIPKID has publicly admitted to "collecting tens of millions of hours of students' speaking samples [to]…train[…] their AI model to understand facial expressions."

462. Plaintiff alleges that along with this activity, VIPKID has similarly collected tens of millions of hours of portraits, pictures, images, and/or voices of VIPKID Teachers to benefit the development of its artificial intelligence for the purposes of trade—without the knowledge or consent of any VIPKID Teachers.

463. By developing artificial intelligence capabilities in this way, VIPKID has drawn trade to the firm.

464. VIPKID has succeeded in drawing trade to the firm in this way by offering English-as-a-second language sessions taught using artificial intelligence as a replacement for live instruction.

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 69 of 132 PageID
#: 77

Future Technology Co., Ltd; Tencent Holdings Limited; Cloud & Smart Industries at Tencent Holdings Ltd.; China Renaissance Securities; Sequoia Capital Operations LLC; VIPKID HK Limited; VIPKID Class HK Limited; VIPTeach and other unknown entities and/or persons. (the "Conspirators")

473. The Conspirators entered into a conspiracy to defraud all VIPKID Teachers, including Plaintiff.

474. And/or the Conspirators entered into a conspiracy to violate Plaintiff's civil rights.

475. VIPKID committed various overt acts in furtherance of this conspiracy, including:

(i) Establishing VIPKID—an entity that falsely claims to "make education more accessible by connecting students and teachers around the world" in order to create a false image that it is a company with benign and philanthropic aims. The creation of VIPKID as a separate legal entity was an integral part of the implementation or execution of this conspiracy to defraud VIPKID Teachers such as Plaintiff and other people;

(ii) Trading/engaging in commerce using the false image of the existence of VIPKID Teacher jobs as professional teaching job that allow current and/or aspiring teachers to join the "largest global teaching community" to benefit from professional development opportunities, including by generating investments and other benefits as a result;

(iii) Publishing an English-language Website and other statements, communications, and materials dedicated entirely to the perpetuation of the fraudulent image of VIPKID and VIPKID Teachers;

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1

Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 71 of 132 PageID
#: 79

INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

(iv) Defrauding New Yorkers and other Americans into working for VIPKID in the United States, as well as defrauding them into continuing to work for VIPKID as VIPKID Teachers over the course of months and years; and

(v) Concealing VIPKID's use of recordings, images of VIPKID Teachers to create and develop artificial intelligence technology.

476. The Conspirators, jointly, severally, and intentionally participated in the furtherance of this plan and/or purpose by:

   (i) Continuing to fund VIPKID

   (ii) Continuing to publicize VIPKID

   (iii) Continuing to publicize the false image of the purpose and activities of VIPKID

   (iv) Continuing to publicize the false image of the purpose and activities of VIPKID Teachers

   (v) Continuing to hire VIPKID Teachers

   (vi) Establishing VIPTeach

477. As the intended victim of this conspiracy, Plaintiff suffered actual injury as a result of this conspiracy. Plaintiff suffered economic and non-economic injury, including humiliation, anxiety, and pain and suffering.

478. The nature and the full extent of these damages and harms will be established through trial.

## SIXTH CAUSE OF ACTION: UNJUST ENRICHMENT

479. The named Plaintiff asserts his claim on behalf of himself and the VIPKID Class.

480. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

70 of 88

481. VIPKID was unjustly enriched at the expense of Plaintiff by using Plaintiffs image and likeness to develop technologies, including artificial intelligence technologies—without Plaintiff's knowledge or consent.

482. It is against equity and good conscience to permit VIPKID to retain profit related to Plaintiff's service at Plaintiff's expense because VIPKID illicitly obtained and used images of Plaintiff to further undisclosed ends.

483. VIPKID owes Plaintiffs damages in law and equity, and/or must be disgraced from his ill-gotten gains.

## COLLECTIVE ACTION ALLEGATIONS

484. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

485. Pending any modifications necessitated by discovery, the named Plaintiff preliminarily defines the following classes:

All current and former VIPKID Teachers ("VIPKID Collective")

486. Plaintiff brings the below-detailed FLSA and NYLL Causes of Action on behalf of himself and the VIPKID Collective.

487. All members of the VIPKID Collective were subject to the same polices and practices alleged herein, including being misclassified as independent contractors.

488. The Relief sought by the Plaintiff is typical of the relief that would be sought by each member of the Collective or subclass in separate actions.

489. The Plaintiff and members of the collective have sustained similar injuries and damages as a result of VIPKID's unlawful acts and/or omissions.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM     INDEX NO. 613283/2020

NYSCEF DOC. NO. 1    Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 73 of 132 PageID   RECEIVED NYSCEF: 11/18/2020

#: 81

490. As a part of its regular business practice, VIPKID has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA and NYLL with respect to Plaintiff and the VIPKID Collective. This policy and pattern or practice includes, but is not limited to VIPKID's:

(a) Failure to correctly compensate with minimum wages for all of the hours they worked;

(b) Failure to pay for hours worked in excess of 40 hours per workweek and due spread-of-hours pay;

(c) Failure to correctly count hours

(d) Failure to provide required rest and meal periods

(e) Practice of making unlawful deductions to wages.

(f) Failure to duly distribute tips and/or service charges from the Plaintiff and the VIPKID

(g) Failure to keep true and accurate records as required by law;

(h) Failure to furnish Plaintiff and the VIPKID Collective with an accurate statement of wages, hours worked, rates paid, gross wages, and any allowances as required by law;

(i) VIPKID's unlawful conduct, as described in this Class Action Complaint, is pursuant to a corporate policy or practice.

491. All of the work that Plaintiff and the VIPKID Collective have performed has been assigned by VIPKID on behalf of VIPKID and/or "its parents, subsidiaries, representatives, and affiliates" who have all been aware of all of the work that Plaintiff and the VIPKID Collective have performed.

492. VIPKID is aware or should have been aware that federal law requires them to pay Plaintiff's and the VIP Collective minimum wage for all of the hours they worked.

72 of 88

493. VIPKID is aware or should have been aware that federal law requires them to pay Plaintiff's and the VIP Collective for hours worked in excess of 40 hours per week.

494. Plaintiff and Members of the VIPKID Collective are similarly situated as they share the same exact employment relationship with VIPKID.

495. VIPKID's unlawful conduct has been widespread, repeated, and consistent.

496. There are many similarly situated current and former VIPKID Teachers who have been denied minimum wage and overtime compensation in violation of the FLSA and the NYLL who benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

497. This notice should be sent to the VIPKID Collective pursuant to 29 U.S.C. § 216(b) and NY Labor Law § 162 et. seq.

498. Those similarly situated employees are known to VIPKIDs, are readily identifiable, and can be located through VIPKID's records.

499. In recognition of the services members of the VIPKID Collective have and will continue to render, Plaintiff will request payment of a service award upon resolution of this action.

## SEVENTH CAUSE OF ACTION: BREACH OF THE FAIR LABOR STANDARD ACT (FLSA) 28 U.S.C. §§ 201 ET SEQ

500. Plaintiff brings the below-detailed FLSA Causes of Action on behalf of himself and the VIPKID Collective.

501. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

502. During all times relevant to this action, Plaintiff and the VIPKID Collective were employed by VIPKID, as defined by 29 U.S.C. § 203(e).

503. During all times relevant to this action, the named Plaintiff and the VIPKID Collective were employed by VIPKID, an employer, as defined by 29 U.S.C. § 203(d).

504. VIPKID is an enterprise engaged in interstate commerce that has employees engaged in commerce within the meaning of 29 U.S.C. § 203(s)(i).

505. During all times relevant to this action, Plaintiff and the VIPKID Collective were employed by VIPKID and were engaged in commerce as defined broadly under 29 USC § 203(b).

506. VIPKID has a total annual gross revenue in excess of $500,000.

507. VIPKID's unlawful conduct, as described in this Complaint, has been willful and intentional.

508. VIPKID was aware or should have been aware that the practices described in this Complaint were unlawful.

509. VIPKID has not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff and the members of the VIPKID Collective.

510. In fact, VIPKID has made deliberate efforts to evade and avoid the requirements of the FLSA, including by making it a policy of refusing to hire workers in states where such evasion is more likely to be detected.

511. As a result of VIPKID's violations of the FLSA, Plaintiff and the members of the VIPKid Collective have suffered damages under the FLSA in amounts to be determined at trial and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

512. Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

513. Upon information and belief, VIPKID has a single policy and practice on counting hours of employment and this policy and practice was applied to all VIPKID Teachers.

514. Resultantly, VIPKID willfully and deliberately undercounted not only Plaintiff's hours but the hours of all VIPKID Teachers.

### Failure to Pay Minimum Wages. 29 U.S.C. § 206.

515. VIPKID willfully and deliberately failed and fails to pay its employees, current and former, including Plaintiff and the VIPKID Collective, minimum wage for all hours and premium overtime wage for hours that they worked in excess of 40 hours per workweek.

516. Plaintiff was not performing his services in a workplace within a foreign country.

517. Plaintiff and all members of the VIPKID Collective have never had recourse to any workplace and have always worked from their homes as employees legally permitted to work in the United States.

### Deliberate Undercounting of Hours Worked.

518. VIPKID willfully and deliberately undercounted Plaintiff's hours, including time spent getting specially certified to teach specific VIPKID sessions, time spent writing mandatory detailed reports, time spent procuring and setting up materials for sessions, time spent repairing essential tools required for performance under the contract, time spent interacting with and responding to support services, time spent completing various administrative and recording tasks, and time spent in preparation for sessions.

519. VIPKID's refusal to count all such activities, separately and cumulatively, stood to directly reduce Plaintiff's wages and earnings.

### Uncounted Meeting and Training Time.

Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 77 of 132 PageID #: 85

520. VIPKID never paid VIPKID Teachers for any time spent in meetings or any times spent training.

521. VIPKID does not organize formal meetings. Instead, VIPKID handles all administrative work through "meetings" conducted via email or chat.

522. VIPKID Teachers were never paid for any of the time they spent participating in meetings conducted via email or chat.

523. VIPKID deliberately and willfully implemented a scheme to train prospective VIPKID Teachers without paying them for their time spent in training, prior to and through the course of employment.

### On-Duty Waiting Time

524. Plaintiff was engaged to be on-call for short-notice bookings. Short-notice bookings were any bookings that were made for classes scheduled to take place within 24 hours and with at least one hour's notice.

525. However, Plaintiff was never paid for his time spent waiting to teach.

### Suffered or Permitted Unpaid Work

526. Plaintiff was not paid for any work that he did for the benefit of VIPKID, outside 25 of the minutes he spent teaching classes that usually lasted closer to thirty minutes.

527. Employers are permitted to establish rules for employees regarding working only during scheduled hours and are encouraged to enforce those rules consistently to ensure compliance. To the contrary, VIPKID deliberately structured Plaintiff's work and his working conditions and the technology he used to maximize the potential for his being required to do unpaid work.

**Rest and meal periods.**

528. VIPKID's scheduling policies, practices, and softwares deliberately forced VIPKID Teachers to work non-stop for as long as they possibly could.

**Illegal Deductions.**

529. VIPKID made unpredictable, and unjustified deductions from Plaintiff's earnings.

530. Moreover, Plaintiff was charged unlawful liquidation damages.

531. Further, upon termination of Plaintiff's employment with VIPKID, VIPKID intentionally and unlawfully made significant deductions from pay owed to Plaintiff in his final paycheck.

532. Upon information and belief, VIPKID made similar deductions from many other VIPKID Teachers in the final paychecks.

**Maximum Hours**

533. VIPKID has failed to pay Plaintiff and the members of the VIPKid Collective additional or higher wages due as a result of their spread of hours, including overtime wages for all of the hours that they worked in excess of 40 hours in a work week.

**Tips. (29 U.S.C. § 203(m)(b))**

534. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

535. If VIPKID is gaining additional tips, gratuities, or benefits as a result of VIPKID Teacher services performed for VIPKID, VIPKID has not permitted Plaintiff and the members of the VIPKID Collective to access or retain any or all of the gratuities or tips they are owed.

**Failure to Keep Records.**

536. VIPKID willfully failed to record all of the time that its employees, including Plaintiff and the VIPKID Collective, have worked for the benefit of VIPKID.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM          INDEX NO. 613283/2020

NYSCEF DOC. NO. 1          Case 2:20-cv-06370-JS-LGD          Document 1-1          Filed 12/30/20          Page 79 of 132 PageID          RECEIVED NYSCEF: 11/18/2020

#: 87

**Failure to Notify.**

537. VIPKID failed to post and keep posted in conspicuous places on their digital platform

required notices about wage and labor laws protecting VIPKID Teachers.

## EIGHTH CAUSE OF ACTION: BREACH OF NY WAGE & HOUR LABOR LAWS § 198

538. Plaintiff brings the below-detailed NYLL Causes of Action on behalf of himself and the

VIPKID Collective.

539. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

**New York Labor Law Article 19 Minimum Wage Act (NYLL Article 19, § 652) —**

**Violations of the Minimum Wage Requirements**

540. During all relevant times, VIPKID willfully and deliberately failed to pay its employees,

including Plaintiff and the VIPKID Collective, New York State statutory minimum wage for

each and every hour of work and any premium overtime wage for hours that they worked in

excess of 40 hours per workweek. (NYLL Article 19, § 652).

541. Through this knowing or intentional failure, VIPKID has willfully violated the NYLL

Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor

Regulations.

542. Due to Defendants' violations of the NYLL, Plaintiff and the members of the VIPKID Class

are entitled to recover from VIPKID, their unpaid overtime wages, liquidated damages, as

provided for by NYLL Article 6, § 198.

543. Plaintiff and the VIPKID Class are entitled to recover, among other things, the amount of

any such underpayments, together with costs all reasonable attorney's fees, prejudgment

interest as required under the civil practice law and rules, an additional amount as liquidated damages equal to one hundred percent of the total of such underpayments found to be due.

### New York Labor Law Article 19 Minimum Wage Act — Unpaid Overtime (NYLL Article 19, §§ 650 *et seq*.)

544. VIPKID failed to pay Plaintiff and the members of the VIPKID Class overtime wages to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations.

545. Through their knowing or intentional failure to pay Plaintiff and the members of the VIPKID Collective overtime wages for hours worked in excess of 40 hours per week, VIPKID has willfully violated the NYLL Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

### New York Labor Law — Spread-of-Hours Pay

546. Defendants have willfully failed to pay Plaintiff and the VIPKID Collective additional compensation of one's hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

### Unlawful Wage Deductions (Violations of New York Labor Law § 193)

547. VIPKID, pursuant to a unilateral and illegal policy, made deductions from the wages due to VIPKID Teachers, requiring employees to pay such fees for the benefit of VIPKID.

548. All deductions from VIPKID Teachers wages were punitive and therefore not for the benefit of the employee, namely VIPKID Teachers.

549. The deductions, charges, and required payment at issue violate §193 because they were applied to wages that were already earned, and deductions were neither for the benefit of VIPKID Teachers nor of the limited type permitted by the statute.

550. VIPKID's actions are exactly the type of actions that NYLL §193 intends to prohibit.

### Unlawful Wage Practices

551. Upon information and belief, VIPKID engages in discriminatory pay practices, paying VIPKID Teachers different wages based on their nationality, their citizenship, their sex, their gender, and on the basis of other immutable characteristics.

552. In addition to special, liquidated damages and/or other damages, Plaintiff seeks any civil penalties that flow from VIPKID's misconduct, recognizing that any employer who fails to pay the wages of his employees or differentiates in rate of pay because of protected class status shall forfeit to the people of the state the sum of five hundred dollars for each such failure, to be recovered by the commissioner.

### Time allowed for Meals. ( NY Labor Law § 162 et. Seq)

553. VIPKID's pay's structure, pay scale, and technology deliberately prevented Plaintiff and the VIPKID Collective from taking breaks for meals.

### Off-the-Clock Hours. ( NY Labor Law § 190 et. Seq)

554. VIPKID had a practice and policy of making VIPKID Teachers do unpaid and illegal off-the-clock work.

555. This includes making Plaintiff spend time in preparation for work before a shift begins, complete post-shift reports and other work that could not have been completed during the time of the shift, work correcting and offering corrections on VIPKID materials,

administrative work such as paperwork or follow up on correspondence, attending meetings, employee training, and waiting for work when no work was immediately.

### § 196-b. Sick leave requirements

556. As an employer with one hundred or more employees in any calendar year, VIPKID owes each employee up to fifty-six hours of paid sick leave each calendar year that were/are to be accrued at a rate of not less than one hour per every thirty hours worked, beginning at the commencement of employment.

557. VIPKID never gave Plaintiff or members of the VIPKID Collective any options for taking sick leave, either paid or unpaid.

### § 196-d. Gratuities.

558. If VIPKID is gaining additional tips, gratuities, or other benefits in favor of VIPKID Teacher services performed for VIPKID, VIPKID has not permitted Plaintiff and the members of the VIPKid Collective to access or retain any or all of the gratuities or tips they received.

559. Then VIPKID has knowing or intentionally demand for, accepted, and/or retained part of the gratuities received by Plaintiff and the members of the VIPKID Class.

560. By so doing, VIPKID has willfully violated NYLL Article 6 § 196-d and the supporting New York State Department of Labor Regulations, including but not limited to, the regulations in 12 N.Y.C.R.R. §§ 137 *et seq.*and 146 *et seq.,* entitling Plaintiff and the members of the VIPKID Class to the value of the misappropriated gratuities, liquidated damages, as provided for by the NYLL Article 6, § 198, reasonable attorneys' fees, costs, and pre-judgment and post-judgement interest.

### Notice and record-keeping requirements (NYLL Article 19, § 661).

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO.: 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 83 of 132 PageID #: 91

INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

561. VIPKID failed to post in a conspicuous place on their digital platforms, required notices summarizing minimum wages provisions, in violation of the NYLL and supporting New York State Department of Labor Regulations.

562. VIPKID failed to provide Plaintiff and members of the VIPKID Collective, in writing at the time of hiring, a notice stating, amongst others, VIPKID's overtime rate of pay.

563. VIPKID failed to establish, maintain and preserve true, and accurate payroll records showing for each week worked of, among others:

Hours worked; the regular hourly rate or rates of pay, the overtime rate or rates of pay, the number of regular hours worked, and the number of overtime hours worked; other relevant rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any; amount of sick leave provided to each employee; prevailing wage supplements, if any, and net wages for each employee.

564. Through their knowing or intentional failures, VIPKID has willfully violated New York Labor Law, and the supporting New York State Department of Labor Regulations.

565. Due to VIPKID's violations of the NYLL, Plaintiff and the members of the VIPKID Class are entitled to recover from the all unpaid wages, liquidation damages, as provided for by NYLL Article 6, §198, reasonable attorney's fees, costs, pre-judgement and post-judgement interest, and other compensation, damages, and awards as provided for by NYLL Article 6, § 198, by other applicable laws, or as deemed appropriate by this Court.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
INDEX NO. 613283/2020
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD    Document 1-1    Filed 12/30/20    Page 84 of 132 PageID
#: 92
RECEIVED NYSCEF: 11/18/2020

## NINTH CAUSE OF ACTION Retaliatory Action by Employers against Employee

## Complaints. ( NY Labor Law § 215 et. Seq)

566. Plaintiff brings the below-detailed causes of action on behalf of himself and a sub-class of

the VIPKID Collective, the "VIPKID Whistleblower Class"

567. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

568. In violation of Section 215 of the New York State Labor Law, Plaintiff was illegally

discharged and his contract was terminated in retaliation against Plaintiff's complaints, to

VIPKID, about labor law violations committed against him by VIPKID.

569. Over the course of nearly four years of employment with VIPKID, Plaintiff would regularly

draw attention to VIPKID's unfair and unlawful policies and practices.

570. As a result of Plaintiff's regular complaints, he was denied meaningful opportunities for

advancement in the company, including certifications required to teach sessions and

certifications required to take part in leadership opportunities.

571. Ultimately, Plaintiff was terminated for his complaints against VIPKID's unlawful practices:

572. On June 2, 2019, Plaintiff began to receive several emails from VIPKID as follows:

"VIPKID is currently experiencing some technical issues which might impact your ability to
log on to the Teacher Portal, or enter the classroom, or submit feedback…In the event that it
is not fixed in time for your classes, please know that any classes marked [Teacher-No-
Show] will be changed to System Problem."

573. Eventually Plaintiff received an email from VIPKID stating that:

"the system issue that prevented teachers, students, and parents from being able to enter the
classroom environment" occurred because "[o]n June 2, a fiber optic cable managed by
Amazon Web Services (AWS) was physically damaged, affecting all AWS users in Beijing
and its surrounding areas, including VIPKid."

83 of 88

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 85 of 132 PageID
#: 93
INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/18/2020

574. VIPKID continued, "Our priority now is to ensure that all teachers receive payment, proper finish types, and accurate parent feedback for their affected classes."

575. Due to what VIPKID referred to as "system issue," Plaintiff was unable to deliver his scheduled sessions on or around June 2, 2019.

576. When Plaintiff was finally able to "re-enter" the VIPKID Platform, Plaintiff was shocked to find that he had been marked as a "Teacher No Show" for all classes that had been effected by the "system issue."

577. The "Teacher No Show" marking meant that the system had recorded Plaintiff as not having shown up for the class at all—when in fact he had tried (and evidenced his efforts) to enter the VIPKID Platform.

578. Plaintiff appealed the "Teacher No Shows" on his record.

579. As a result of Plaintiff's appeal, VIPKID changed Plaintiff's record from "Teacher No Show" to "Teacher Cancellation" for all the classes affected by the "system issue."

580. However, this record was also false—as Plaintiff did not cancel any of his classes and was unable to access the Teaching Platform despite his best efforts.

581. On the basis of this false record, Plaintiff was denied wages and was charged liquidated damages. Plaintiff also risked termination as a result because of the number of "Teacher Cancellations" placed on his record.

582. Pursuant to the improper result of his appeal, Plaintiff spent about one week requesting VIPKID to rectify this false record.

583. VIPKID refused any further changes and eventually became completely non-responsive.

584. This was not the first time that Plaintiff had experienced VIPKID creating a false record to hide technical difficulties experienced on/by the VIPKID Teaching Platform.

585. Frustrated by the constant deductions and sub-standard treatment, Plaintiff informed VIPKID that he would protest against the company.

586. Subsequently, in one of his scheduled classes, Plaintiff held a sign that read "VIPKID IS STEALING" and sat silently in front of his computer, without saying a word.

587. Plaintiff was fired the next day.

588. Plaintiff re-applied to VIPKID using all of the same information he provided the first time around, only using a different email address.

589. Plaintiff was rehired after a grueling and extended recruitment process—and after being subject to a full background check and providing VIPKID true and authentic identity credentials, just as he had done through his first recruitment process with VIPKID.

590. After being re-hired in June 2019. Plaintiff continued working with VIPKID without issue until around June 2020, when Plaintiff asked for an increase in his wages.

591. In a message from Plaintiff to VIPKID dated June 6, 2020, Plaintiff wrote:

"…this is my 4th year working here. I began in November 2016 …I have been with VIPKID a total of 1,31 days—students taught, 4,304, classes taught, 6,397, with a whooping 159,925 minutes taught….[the] equivalent of 111 days….I have a total of 1,339 Excellent 5-Star rated feedback reviews, and I have maintained a 5 star rated status so I think its fair to say I deserve a raise, please fo the right thing and treat your long term teachers with respect.

In 4 years I have never been given the opportunity to have a raise I have never had the opportunity to teach as a Mock Session Mentor because in 4 years there has never been any available positions for my and YES I have emailed the company about my interest in teaching as a Mock Session Mentor because I am clearly qualified to do so however there are never any available positions.

I have 3 degrees and my Masters is specifically in Educational Technology and Online

85 of 88

Learning so can you tell me how I can move up in the company if I keep getting denied raises. I have been very faithful to this company but [] the company keeps changing its policy, I just received an email stating it will change its service fee structure now this is the third time I have seen a change in the service fee and not once has it benefited me. In 4 years, I have not had a raise or been given any opportunity to advance so if the company does want to award their long term teachers [then] they need to start with me!"

592. A few days after Plaintiff sent this message, he was terminated.

593. According to VIPKID, Plaintiff was terminated because VIPKID:

"recently discovered that after your contract was terminated by VIPKID on June 13, 2019, you created a new account on VIPKID's platform, using a different email address. Based on VIPKID's standards and procedures, teachers are only allowed to have one account on VIPKID's platform. Thus, teachers whose contracts were previously terminated by VIPKID, are not permitted to create other accounts to continue teaching on the VIPKID platform. Accordingly, we are terminating your Agreement, effective immediately. All classes that you scheduled on or after this date have been cancelled. Please note that any new account you create moving forward will also be removed from our system upon discovery."

594. Despite Plaintiff's best efforts he has never found any language speaking to the policy that

VIPKID described as the basis of his termination and the cancellation of his classes—nor did

VIPKID ever furnish him with any evidence of such a policy.

595. Notably, Plaintiff had less than two weeks left until the formal end of his contractual period.

596. VIPKID willfully and deliberately terminated Plaintiff because he had made specific and

substantial claims about VIPKID's unlawful employment practices.

597. More over, as is clear from his letter, Plaintiff had pieced together much of the information

required to uncover VIPKID's fraud.

598. After his second termination at the hands of VIPKID, Plaintiff applied to VIPKID again

using a third e-mail address.

599. Plaintiff offered and accepted a job during his third round of recruitment by VIPKID.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
INDEX NO. 613283/2020

NYSCEF DOC. NO. 1
Case 2:20-cv-06370-JS-LGD   Document 1-1   Filed 12/30/20   Page 88 of 132 PageID
RECEIVED NYSCEF: 11/18/2020
#: 96

600. Plaintiff passed all assessment rounds and was ready to execute a new contract with VIPKID when VIPKID rescinded its third job offer to Plaintiff and stopped all communication with him—without offering any explanation.

601. Plaintiff and the VIPKID Whistleblower Sub-Class are entitled, in addition to payment of lost compensation, damages up to $20,000 each, as well as any additional damages or awards this Court may order, including an injunction to restrain continued violation, compensation for lost wages, benefits and other remuneration, and the payment by the employer of reasonable costs, disbursements, and attorney's fees.

## **TENTH CAUSE OF ACTION: Retaliatory Action by Employers for Employee Whistleblowing. ( NY Labor Law § 740 et. Seq)**

602. Plaintiff brings the below-detailed FLSA Causes of Action on behalf of himself and a sub-class of the VIPKID Collective, the "VIPKID Whistleblower Class"

603. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

604. Plaintiff is a whistleblower because he objected to and refused to participate in activities, policies and practices in violation state and federal wage and labour laws.

605. VIPKID took adverse employment actions against Plaintiff and ultimately wrongfully discharged him because Plaintiff, pointing to pertinent facts that underlined VIPKID's unlawful activity, threatened to vindicate his rights under the law.

606. As a whistleblower, Plaintiff is entitled to all due damages and awards that this Court deems fitting, as well as other relief, including injunctive, declaratory and/or punitive relief, that the Court in its discretion deems necessary or appropriate—including any action that might prevent VIPKID from causing further harm to VIPKID Teachers and their reputations.

87 of 88

## PRAYER FOR RELIEF:

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and in favor of those he represents against VIPKID containing the following relief:

A. A declaratory judgment that the actions, conduct, and practices complained of herein violate the laws of the State of New York;

B. An award of all damages, penalties, and costs invoked herein plus prejudgment interest, in an amount to be determined at trial, including compensatory damages, exemplary damages, special damages, treble damages, and any other damages permissible under law and/or considered suitable by this Court to compensate Plaintiffs for all monetary and non-monetary harm, damages, and injuries suffered;

C. An award of punitive damages as permitted under applicable laws, regulations, and policies;

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM   INDEX NO. 613483/2020

NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 11/18/2020

# APPENDIX 1

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM	INDEX NO. 613283/2020
NYSCEF DOC. NO. 1	RECEIVED NYSCEF: 11/18/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No. & Year:

_____x	_____/_____

Kevin J. Meehan

                Plaintiff,	Date Index No. Purchased:

   -against-	_____

VIPKid; VIPKids International, Inc. aka VIPKid International,
Inc. aka VIPKid; Beijing Dami Technology Co., Ltd. aka
Beijing Da Mi Technology Co., Ltd. aka VIPKid; Beijing Dami
Future Technology Co., Ltd. aka Beijing Da Mi Future
Technology Co., Ltd.; Tencent Holdings Ltd.; Cloud & Smart
Industries, Tencent Holdings Ltd. aka Cloud & Smart Industries	FLSA Consent-to-Join
at Tencent Holdings Ltd.; Tencent America LLC; Tencent
Cloud LLC; China Renaissance Holdings Ltd. aka China
Renaissance Securities aka China Renaissance; Sequoia Capital
Operations LLC; VIPKID HK Limited; VIPKID Class HK
Limited; and VIPTeach Inc.

                Defendants.

_____x

I hereby consent to be a plaintiff in an action under the Fair Labor Standards Act, 29
U.S.C. § 201 et seq., to secure unpaid overtime pay, liquidated damages, attorneys' fees,
costs and other relief arising out of my employment with the Defendants and any other
associated parties.

I authorize Muciri Law, PLLC, and any associated attorneys as well as any successors or
assigns, to represent me with my claims.

By signing and returning this consent to sue, I understand that, if accepted for
representation, I will be represented by the above attorneys without prepayment of costs
or attorneys' fees. I understand that if Plaintiffs are successful, costs expended by
attorneys on my behalf will be deducted from my settlement or judgment amount on a
pro rata basis with all other plaintiffs. I understand that the attorneys may petition the
court for an award of fees and costs to be paid by defendants on my behalf.

Date: _____11/11/2020_____

Signature: _____ Print Name: _Kevin J. Meehan_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------x

In the Matter of the Application of
 Kevin J. Meehan

_____,

**[Fill in name(s)]**    Plaintiff(s)/Petitioner(s)
                            -against-

 VIPKID et al

_____,

**[ Fill in name(s)]**    Defendant(s)/Respondent(s)

-------------------------------------------------------------------x

**[ Index No. & Year]**
Index No.

_____ / ____

_____

 Summons and Complaint

_____

**[Insert name(s) of papers submitted]**

_____
                    **[YOUR SIGNATURE]**

 Lakshmi Gopal

_____
                **[PRINT YOUR NAME]**

 43 West 43rd Street

_____
                    **[YOUR ADDRESS]**
 New York, NY, 22201

_____
                **[CITY, STATE ZIP CODE]**
 (202) 956 8009

_____
                **[YOUR PHONE NUMBER]**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------------X

Kevin J. Meehan ,

**[2. Fill in name(s)]**          Plaintiff(s)/Petitioner(s)

-against-

VIPKID et. al. ,

**[3. Fill in name(s)]**          Defendant(s)/Respondent(s)

------------------------------------------------------------------------X

**[1. Index No. & Year]**
Index No.

_____ / _____

**CERTIFICATION
PURSUANT TO
22 NYCRR 130-1.1-a**

I hereby certify that all of the papers that I have served, filed or submitted to the court in this

action/proceedings (as indicated by the check marks below) are not frivolous as defined in

subsection c of Section 130-1.1 of the Rules of the Chief Administrator of the Courts.

- [ ] Note of Issue
- [ ] Poor Person Order
- [ ] Order permitting alternative service
- [x] Summons or Summons with Notice
- [ ] Verified Complaint
- [ ] Affidavit of Service or Defendant's Waiver
- [ ] Notice of Appearance
- [ ] Affidavit or Affirmation of Regularity
- [ ] Affidavit of Military Status or Investigator
- [ ] Plaintiff's Affidavit
- [ ] Affidavit of Witness
- [ ] Exhibits _____
- _____

- [ ] Defendant's Affidavit
- [ ] Petition
- [ ] Consent of Infant
- [ ] Consent of Spouse
- [ ] Emergency Affidavit
- [ ] Affidavit in Support of TRO against public officers, etc.
- [ ] Decision
- [ ] Judgment
- [ ] Reply Affidavit
- [ ] Notice of Entry
- [x] Other Complaint _____

**[4. Date]** Dated: Nov. 13, 2020

(Plaintiff's attorney)

**[5. Plaintiff Signature]**

LAKSHMI GOPAL

**[6. Print Name]**

Duly Sworn to before me this

3 day of November , 2020

_____

**[7. Notary Public]**

County/City of Arlington
Commonwealth/State of Virginia
The foregoing instrument was acknowledged
before me this 13 day of Nov,
2020 , by
LAKSHMI GOPAL
(name of person seeking acknowledgement)
_____
Notary Public
My Commission Expires: 04-30-2022

Robert Sanchez
Commonwealth of Virginia
Notary Public
Commission No. 7791794
Commission Expires 04/30/2022

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 613283/2020
NYSCEF DOC. NO. 2                                      RECEIVED NYSCEF: 11/13/2020

SUPREME COURT OF THE STATE OF NEW YORK        Index No. & Year:
COUNTY OF NASSAU
                                              _____/_____
----------------------------------------------------------------x

Kevin J. Meehan                                Date Index No. Purchased:

                    Plaintiff,                 _____

          -against-

VIPKID; VIPKIDS International, Inc. (VIPKID          **EXHIBIT**
International, Inc.); VIPKIDS International, Inc., New
York (VIPKID International, Inc., New York); VIPKIDS    **Plaintiff's Attorney's Mailing**
International, Inc., Delaware (VIPKID International,     **Address:**
Inc., Delaware); VIPKIDS International, Inc., San       43 W 43rd Street, Suite 226
Francisco (VIPKID International, Inc., San Francisco);  New York, NY 10036
Beijing Dami Technology Co., Ltd. (Beijing Da Mi
Technology Co., Ltd.); Beijing Dami Future Technology
Co., Ltd. (Beijing Da Mi Future Technology Co., Ltd.);
Tencent Holdings Ltd.; Cloud & Smart Industries,
Tencent Holdings Ltd. (Cloud & Smart Industries at
Tencent Holdings Ltd.); China Renaissance Holdings
Ltd.; Sequoia Capital Operations LLC; VIPKID HK
Limited; VIPKID Class HK Limited; and VIPTeach Inc.
                    Defendants.

----------------------------------------------------------------x

mučiri law
small is beautiful

# EXHIBIT A

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 613883/2020

NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-1:New York Legal Counsel

2/25

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM    INDEX NO. 612283/2020

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-1-1: LinkedIn Post for New York Legal Counsel

3/25

Case 2:20-cv-05970-JS-LGD    Document 1-1    Filed 12/30/20    Page 105 of 132 PageID #: 105







FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM
INDEX NO. 613283/2020
(1) Legal Counsel - VIPKid - LinkedIn | https://www.linkedin.com/jobs/view/2119732246/?refId=7804017...
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 11/13/2020

Case 1:20-cv-06570-JS-LGD    Document 1-1    Filed 12/30/20    Page 99 of 132 PageID
#: 107



INDEX NO. 613283/2020
RECEIVED NYSCEF: 11/13/2020



FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM    INDEX NO. 611683/2020

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-1-2: Greenhouse Post for New York Legal Counsel

8/25

# Legal Counsel



at VIPKID (View all jobs)

San Francisco, CA

VIPKid, an innovative education technology firm, is focused on growing global influence and creating social impact through leveraging our online learning platform for good. With VIPKid's education technology platform, we aspire to creating unique value to the world by applying our expertise in education, core business competency, and technology innovation.

We are looking for an attorney to join the Offshore Legal Team, to assist with a variety legal issues related to the teacher-side of our business, including the review of commercial contracts, as well as compliance with applicable laws and regulations. The successful candidate will have experience with advice and counseling, reviewing contracts, and preparing responses to inquiries regarding legal matters. This position reports to the U.S. Legal Director and is based in New York City.

### Responsibilities

- Provide legal support for the Company's U.S. and international business, including advice and counseling regarding the Company's day-to-day operations, and conducting risk management and control for on-going projects;
- Review, revise and draft a wide variety of commercial contracts in English and Chinese;
- Guide management and business operations on U.S. and international regulatory and compliance issues, to ensure compliance with all applicable laws and regulations; and
- Perform other duties as assigned by Company management.

### Qualifications

- J.D. or LLM degree from an accredited U.S. law school and current license to practice law in one or more jurisdictions in the U.S. (New York or California bar qualification is preferred);
- Minimum two years of legal experience at a U.S. law firm or within an in-house legal department in the U.S.;
- Background in U.S. employment law is a strong plus;
- Fluent in English and Mandarin Chinese with excellent legal writing skill and exceptional communication and negotiation skills;
- Excellent interpersonal skills, including the ability to interact effectively and professionally with individuals at all levels, internal and external, and the ability to work on teams;
- Commitment to highest professional and ethical standards; and
- Must be authorized to work in the United States and must be willing to start working immediately.

## Apply for this Job

* Required

First Name *

Last Name *

Email *

Phone

Resume/CV    Attach, Dropbox, Google Drive, Paste

Cover Letter    Attach, Dropbox, Google Drive, Paste

---

Are you legally authorized to work in the United States? *

| -- | ▼ |

Will you now or in the future require visa sponsorship for employment (e.g., H-1B visa)? *

| -- | ▼ |

LinkedIn Profile

Website

How did you hear about this job?

---

**U.S. Equal Opportunity Employment Information (Completion is voluntary)**

Individuals seeking employment at VIPKID are considered without regards to race, color, religion, national origin, age, sex, marital status, ancestry, physical or mental disability, veteran status, gender identity, or sexual orientation. You are being given the opportunity to provide the following information in order to help us comply with federal and state Equal Employment Opportunity/Affirmative Action record keeping, reporting, and other legal requirements.

Completion of the form is entirely **voluntary**. Whatever your decision, it will not be considered in the hiring process or thereafter. Any information that you do provide will be

recorded and maintained in a confidential file.

| Gender | Please select | ▼ |
|---|---|---|

| Are you Hispanic/Latino? | Please select | ▼ |
|---|---|---|

### Race & Ethnicity Definitions

If you believe you belong to any of the categories of protected veterans listed below, please indicate by making the appropriate selection. As a government contractor subject to Vietnam Era Veterans Readjustment Assistance Act (VEVRAA), we request this information in order to measure the effectiveness of the outreach and positive recruitment efforts we undertake pursuant to VEVRAA. Classification of protected categories is as follows:

A "disabled veteran" is one of the following: a veteran of the U.S. military, ground, naval or air service who is entitled to compensation (or who but for the receipt of military retired pay would be entitled to compensation) under laws administered by the Secretary of Veterans Affairs; or a person who was discharged or released from active duty because of a service-connected disability.

A "recently separated veteran" means any veteran during the three-year period beginning on the date of such veteran's discharge or release from active duty in the U.S. military, ground, naval, or air service.

An "active duty wartime or campaign badge veteran" means a veteran who served on active duty in the U.S. military, ground, naval or air service during a war, or in a campaign or expedition for which a campaign badge has been authorized under the laws administered by the Department of Defense.

An "Armed forces service medal veteran" means a veteran who, while serving on active duty in the U.S. military, ground, naval or air service, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order 12985.

| Veteran Status | Please select | ▼ |
|---|---|---|

Form CC-305
OMB Control Number 1250-0005
Expires 05/31/2023

## **Voluntary Self-Identification of Disability**

### **Why are you being asked to complete this form?**

We are a federal contractor or subcontractor required by law to provide equal employment opportunity to qualified people with disabilities. We are also required to measure our progress toward having at least 7% of our workforce be individuals with disabilities. To do this, we must ask applicants and employees if they have a disability or have ever had a disability. Because a person may become disabled at any time, we ask all of our employees to update their information at least every five years.

Identifying yourself as an individual with a disability is voluntary, and we hope that you will

choose to do so. Your answer will be maintained confidentially and not be seen by selecting officials or anyone else involved in making personnel decisions. Completing the form will not negatively impact you in any way, regardless of whether you have self-identified in the past. For more information about this form or the equal employment obligations of federal contractors under Section 503 of the Rehabilitation Act, visit the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) website at www.dol.gov/ofccp.

## How do you know if you have a disability?

You are considered to have a disability if you have a physical or mental impairment or medical condition that substantially limits a major life activity, or if you have a history or record of such an impairment or medical condition.

Disabilities include, but are not limited to:

- Autism
- Autoimmune disorder, for example, lupus, fibromyalgia, rheumatoid arthritis, or HIV/AIDS
- Blind or low vision
- Cancer
- Cardiovascular or heart disease
- Celiac disease
- Cerebral palsy
- Deaf or hard of hearing
- Depression or anxiety
- Diabetes
- Epilepsy
- Gastrointestinal disorders, for example, Crohn's Disease, or irritable bowel syndrome
- Intellectual disability
- Missing limbs or partially missing limbs
- Nervous system condition for example, migraine headaches, Parkinson's disease, or Multiple sclerosis (MS)
- Psychiatric condition, for example, bipolar disorder, schizophrenia, PTSD, or major depression

Disability Status     | Please select                                        ▼ |

[1]Section 503 of the Rehabilitation Act of 1973, as amended. For more information about this form or the equal employment obligations of Federal contractors, visit the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) website at www.dol.gov/ofccp.

PUBLIC BURDEN STATEMENT: According to the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. This survey should take about 5 minutes to complete.

Submit Application

12/25

Powered by greenhouse

Read our Privacy Policy

13/25

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM    INDEX NO. 611183/2020

NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-2: LinkedIn Employees in New York

14/25

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM    INDEX NO. 613483/2020
NYSCEF DOC. NO. 2                                 RECEIVED NYSCEF: 11/13/2020



15/25

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM    INDEX NO. 611983/2020

NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-3: VIPKID Teachers in New York Facebook Group

16/25

Case 2:20-cv-06352-GRB-SIL   Document 1-1   Filed 12/30/20   Page 110 of 132 PageID #: 118
VIPKid Teachers New York and Beyond | Facebook



# VIPKid Teachers New York and Beyond

🔒 Private group  360 members

           

 VIPKid Teachers New York and Beyond          **Join Group**  •••

### About this group

Welcome to VIPKid from New York (and anywhere else)! We are a group of teachers (prospective, new and veteran) who want to share ideas and encourage one another. Tips on teaching from NY, area events, ideas and learning material are all things you should share! We, also, encourage you to find guidance here, if you need it. Let's have fun and, most importantly, let's be kind! We all know how those late nights and early mornings can make us cranky, but we are here to get you through that! Post your morning latte or cup of tea and pick everyone up! VIPKid memes? Share 'em! Welcome to our New York page! **See less**

🔒 **Private**
Only members can see who's in the group and what they post



Only members can see who's in the group and what they post.

**Visible**
Anyone can find this group.

**General group**

**History**
Group created on 31 August 2018. Name last changed on 19 September 2018. **See More**

## Members · 360

Kacey and Susan are admins.

## Activity

**No new posts today**
25 in the last month

**360 total members**
+ 1 in the last week

## Group rules from the admins

1   **NY Page Guidelines**                                   ⌄

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 611683/2020

NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-4: VIPKID Advertising New York Events

New York City, NY VIPKid Meetup hosted by Erin Benedetto (New Host) | Sunday, February 9 11:00 AM 6:00 PM    Page 113 of 132 PageID #: 121



BACK TO ALL EVENTS

# New York City, NY VIPKid Meetup hosted by Erin Benedetto (New Host)

**SUNDAY, FEBRUARY 9**
11:00 AM - 6:00 PM

**STARBUCKS**
New York, NY

**CLOSED**

Don't miss 2020 Lunar Parade. See pictures of swag we will be giving away. Don't miss ou home!

Sunday February 9, 2020

21st Lunar New Year Parade, New York City Chinatown

Parade Organizer: Better Chinatown USA

Eventbrite uses cookies. By continuing to browse the site you are agreeing to our use of cookies. Review our cookie policy for more details



20/25

New York City VIPKID Meetup hosted by Erin Benedetto (NewHost) | Sunday, February 9, 11:00 AM 6:00 PM        Page 114 of 132 PageID #: 122

For the 2nd year we will have an official VIPKID meetup in NYC at the Lunar New Year Parade.

Children and the entire family are welcome for this event.

Actual Parade Start: 1:00pm

Parade Route: http://betterchinatown.com/lny-parade/

*We will meet at 11:00am at the Starbucks, 111 Worth St (and Lafayette), New York, NY 10013 to ensure*

We will leave Starbucks at approximately 11:15am and start walking to our viewing spot.

If anyone arrives late, you can try to find us near the Wo Hop Restaurant, 17 Mott St (between Worth & M

To enjoy the day and the parade, we recommend the following:

· Dress for the weather, probably warm – it's a long time to stand.

· Get in the spirit – dress yourself and your family in as much VIPKID gear, orange and red clothing items

· Take public transportation - parking is expensive and road closures are extensive.

· Charge your phone and bring charged up external battery packs if possible – sometimes the weather ca lose their charge (your students will be overwhelmed and so excited when you show them your pictures the parade).

· Once we find our spot it will be difficult to leave for phone charging, bathrooms or coffee refills.

· Bring water & snacks if you like.

· A great app to help you find your way: CityMapper (https://citymapper.com/nyc?lang=en).

21/25

New York City VIPKid Meetup hosted by Erin Benedetto (New Host) Sunday, February 9 11:30 AM · 6:00 PM    Page 115 of 132 PageID #: 123

· Bring cash – most restaurants and stores in the area don't take credit or debit cards.

Rather than go to dinner after parade as a group (group dinners are always a challenge in Chinatown as particularly on this day), here are a few recommendations for dim sum and dumplings you might enjoy Chinese treat – the egg custard tart.

~ Golden Unicorn (my oldest son loves the dumplings here), 18 East Broadway, NYC 10002

~ Wo Hop (near our viewing spot), 17 Mott St, NYC 10013

~ Nom Wha Tea Parlor (cash only, no reservations, but worth the wait), 13 Doyers St, NYC 10013

~ Dim Sum Go Go (my favorite walking food tour always stops here), 5 E Broadway, NYC 10038

~ Buddha Bodai Kosher Vegetarian Restaurant, 5 Mott St, NYC10013

~ Golden Manna Bakery (another stop for the walking food tour), 16 Bowery, NYC 10013

**This is a teacher-led Meetup that is officially sponsored by VIPKid**

22/25

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 611683/2020

NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-5: VIPKID Int'l in New York

23/25

**Registration Number:** 5442843

**Name:** SHUOQIU GU

**Business Name:** VIPKIDS International, Inc.

**Business Address:** 450 Lexington Ave
New York, NY 10017-3904
(New York County)

**Business Phone:**

**Email:**

**Date Admitted:** 06/06/2016

**Appellate Division Department Admission:** 1st

**Law School:** University of Minnesota Law School

**Registration Status:** Attorney - Due to Register within 30 Days of Birthday

**Next Registration:** Oct 2020

**Disciplinary History: No record of public discipline.**

The Detail Report above contains information that has been provided by the attorney listed, with the exception of REGISTRATION STATUS, which is generated from the OCA database. Every effort is made to insure the information in the database is accurate and up-to-date.

The good standing of an attorney and/or any information regarding disciplinary actions must be confirmed with the appropriate Appellate Division Department. Information on how to contact the Appellate Divisions of the Supreme Court in New York is available at www.nycourts.gov/courts.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 611483/2020

NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 11/13/2020

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No. & Year:

_____/_____

-------------------------------------------------------------------x

Kevin J. Meehan

Date Index No. Purchased:

                  Plaintiff,

_____

     -against-

VIPKID; VIPKIDS International, Inc. (VIPKID
International, Inc.); VIPKIDS International, Inc., New
York (VIPKID International, Inc., New York); VIPKIDS
International, Inc., Delaware (VIPKID International,
Inc., Delaware); VIPKIDS International, Inc., San
Francisco (VIPKID International, Inc., San Francisco);
Beijing Dami Technology Co., Ltd. (Beijing Da Mi
Technology Co., Ltd.); Beijing Dami Future Technology
Co., Ltd. (Beijing Da Mi Future Technology Co., Ltd.);
Tencent Holdings Ltd.; Cloud & Smart Industries,
Tencent Holdings Ltd. (Cloud & Smart Industries at
Tencent Holdings Ltd.); China Renaissance Holdings
Ltd.; Sequoia Capital Operations LLC; VIPKID HK
Limited; VIPKID Class HK Limited; and VIPTeach Inc.

                  Defendants.

-------------------------------------------------------------------x

**EXHIBIT**

**Plaintiff's Attorney's Mailing Address:**

43 W 43rd Street, Suite 226
New York, NY 10036

# END

mučiri law
small is beautiful

25/25

**FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM** INDEX NO. 611183/2020

NYSCEF DOC. NO. 3                                      RECEIVED NYSCEF: 11/13/2020

SUPREME COURT OF THE STATE OF NEW YORK      Index No. & Year:
COUNTY OF NASSAU
                                              _____/_____
-----------------------------------------------------------------x

Kevin J. Meehan                               Date Index No. Purchased:

                        Plaintiff,            _____

        -against-

VIPKID; VIPKIDS International, Inc. (VIPKID    **EXHIBIT**
International, Inc.); VIPKIDS International, Inc., New
York (VIPKID International, Inc., New York); VIPKIDS    **Plaintiff's Attorney's Mailing**
International, Inc., Delaware (VIPKID International,    **Address:**
Inc., Delaware); VIPKIDS International, Inc., San
Francisco (VIPKID International, Inc., San Francisco);    43 W 43rd Street, Suite 226
Beijing Dami Technology Co., Ltd. (Beijing Da Mi    New York, NY 10036
Technology Co., Ltd.); Beijing Dami Future Technology
Co., Ltd. (Beijing Da Mi Future Technology Co., Ltd.);
Tencent Holdings Ltd.; Cloud & Smart Industries,
Tencent Holdings Ltd. (Cloud & Smart Industries at
Tencent Holdings Ltd.); China Renaissance Holdings
Ltd.; Sequoia Capital Operations LLC; VIPKID HK
Limited; VIPKID Class HK Limited; and VIPTeach Inc.
                        Defendants.

-----------------------------------------------------------------x



mučiri law
small is beautiful


# EXHIBIT B

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM INDEX NO. 611983/2020

NYSCEF DOC. NO. 3                                          RECEIVED NYSCEF: 11/13/2020

EXHIBIT B-1: Template A Agreement

# CONSULTING AGREEMENT

Effective 2018-05-01 , Kevin James Meehan ("Consultant") and VIPKID HK Ltd. ("Company") agree as follows:

## 1.    Services; Payment; No Violation of Rights or Obligations.

Consultant agrees to undertake and complete the Services (as defined in Exhibit A) in accordance with and on the schedule specified in Exhibit A. As the only consideration due Consultant regarding the subject matter of this Agreement, Company will pay Consultant in accordance with Exhibit A. Unless otherwise specifically agreed upon by Company in writing (and notwithstanding any other provision of this Agreement), all activity relating to Services will be performed by and only by Consultant. Consultant agrees that it will not (and will not permit others to) violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose at any time Consultant's own or any third party's confidential information or intellectual property in connection with the Services or otherwise for or on behalf of Company.

## 2.    Ownership Rights; Proprietary Information; Publicity.

a)    Company shall own all right, title and interest (including all intellectual property rights of any sort throughout the world) relating to any and all inventions, works of authorship, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by or for or on behalf of Consultant during the term of this Agreement that relate to the subject matter of or arise out of or in connection with the Services or any Proprietary Information (as defined below) (collectively, "Inventions") and Consultant will promptly disclose and provide all Inventions to Company. Consultant hereby makes all assignments necessary to accomplish the foregoing ownership. Consultant shall assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights assigned. Consultant hereby irrevocably designates and appoints Company as its agents and attorneys-in-fact, coupled with an interest, to act for and on Consultant's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Consultant and all other creators or owners of the applicable Invention.

b)    Consultant agrees that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees or other Company's consultant) developed, learned or obtained by or on behalf of Consultant during the period that Consultant is to be providing the Services that relate to Company or the business or demonstrably anticipated business of Company or in connection with the Services or that are received by or for Company in confidence, constitute "Proprietary Information." Proprietary information also includes information

...ved in confidence by the Company from its customers or suppliers or other third parties. Consultant shall hold in confidence and not disclose or, except in performing the Services, use or permit to be used any Proprietary Information. However, Consultant shall not be obligated under this paragraph with respect to information Consultant can document is or becomes readily publicly available without restriction through no fault of Consultant, provided that Consultant must promptly notify Company of any knowledge of the same. Upon termination or as otherwise requested by Company, Consultant will promptly provide to Company all items and copies containing or embodying Proprietary Information, except that Consultant may keep its personal copies of its compensation records and this Agreement. Consultant also recognizes and agrees that Consultant has no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that Consultant's activity, and any files or messages, on or using any of those systems may be monitored at any time without notice.

c)    To the extent allowed by law, Section 2(a) and any license granted Company hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). Furthermore, Consultant agrees that notwithstanding any rights of publicity, privacy or otherwise (whether or not statutory) anywhere in the world, and without any further compensation, Company may and is hereby authorized to (and to allow others to) use Consultant's name and group photographs, video and/or audio recordings documenting Consultant in activities relating to the provision of Service set out in this Agreement in connection with promotion of its business, products or services. To the extent any of the foregoing is ineffective under applicable law, Consultant hereby provides any and all ratifications and consents necessary to accomplish the purposes of the foregoing to the extent possible and agrees not to assert any Moral Rights with respect thereto. Consultant will confirm any such ratifications and consents from time to time as requested by Company. If any other person is in any way involved in any Services, Consultant will obtain the foregoing ratifications, consents and authorizations from such person for Company's exclusive benefit.

d)    If any part of the Services or Inventions or information provided hereunder is based on, incorporates, or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, distributed and otherwise exploited without using or violating technology or intellectual property rights owned by or licensed to Consultant (or any person involved in the Services) and not assigned hereunder, Consultant hereby grants Company and its successors a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such technology and intellectual property rights in support of Company's exercise or exploitation of the Services, Inventions, other work or information performed or provided hereunder, or any assigned rights (including any modifications, improvements and derivatives of any of them).

3.    **Warranties and Other Obligations.**

Consultant represents, warrants and covenants that: (i) the Services will be performed in a professional and workmanlike manner and that none of such Services nor any part of this Agreement is or will be inconsistent with any obligation Consultant may have to others; (ii) all work under this Agreement shall be Consultant's original work and none of the Services or Inventions nor any development, use, production, distribution or

RP1-4-20180403.html

...tation thereof, without... ...misappropriate or violate any intellectual property or other right of any person or entity (including, without limitation, Consultant); (iii) Consultant has the full right to allow it to provide Company with the assignments and rights provided for herein (and has written enforceable agreements with all persons necessary to give it the rights to do the foregoing and otherwise fully perform this Agreement); (iv) Consultant shall comply with all applicable laws and Company safety rules in the course of performing the Services; and (v) if Consultant's work requires a license, Consultant has obtained that license and the license is in full force and effect.

4. **Conflicts of Interest.**

Consultant represents and warrants that Consultant has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement, or that would preclude Consultant from fully complying with the provisions hereof, and further certifies that Consultant will not enter into such conflicting agreement during the term of this Agreement.

5. **Termination.**

a) Either party may terminate this Agreement for any reason with two weeks advance written notice. If Company informed Consultant to terminate the contract in two weeks advance, Company may limit Consultant's availability for time slots and remove Consultant's access to VIPKID related platforms and may reassign already booked classes.

b) Company may terminate this Agreement without prior notice for any of the following reason: (i)Consultant breaches a material provision of this Agreement; (ii)Consultant is found unsuitable for the position in the reasonable opinion of Company; (iii)Consultant engages in misconduct (including any illegal activity during or outside of class hours) or any activity or actions that, in the reasonable opinion of Company may injure or tend to injure Company or the reputation of Company;(iv)Consultant consistently receives low feedback scores or severe complaints from students and parents;(v)Consultant does not provide the necessary tools to teach stable, high quality classes;(vi)Consultant's number of class cancellations (as stipulated in the Company's Teacher Practices) exceeds maximum number during the term of this agreement. (vii) Consultant provided false information or documentation in application stage and during the contract period.

6. **Relationship of the Parties; Independent Contractor; No Employee Benefits; Taxes; Indemnification.**

Notwithstanding any provision hereof, Consultant is an independent contractor and is not an employee, agent, partner or joint venturer of Company and shall not bind nor attempt to bind Company to any contract. Nothing in this Agreement shall be interpreted or construed as creating or establishing a relationship of

and employee between Company and Consultant, or any employee or agent of Consultant. Consultant shall accept any directions issued by Company pertaining to the goals to be attained and the results to be achieved by Consultant, but Consultant shall be solely responsible for the manner and hours in which the Services are performed under this Agreement. Consultant shall not be eligible to participate in any of Company's employee benefit plans, fringe benefit programs, group insurance arrangements or similar programs. Company shall not provide workers' compensation, disability insurance, Social Security or unemployment compensation coverage or any other statutory benefit to Consultant. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement, and Consultant agrees to and acknowledges the obligation to pay all taxes, including without limitation all federal and state income tax, social security taxes and unemployment, disability insurance and workers' compensation applicable to Consultant and any person who performs Services in connection with this Agreement, and that Consultant will not be eligible for any employee benefits (nor does Consultant desire any of them) and expressly waives any entitlement to such benefits.

7.    **Indemnification.**

Consultant agrees to indemnify and hold the Company, its affiliates and their respective directors, officers, agents and employees harmless to the extent of any obligation imposed on the Company (i) to pay withholding taxes or similar items or (ii) resulting from Consultant's being determined not to be an independent contractor. Consultant further agrees to indemnify and hold the Company, its affiliates and their respective directors, officers, agents and employees harmless from and against all claims, demands, losses, damages and judgments, including court costs and attorneys' fees, arising out of or based upon any breach or alleged breach by Consultant of any representation, warranty, certification, covenant, obligation or other agreement set forth in this Agreement.

8.    **Assignment.**

This Agreement and the services contemplated hereunder are personal to Consultant and Consultant shall not have the right or ability to assign, transfer or subcontract any rights or obligations under this Agreement without the written consent of Company. Any attempt to do so shall be void. Company may fully assign and transfer this Agreement in whole or part.

9.    **Notice.**

All notices under this Agreement shall be in writing and shall be deemed given when personally delivered or sent by email, or three days after being sent by prepaid certified or registered U.S. mail to the address of the party to be noticed as set forth herein or to such other address as such party last provided to the other by written notice.

Consultant and the Company agree that any and all controversies, claims, or disputes arising out of, relating to, or resulting from Consultant's performance of services for the Company or the termination of Consultant's contract with the Company, including any breach of this mutual agreement to arbitrate claims (this "Arbitration Agreement"), shall be subject to binding arbitration. Both parties agree that this Arbitration Agreement is enforceable under the Federal Arbitration Act, 9 U.S.C. §1 et seq. (the "FAA"). If the FAA is found not to apply, then this Arbitration Agreement is enforceable under the laws of the state in which Consultant performs services. However, both parties agree that there will be no right to bring any dispute covered by this Arbitration Agreement as a class, collective or representative action.

a)    Claims Covered By this Arbitration Agreement. To the maximum extent allowed by law, the Company and Consultant mutually consent to the resolution by binding arbitration of all claims or causes of action that the Company may have against Consultant or that Consultant may have against the Company or the Company's current and former owners, partners, members, officers, directors, employees, representatives and agents, all subsidiary and affiliated entities, all benefit plans the benefit plans' sponsors, fiduciaries, administrators, affiliates, and all successors and assigns of any of them.

b)    Class Action Waiver. Consultant agrees that Consultant will not assert class action, collective action or representative action claims against the Company in arbitration or otherwise, nor will Consultant join or serve as a member of a class, collective or representative action. Consultant understands that this means that there will be no right or authority for any dispute to be brought, heard, or arbitrated as a class, collective or representative action ("Class Action Waiver"). The Class Action Waiver shall not be severable from this Arbitration Agreement in any lawsuit in which (1) the complaint is filed as a class, collective or representative action and (2) the civil court of competent jurisdiction in which the complaint was filed finds the Class Action Waiver is unenforceable (and such finding is confirmed by appellate review if review is sought). In such instances, the class action must be litigated in a civil court of competent jurisdiction and not as class arbitration.

Consultant understands that either party may lawfully seek enforcement of this Arbitration Agreement and the Class Action Waiver under the FAA and seek dismissal of such actions or claims. Notwithstanding any other clause contained in this Arbitration Agreement, any claim that all or part of the Class Action Waiver is invalid, unenforceable void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. The Class Action Waiver shall be severable when a dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration.

c)    Administrative Relief. Consultant understands that this Arbitration Agreement does not prohibit Consultant from pursuing an administrative claim with a local, state, or federal administrative body that is authorized to enforce or administer laws related to employment. Consultant understands that this Agreement does, however, preclude Consultant from pursuing any court action regarding any such claim, except as permitted by law. Further, nothing in this Arbitration Agreement excuses either party from bringing an administrative claim before a state or federal agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

to a Court or Jury Trial. Consultant understands that, by signing this Arbitration Agreement, both the Company and Consultant are giving up any right they may have to a court or jury trial on all claims Consultant and the Company may have against each other, as described in Section (a) above.

e)    **Arbitration Procedures.** The Company and Consultant agree that, except as provided in the Arbitration Agreement, any arbitration shall be in accordance with and under the auspices and rules of JAMS, Inc. ("JAMS") for the resolution of employment disputes, pursuant to its employment arbitration rules & procedures. The JAMS Employment Arbitration Rules and procedures are available at www.JAMSadr.com. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a class proceeding. Notwithstanding anything in the JAMS rules, the arbitrator will not have the authority to determine whether this Arbitration Agreement or any portion of it is enforceable, revocable or valid, the arbitrability of disputes, or whether claims may be arbitrated on a class, collective, or representative basis. The Parties agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication, motions to dismiss and demurrers prior to any arbitration hearing. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses. Consultant agrees that any arbitration under this Arbitration Agreement shall be conducted in San Francisco County or the site of the closest JAMS office to Consultant in Consultant's home state whichever Consultant choses. The arbitrator shall apply the substantive law of the state in which Consultant performs the Services. The arbitrator's decision regarding the claims shall be final and binding upon the parties, and shall be enforceable in any court having jurisdiction thereof. No remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement.

f)    **Attorneys' Fees and Costs.** In the event that either party initiates an arbitration, Consultant agrees that each party shall be responsible for paying such party's own attorneys' fees and costs. Consultant agrees that the arbitrator shall have the power to award any remedies available under applicable law, and that the arbitrator shall award attorneys' fees and costs to the prevailing party, except as prohibited by law.

g)    **Modification/Entire Agreement.** This Arbitration Agreement shall survive the termination of Consultant's contract with the Company. It can only be revoked or modified by a writing signed by the parties that specifically states an intent to revoke or modify this Arbitration Agreement. This is the complete agreement of the parties on the subject of arbitration of disputes. This Arbitration Agreement supersedes any prior or contemporaneous oral or written understanding on the subject. If any provision of this Arbitration Agreement is found to be unenforceable, in whole or in part, such finding shall not affect the validity of the remainder of this Arbitration Agreement and this Arbitration Agreement shall be reformed to the greatest extent possible to ensure that the resolution of all conflicts between the parties are resolved by neutral, binding arbitration.

**11.  Miscellaneous.**

any breach of Section 2 or 3 will cause irreparable harm to Company for which damages would not be adequate remedy, and therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies.

b)     The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights.  No changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both parties.

c)     In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

d)     This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware. This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that it is not relying on any statement or representation not contained in this Agreement.  To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

e)     Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

f)     In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

g)     This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

*[Signature Page]*

VIPKID HK Limited



Date:     2018-05-01

9/33

CONSULTANT

Name:    Kevin James Meehan

Date:    2018-05-01

**EXHIBIT A**

## 1. SERVICES and TERM of AGREEMENT

The term during which Consultant will provide services under this Agreement will be for six (6) months, from 2018-05-01    to 2018-10-31   , unless extended in writing by the parties or terminated earlier under Section 5 above, whichever occurs first.

This contract shall take effect upon receipt and verified of all documentation requested by the Company and successful completion of a background check (if any), whichever is later.

The services (the "Services") to be provided by Consultant will consist of the following:

-   Teaching online classes using the Company platform

10/33

:///C:/Share/Downloads/RP1-4-20180403.html

## 2.  FEES

In exchange for performance of the Services, the Company will pay Consultant a fee on a per-class basis, details are as follows:

2.1  Consultant's minimum payment is 8.0   USD per class (class time is usually 25 minutes, no more than 30 minutes. For more details, please refer to Teacher Practices displayed in "my account" in teacher's portal at https://t.vipkid.com.cn/personal_info/practice.

2.2   For other incentives in addition to the minimum payment, please refer to the "Teacher Practices" displayed in "my account" in teacher's portal.at https://t.vipkid.com.cn/personal_info/practice.

## 3.  FEE PAYMENT

Service fee will be monthly paid to Consultant no later than the 15th of the following month.

## 4.  NECESSARY CONDITIONS

4.1  Consultant shall be responsible to provide well-functioning tools at his/her own cost to teach in the online classroom including but not limited to microphone, camera, computer, and Internet connection of adequate speed.

4.2  Consultant will be required to upgrade said tools if contacted by Company about malfunctioning hardware.

4.3  Company understands that Internet issues and technological problems happen without notice, and will deal with these issues on a case-by-case basis respectfully, giving Consultant time to resolve situations as they occur. Reoccurring issues that directly affect the classroom environment may result in termination of this Contract.

FILED: NASSAU COUNTY CLERK 11/13/2020 08:50 PM    INDEX NO. 611583/2020

NYSCEF DOC. NO. 3    RECEIVED NYSCEF: 11/13/2020

EXHIBIT A-1: LinkedIn Post for New York Legal Counsel

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") constitutes a legal agreement between Kevin J Meehan ("TEACHER"), an independent contractor engaged in the business of educating students, and VIPKID HK Limited ("VIPKID"), and shall govern TEACHER's use of VIPKID's website and technology platform (the "VIPKID Platform").

**IMPORTANT: PLEASE REVIEW THIS AGREEMENT CAREFULLY. IN PARTICULAR, PLEASE REVIEW THE ARBITRATION PROVISION IN SECTION 13, AS IT REQUIRES THE PARTIES TO RESOLVE DISPUTES ON AN INDIVIDUAL BASIS, TO THE FULLEST EXTENT PERMITTED BY LAW, THROUGH FINAL AND BINDING ARBITRATION. BY ELECTRONICALLY EXECUTING THIS AGREEMENT, TEACHER ACKNOWLEDGES THAT TEACHER HAS READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT, INCLUDING SECTION 13, AND HAS TAKEN TIME TO CONSIDER THE CONSEQUENCES OF EXECUTING THIS AGREEMENT.**

VIPKID operates an online technology platform that enables minors in need of online English language instruction ("Students") and their parents to connect with and receive classes from TEACHERS in the business of providing such services. TEACHER desires to enter into this Agreement to give TEACHER the right to access and utilize the VIPKID Platform to generate business.

In consideration of the above, as well as the mutual promises described herein, TEACHER and VIPKID (collectively "the parties") agree as follows:

1. **USE OF THE VIPKID PLATFORM**

   A. Subject to the terms and conditions contained herein, this Agreement shall give TEACHER the right to utilize the VIPKID Platform, and to receive the negotiated and agreed upon fees for each class TEACHER fully completes for Students in accordance with the terms of this Agreement, and the parameters of the class specified by the Student.

   B. TEACHER shall have complete discretion to determine whether, when, and how often TEACHER will be available to teach classes for Students, and TEACHER shall have no obligation to be available to teach classes on any specific day, at any specific time, for any specific duration, or with any specific frequency, except as specifically agreed by TEACHER. Specifically, Students will only be able to reserve classes with TEACHER on days, and during times, that TEACHER chooses to be available. To facilitate such reservations, TEACHER agrees to select the days of the week, and times of day, during which TEACHER chooses to be available to teach classes for Students using the calendar feature in the "Teacher Portal." Students may then reserve classes with TEACHER at any time up to twenty-four (24) hours in advance of the class start time for the timeslots selected by TEACHER. TEACHER may also elect to allow Students to reserve classes with TEACHER at any time up to one (1) hour in advance of the timeslots selected by TEACHER by confirming TEACHER's agreement to the "24H Booking" feature. If a Student wishes to reserve a class with TEACHER less than twenty-four (24) hours in advance of the class start time, and TEACHER has not elected to use the "24H Booking" feature, VIPKID shall consult with TEACHER, and confirm TEACHER's availability and willingness to teach the class, before any such reservation is finalized.

   C. If a Student reserves a class with TEACHER on a day and time that TEACHER chooses to be available to teach classes for Students, TEACHER will be deemed to have "accepted" the class, and shall be contractually obligated to complete the class in accordance with the terms of this Agreement, and the specific parameters of the class

specified by the Student. However, TEACHER retains the option to cancel classes subject to and in accordance with VIPKID's then-current cancellation and no-show policy. TEACHER acknowledges and agrees that: (i) exceeding the maximum number of cancellations and/or no-shows, as set forth in VIPKID's then-current cancellation and no-show policy, shall constitute a material breach of this Agreement; and (ii) cancelling a class with less than twenty-four (24) hours' notice, or otherwise failing to appear for a class without having cancelled the class, may subject TEACHER to liquidated damages.

D. In addition to determining whether, when, and how often TEACHER will be available to teach classes arranged through the VIPKID Platform, TEACHER shall also have complete discretion to determine the location(s) in which TEACHER will be located when teaching classes, so long as: (i) the environment in the location(s) selected by TEACHER are suitable for teaching minors; and (ii) TEACHER possesses all licenses, certifications, permits and other legal prerequisites necessary to teach classes in such location(s).

E. TEACHER understands that Students and their parents may rate the quality of TEACHER's services, and provide comments and/or feedback, which will be shown on the "Parent Feedback Tab" in the Teacher Portal and/or on the "Classroom" page. If TEACHER believes any ratings, comments, or feedback provided by Students and parents is unfair or inaccurate, TEACHER may challenge the ratings, comments, or feedback by requesting an appeal through the Teacher Portal.

F. Nothing in this Agreement shall be construed as a guarantee that TEACHER shall be guaranteed any particular number of classes during any particular time period.

## 2. TEACHER'S REPRESENTATIONS AND WARRANTIES, AND TEACHER'S PROVISION OF SERVICES TO STUDENTS

A. TEACHER represents that TEACHER is an independently established enterprise in the business of providing the educational services contemplated by this Agreement, and that TEACHER satisfies all legal requirements, and maintains all licenses, permits, and certificates, necessary to perform such services.

B. TEACHER agrees to teach each class accepted pursuant to this Agreement in compliance with all applicable laws and regulations in the location in which TEACHER performs the class. TEACHER further agrees not to use the VIPKID Platform for any purpose that is unlawful or otherwise prohibited by this Agreement, or in any manner that could damage, disable, overburden, or impair the VIPKID Platform. TEACHER further agrees not to divert or recruit Students away from the VIPKID Platform for TEACHER's own benefit, or the benefit of any third party. TEACHER further agrees not to use offensive or derogatory language during classes, or discuss topics that may potentially be harmful, offensive, or otherwise sensitive in nature (e.g., sexual, violent, religiously or politically contentious, etc.).

C. Full Performance. TEACHER agrees to devote his or her best efforts, skills, and abilities to the performance of each class TEACHER accepts or is otherwise obligated to complete under this Agreement. Generally, full performance will include, but is not limited to: (i) timely commencement of the class at the scheduled start time; (ii) full provision of the requested class and lesson, in accordance with the designated curriculum and parameters specified by the Student, for the full duration of the class, in a professional manner, consistent with industry standard; and (iii) timely completion and submission of "Class Feedback" and/or "Unit Assessment" materials for Students.

D. TEACHER shall not be required to wear a uniform or other clothing of any type bearing VIPKID's name or logo. TEACHER is free to wear any apparel or clothing of TEACHER's choosing, including apparel or clothing advertising TEACHER's business and services, when teaching classes arranged through the VIPKID Platform, so long as TEACHER maintains a professional appearance consistent with the standards generally adhered to in the profession.