<div align="center">

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

</div>

| | |
|---|---|
| KEVIN J. MEEHAN<br><div align="right">PLAINTIFF,</div><br>v.<br><br>VIPKID aka BEIJING DAMI TECHNOLOGY CO., LTD., VIPKID HK LTD. aka VIPKID, BEIJING DAMI FUTURE TECHNOLOGY CO. LTD. aka VIPKID, TENCENT HOLDINGS LTD. aka TENCENT, TENCENT AMERICA L.L.C. aka TENCENT, TENCENT CLOUD L.L.C., SEQUOIA CAPITAL OPERATIONS L.L.C. aka SEQUOIA CAPITAL, CHINA RENAISSANCE HOLDINGS LTD. aka CHINA RENAISSANCE, and VIPKID INTERNATIONAL, INC. aka VIPKIDS INTERNATIONAL, INC. aka VIPKID<br><div align="right">DEFENDANTS.</div> | **Complaint for a Civil Case**<br>Case No. 2:20-cv-06370-JS-AKT<br><br>Jury Trial Requested<br><br><br><br>**FIRST AMENDED COMPLAINT** |

<div align="center">

**COMPLAINT AND DEMAND FOR JURY TRIAL**

</div>

By and through his attorney, Kevin Meehan ("Plaintiff"), on his own behalf and on behalf of all others similarly situated ("Plaintiffs"), complains against the above Defendants, alleging as follows:

<div align="center">

**JURISDICTION & VENUE**

</div>

1.  Plaintiff estimates at least $2,000 in cumulative economic and non-economic damages and injuries per VIPKid class session taught, with the final amount to be fully determined through trial.

2.  This Court has jurisdiction under 28 U.S.C. § 1332(d), as well as 28 U.S.C. § § 2201 and 2202.

3.  Pursuant to 28 U.S.C. §1391(b), venue is proper in the Eastern District of New York because events forming the basis of the Complaint occurred in this District.

4.  All Defendants are subject to personal jurisdiction in New York.

<div align="right">1</div>

## NATURE OF THIS ACTION

5.     Defendants are "VIPKID HK Limited and its parents, subsidiaries, representatives, and affiliates (collectively 'VIPKid,' 'we,' 'us,' or 'our')," see *VIPKid Terms of Use* available at www.vipkid.com/teach/terms-of-use, and encompass China's most powerful multinational companies competing in the global artificial intelligence technology (AI) sector.

6.     "VIPKid" is an education technology brand created in 2013 and officially launched in 2014.

7.     At the heart of VIPKid is a real-time, video-based suite of technologies, the "VIPKid Platform."

8.     Defendants have been surreptitiously misusing the VIPKid Platform for mass collection of personal data, including from teachers working on the VIPKid Platform ("VIPKid Teachers").

9.     Plaintiff and other similarly situated current and former VIPKid Teachers are victims of cyber-fraud and other harms that resulted from Defendants' deliberate and systematic misuse of the VIPKid Platform. ("VIPKid Scheme").

10.    At the heart of the VIPKid Scheme is a false narrative about VIPKid and the VIPKid Platform that was designed to trick American teachers into working on the VIPKid Platform as VIPKid Teachers ("VIPKid Narrative"), where their biometric data was harvested without their knowledge or consent and where they were subject to other unlawful working conditions.

## PARTIES

### A.      THE PLAINTIFFS

11.    Plaintiff Kevin J. Meehan brings this action on behalf of himself, and all other similarly situated current and former VIPKid Teachers, pursuant to Federal Rule of Civil Procedure 23.

### Kevin Meehan

12.    Plaintiff Meehan is an American citizen, born and raised in Nassau County, New York and has remained a domiciliary of Nassau County and a citizen of New York State for his entire life.

13.    Plaintiff was employed by VIPKID from approximately October 2016 to June 2020, working remotely from various locations, including Nassau County.

14.    Plaintiff was employed by VIPKID though falsely classified as an independent contractor.

15.    Plaintiff's FLSA Consent to Sue was filed as APPENDIX 1 to the original complaint. ECF 1-1.

      **B.**     **THE DEFENDANTS**

16.    Defendants are members of four powerful multinational conglomerates competing at the cutting-edge of the global technology sector, working to corner highly lucrative digital technologies.

17.    These technologies include hypothetical and uniquely lucrative forms of artificial intelligence (AI) that mirror human intelligence, hereinafter artificial general intelligence (AGI) which posits that computers can possess human cognitive states, such as human understanding.

18.    Realizing such and other technologies would mean, for example, that Defendants could eventually substitute, online, natural human teachers with virtual humans, namely AI that appears, functions, and behaves like natural humans in key respects.

19.    Such technology would grant Defendants a veritably infinite supply of online "human" capital.

20.    Companies world over are racing to create virtual humans, since, for obvious reasons, such technology would transfer enormous power to the companies and nations that first capture it.

21.    Tangential advancements in facial recognition technology alone would suffice for such power.

22.    Creating realistic, functioning virtual humans, including by advancing computer vision and facial recognition technology, requires large stores of data from natural humans, especially indexes of human expressions, voices, facial geometries, and other valuable but hard to obtain biometric data.

23.    Defendants have been cooperating to be the first to capture and corner such and other related technologies, through numerous, deliberately nebulous, and ambiguous brands, entities, and groups.

24.    Defendants are using VIPKid to stockpile data for the development of facial recognition technology and AI and for discovering AGI and technologies necessary to create virtual humans.

<center>MASTERMIND DEFENDANTS</center>

25.     Certain Defendants that are instrumental for VIPKid do not do business openly as VIPKid. They are named, herein as "Mastermind Defendants," for their key role in the VIPKid Scheme.

**Tencent Holdings Limited (hereinafter "Tencent Holdings")**

26.     Tencent is a multinational conglomerate contained within Tencent Holdings and made up of a significant number of subsidiaries, affiliates, and divisions ("Tencent Network") that cooperate across Tencent Holdings to reach shared commercial technology development objectives.

27.     Tencent's core pursuits include computer vision, audio recognition, natural language processing, and machine learning, used, for example, to edit, create, analyze, and identify images and videos; to improve object/face detection and tracking; and for machine translation and speech recognition.

28.     Tencent develops its technology including by multi-year partnerships with brands like VIPKid.

29.     The VIPKid Platform is made up of software and infrastructure from various sources, including significant Tencent software and infrastructure, and especially Tencent facial recognition software.

30.     Tencent infrastructure ensures that the VIPKid Platform has a smooth connection for efficient and seamless capture of data and videos, enhancing use of the Platform for technological development.

31.     VIPKid stores data on the Tencent Cloud and recordings of VIPKid courses are streamed, stored, exploited, or shared, in whole, part, or duplicate, using Tencent software/hardware/infrastructure.

32.     Overwhelming evidence indicates that Tencent uses the VIPKid Platform for technological development, for example, to train, test, and improve its facial recognition and other technology.

33.     Overwhelming evidence indicates that Tencent uses recordings of VIPKid Teachers for such ends.

34.     Evidence indicates that Tencent is disseminating, throughout the Tencent Network, fruits of the VIPKid Platform, including information related to biometric/personal data of VIPKid Teachers.

35.     Tencent divisions/departments within Tencent Holdings that partner with the VIPKid include:

<div align="right">4</div>

a.   ***Tencent Youtu Lab*** is an AI department formed across the Tencent Network and focused on applying machine learning, pattern recognition and image cognitive technologies to real-world scenarios. The Lab partners with brands such as VIPKid to jointly build AI solutions. The work of the Lab focuses on helping computers see, including for example, for advancing commercial-grade facial recognition technology.

b.   ***Tencent AI Open Platforms***, a startup AI accelerator that brings together top AI capabilities and industry resources to connect industry partners and further the dissemination and application of AI technology. VIPKid is likely one of the start-ups run on Tencent AI Open Platform and a member of the "Tencent AI Accelerator."

c.   ***Tencent Education Business Forum***, a brand made up of 20 products across the Tencent Network, with a reach of 15,000 schools, 70,000 educational institutes, and more than 300 million users. Its catalog of services includes facial recognition technology for monitoring students during class, likely used on the VIPKid Platform.

d.   ***Tencent AI Labs*** develops and deploys experimental AI software, including, for example, AI software that uses games to improve its own learning capabilities.

e.   ***Cloud and Smart Industries Group*** is a division of Tencent Holding, ECF 39, that explores the interactions between users and industries to create innovative solutions for smart industries via technological advancements such as cloud, AI, and network security. CSIG "help[s] VIPKid expand its market leadership in China and in global markets, and to empower the future of education via technology." Exhibit D-7.

36.   Through its agents, Tencent Holdings has infused hundreds of millions of dollars into VIPKid and its Platform to "deepen collaboration in the online education, artificial intelligence, and cloud services sector," funneling funds through VIPKid agents, including VIPKid Ltd., a Cayman Island shell company.

37.     These funds were conditioned on Tencent Holdings exercising control over VIPKid and its operations; changes made by Tencent to VIPKid were significant and palpable to employees.

38.     At least two other Tencent entities also contribute to VIPKid, in their individual and joint capacities:

**Tencent America LLC (hereinafter "Tencent America")**

39.     Describing itself as "a Chinese company which is pursuing new markets and growing rapidly in the US," Tencent America openly states that it "is the US branch of Tencent," with key areas of focus that include advertising, artificial intelligence, investments, and security.

40.     Given the extent of Tencent infrastructure relied upon by VIPKid, Plaintiff will show through discovery that Tencent America supports, contributes to, and/or is part of the VIPKid Platform.

**Tencent Cloud LLC (hereinafter "Tencent Cloud")**

41.     Tencent Cloud provides online education administration services, including hosting services; Big Data and AI services; SaaS tools and services to manage online education administrative processes including enrollment, course scheduling, and certification systems; live video recording and broadcasting; media asset management; automated transcoding; and video AI and content delivery acceleration to improve operational efficiency.

42.     Public statements by Tencent entities evidence that discovery will show that VIPKid uses Tencent Cloud services and/or Tencent Cloud uses VIPKid to develop and enhance its own services.

**Sequoia Capital Operations LLC (hereinafter "Sequoia")**

43.     Sequoia is one of VIPKid's earliest and most important strategic and financial partners, having actively partnered with VIPKid since 2014 at the earliest and 2016 at the latest.

44.     Sequoia has played an active and key role in developing VIPKid, the VIPKid Platform and the VIPKid Scheme, directing VIPKid growth and activities from an early stage. ECF 44.

45. With an interest in using the VIPKid Platform to create game changing technological innovation, Sequoia contributed to the VIPKid Scheme by crafting a false Narrative that positioned VIPKid as company seeking to connect people—deliberately omitting material facts to usurp public trust.

46. Sequoia Global Managing Partner Shen Nanpeng has stated that Sequoia's investment in VIPKid is representative of "Sequoia's most important investment strategy: to be the earliest and most important investor in the top high-growth enterprises." He has mused about what the world will look like when "face recognition or other IDs 'mature'," emphasizing that VIPKid's technological innovation can change markets and displace consumer preferences ECF 44.

47. Sequoia founding partner, Michael Moritz has said that "when [Sequoia] help[s] organize one of [the companies it partners with] at the beginning, it never looks like the greatest idea in the world. I think it is the marketing and PR department that rewrites history." ECF 44.

48. When answering the question "How does Sequoia Invest?" James Buckhouse, a Design Partner at Sequoia and founder at Sequoia Design Lab stated that "Without story, we have no mechanism by which to generate a machine inside the minds of others that does positive work on our behalf…" Id.

49. Discovery will show that Sequoia designed and implemented the VIPKid Narrative, and that Sequoia has shared the fruits of the VIPKid Platform, including across its vast networks.

**China Renaissance (hereinafter "CR")**

50. Founded in 2005, CR is "the leading investment banking and investment management firm dedicated to China's new economy businesses," that aim to transform "traditional industries through entrepreneurship, technological advancement, and innovative business models." ECF 45.

51. CR is VIPKid's exclusive financial advisor and its capital markets partner. CR supports VIPKid in exploring the boundaries and possibilities of online education and has advanced the VIPKid Scheme by actively shaping VIPKid so that VIPKid's activities are responsive to the national policies of the Chinese Government.

52.     Advancing the VIPKid Narrative, CR has stated "VIPKid has redefined and innovated the concept of the global classroom….[and] built enormous brand awareness and a passionate and dedicated teacher community."

<div align="center">

**DAMI DEFENDANTS**

</div>

53.     Defendants that openly do business as VIPKid are named, herein, "Dami Defendants."

**Beijing Dami Technology Co., Ltd. aka VIPKid (hereinafter "BDT")**

54.     BDT is the principal or core VIPKid company and owner of VIPKid trademarks used by Dami Defendants and by the VIPKid Platform when it is being used in certain capacities.

55.     BDT owns VIPKid's English-language website www.vipkid.com, and has owned of at least nine VIPKID apps on Apple's App Store, including online teaching apps. Exhibit D-5-1.

**VIPKid HK Limited aka VIPKid (hereinafter "VIPKid HK")**

56.     VIPKid HK is the contracting party named on purported agreements governing VIPKID Teacher "use of VIPKID's website and technology platform" and is an agent of all Defendants.

57.     It is the parent of Beijing Dami Future Technology Co., Ltd. and owner of "VIPKid Study," an app described on Apple's App Store as a "learning center" and "all-round learning space."

**Beijing Dami Future Technology Co., Ltd. aka VIPKid (hereinafter "BDFT")**

58.     BDFT is a wholly owned subsidiary of VIPKid HK. BDFT owns patents for technology used on the VIPKid Platform, including patents for harvesting VIPKid Teacher biometric data.

59.     BDFT owns VIPKid's Chinese-language website, www.vipkid.com.cn.

**VIPKid International Inc. aka VIPKid (hereinafter "VIPKid Int'l")**

60.     VIPKid Int'l is a wholly owned subsidiary of VIPKid HK, and an agent of all Defendants.

61.     VIPKid Int'l is named as an express beneficiary on purported agreements governing VIPKID Teacher "use of VIPKID's website and technology platform."

DEFENDANTS' CONTACTS WITH NEW YORK

62. Activities conducted in the name of "VIPKid" in New York State, by all defendants jointly and severally were and remain significant and unqualifiedly commercial in nature such that they satisfy requirements for jurisdiction as against all Defendants as set out under N.Y. C.P.L.R. § 302(a).

63. Use of the VIPKID Platform from New York requires VIPKid Teachers located in and across the State to knowingly and repeatedly transmit, over the Internet, to and from New York State, computer files, including personal data, reports, video, correspondence, commands, images, and technology belonging variously to all defendants especially Tencent and Dami Defendants.

64. VIPKid's New York Office serves as the location for its global legal department, which acts as an agent for all Defendants. VIPKid retains New York attorneys to staff this office, including New York-based U.S. Legal Director, Huan Xiong, a New York Attorney based in New York State.

65. Matters related to the VIPKid Scheme are handled by the New York global legal department.

66. The New York Office lobbies New York State to advance interests of all Defendants. ECF 65.

67. Further, LinkedIn lists some 600 people who claim to work for VIPKid from New York. Exhibit A.

68. As to particular defendants, Tencent America is a registered foreign entity in New York and New York is the seat of the "Chief Executive Officer at Tencent America" and Tencent America's "Director-International Partnerships (North America)." Exhibit K.

69. Tencent Cloud technology is integrated into the VIPKid Platform, accessed including in New York.

70. Sequoia agents transact business in New York, actively searching for investments. Exhibit L-3.

71. CR operates in New York through its New York offices, namely, its wholly owned and controlled subsidiary, China Renaissance US, a domestic corporation headquartered in New York City.

72. Dami Defendant apps, trademarks, and websites are downloaded and accessed from New York.

73. Thousands of individuals with New York State addresses have contracted with VIPKid HK. ECF 1.

74. VIPKid Int'l acts as an agent for all Defendants in New York, including in lobbying work. ECF 65

9

## THE VIPKID FRAUDULENT SCHEME

75. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

76. The VIPKid Scheme was implemented to fraudulently induce VIPKid Teachers to work on the VIPKid Platform and to keep them there, under false pretenses and harmful conditions.

77. The VIPKid Scheme is driven by the VIPKid Narrative that falsely frames VIPKid as a professional community of high-quality, networked teachers who enhance access to education.

78. The Scheme extends to design and implementation of working conditions that enhance data harvesting and keep VIPKid Teachers working on the VIPKid Platform as much as possible.

79. Evidence shows that all Defendants agreed to work together to implement the VIPKid Scheme; that each contributed variously, in cash, kind, networks, or know-how; that each has supported or advanced the false Narrative underlying the VIPKid Scheme; and each resultantly benefitted from it.

80. Each Defendant has contributed to the design, development, and/or maintenance of the VIPKid Platform and each has entered into one or more agreement related to the Platform.

81. Dami Defendants are merely the face of the VIPKid Scheme.

82. Each Defendant has played an intentional, deliberate, and self-serving role to advance the VIPKid Scheme. Sequoia crafted the VIPKid Narrative. CR provided political and financial support for the VIPKid Scheme. Tencent Defendants form and/or power the VIPKid Platform with their software, cloud support and technical know-how.

83. The full contribution of each Defendant to the VIPKid Scheme will be determined through trial.

### The VIPKid Scheme was designed to Target North American Teachers

84. Online education providers compete to hire native English-speaking teachers; amongst such teachers, American teachers are highly valued. The VIPKid Narrative falsely distinguishes VIPKid from its well-funded competitors to attract and retain these American teachers.

85.     The VIPKid Scheme targeted American public-school teachers, who are known world over as being unsupported, low-wage earners who are willing to pay out-of-pocket for school supplies.

86.     After psychologically profiling these teachers, the VIPKid Scheme differentiated VIPKid from other platforms by falsely framing VIPKid as created to support teachers by providing them with income, a vibrant community, benefits, and professional networks and opportunities.

87.     Since at least 2016, this Narrative has been advanced on VIPKid's English-language website (www.vipkid.com) and on other public platforms—even though it has no basis in truth.

88.     This Narrative, powered by the VIPKid Scheme, went to the extent of causing American public school teachers to quit their jobs teaching in schools to work online for VIPKid full-time.

**The VIPKid Scheme is Designed for Mass Collection of Personal Data**

89.     VIPKid Teacher working conditions were deliberately designed for harvesting of personal data and technological development, especially development of AI, AGI, and facial recognition technology.

90.     For example, VIPKID Teachers are/were required to use a method called "Total Physical Response," (TPR). TPR is a slow, deliberate, exaggerated style of speaking and gesturing ideal for recording and capturing human speech and movements, for example, to develop and train AI.

91.     VIPKid Teachers never received clear guidance on using TPR and were expected to adopt the style by mimicking videos. Defendants did not "train" VIPKid Teachers in TPR because TPR was not intended to be a genuine pedagogical tool. TPR is a guise to force VIPKid Teachers to adopt mannerism that would enable and enhance capture of their biometric data.

92.     Similarly, VIPKid Teachers are/were required to deliver classes by sticking to a specific script, creating more uniform videos suited for use for the development of various technologies.

93.     VIPKid Teachers are/were told to use various tools, e.g., digital stickers that mapped to faces, for pedagogical value. Such devices aimed to use/train facial recognition and other technology.

94. In the context of surreptitious use of the VIPKid Platform for the development of commercially lucrative technology, VIPKid Teacher recruitment efforts are noteworthy:

95. At its current rate of productivity, VIPKID would need a total cohort of nearly 20 million natural teachers to offer just one 25-minute class per week to each of the 300 million school-going children in China alone. There is no evidence whatsoever that VIPKID is making any efforts to expand its current VIPKID Teacher population to meet this need—by hiring natural humans as teachers. To the contrary, VIPKID appears to be scaling down its teacher recruitment efforts and restricting hiring from certain US jurisdiction, all together.

96. This is because Defendants are not interested in hiring more teachers, they are focused on using existing resources to develop virtual teachers and other advanced technologies.

**VIPKid's Bulk Collection of Biometric Data**

97. VIPKid has collected millions of hours of recordings of VIPKID Teachers giving clear, slow, and simple directions to students while reading from standardized materials.

98. Additionally, VIPKid also appears to be stockpiling similar recordings from American public school students through VIPKid's "Lingo Bus" program, which offers online Mandarin courses through a game-based curriculum run, in whole or in part, on the VIPKid Platform and actively used in public schools in Illinois, Virginia, California, Georgia, Maryland, Utah, and South Carolina.

99. Overwhelming evidence indicates that all these recordings are used, e.g, to train AI models to understand voices, facial expressions, feelings, and emotions, to develop algorithms to analyze eye movements, to create AI courses, and to experiment with other new technologies.

100. Lingo Bus received US$200 million, the largest investment in its sector, from Sequoia and Tencent.

101.    Tencent is famous for using games to develop AI. This past July, Tencent announced that it would

be using a time-sensitive facial recognition system that detects minors and prevents them from

playing video games after dark to ensure compliance with new wave of Chinese regulations.

102.    Similalry, BDFT owns patents for technology for the VIPKid Platform that can harvest VIPKid

Teacher biometric data, including by dissecting and transplanting faces, voices, and mannerisms

such that video layers could be used to make one person look like someone else entirely online.

103.    It's reasonable to assume that personal data, collected on the VIPKid Platform is shared through the

networks of some or all defendants. There is no indication that there are any safeguards in place to

ensure that this data, which might be the largest private collection of personal/biometric data in the

world, is stored safe from misuse.

### The VIPKid Scheme was advanced through Fraudulent Agreements

104.    Vague language in purported agreements about the VIPKid Platform isolated VIPKid Teachers

from each other and the truth about the VIPKid Platform, while allowing Defendants to access,

share, and control—undetected—the VIPKid Platform and its fruits, including recordings.

105.    Notably, including in fraudulent agreements and terms of service, VIPKID Teachers were falsely

told that recording on the VIPKID Platform are used only: "to enable Students to access the class

recordings for <u>educational</u> purposes...[and] by VIPKID and its subsidiaries, affiliates, related

companies and licensees for <u>marketing</u> and <u>promotional purposes</u>." (EXHIBIT J-1, Section 11(c),

emphasis added).

106.    Agreements were also deliberately designed to wrongfully misconstrue VIPKid Teacher rights.

107.    For example, VIPKID structured (and re-structured at least twice) its agreements with VIPKID

Teachers to ensure that, as far as possible, any disputes would be governed by jurisdictions where

VIPKID Teachers could not access protection of American law. Exhibit B.

## CLASS ACTION CLAIMS

108. Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

109. Plaintiff brings the first, second, third, and fourth claims under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class preliminarily defined as:

*all current and former VIPKid Teachers.*

110. All of those persons, including Plaintiff, are referred to herein as the "VIPKid Class," and are readily ascertainable. The number and identity of the Class members should be determinable from the records of Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

111. Class action certification under Rule 23 is proper because, at all times relevant, Plaintiff and other VIPKid Teachers were similarly situated, worked under the same automated conditions, performed the same automated job duties, were compensated in the same manner, managed the same employer-employee relationship, suffered under the same policies and practices instituted by the VIPKid Scheme, and resultantly suffered the same unlawful conduct that was widespread, repeated, consistent, largely automated, and occurring pursuant to corporate policies and practices.

112. Furthermore, VIPKid has acted or refused to act on grounds applicable to the entire class.

113. Class litigation will obviate the need for unduly duplicative litigation.

114. Defendants claim over one hundred thousand VIPKid Teachers, as such joinder of all members is impracticable and presents the risk of inconsistent results that cause prejudice to a party.

115. Common questions among the class predominate over questions affecting individuals.

116. Individual VIPKid Teachers lack the financial resources to conduct a thorough examination of VIPKID and to prosecute vigorously a lawsuit against VIPKID to recover damages.

117. Absent class and collective action VIPKid Teachers likely will not obtain redress of their injuries, and Defendants will retain the proceeds of their violations.

14

## FIRST CAUSE OF ACTION: COMMON LAW FRAUD IN THE INDUCEMENT

118.   Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

119.   All Defendants designed, supported, agreed to and/or implemented the VIPKid Scheme to wrongfully induce teachers into working on the VIPKid Platform.

### Misrepresentations and Omissions of Materia Fact Defendants knew to be False

120.   Material misrepresentations and omissions of fact advanced as a part of the VIPKid Scheme to induce individuals into working on the VIPKid Platform were known to be false by all Defendants and were collateral to purported agreements that VIPKid Teachers signed with VIPKid.

121.   Misrepresentations and omissions of material fact have resulted in special damages that are unrecoverable as contract damages.

### *Material Misrepresentations and Omissions about working as a VIPKid Teacher*

122.   Misrepresentations and omissions of material fact advanced by the VIPKid Scheme were deliberately crafted after psychologically profiling American public school teachers.

123.   After studying the unique vulnerabilities of American public school teachers, the VIPKid Scheme materially misrepresented the work and lifestyle of VIPKid Teachers, including as detailed elsewhere herein, as membership in a "global teaching community," where American teachers could advance their teaching careers, and earn reliable and steady income through flexible, high-quality networking, professional development and growth opportunities. Further, the VIPKid Scheme falsely misrepresented working as a VIPKid Teacher as a viable alternative to full-time employment teaching in-person in schools and falsely misrepresented the value of VIPKid pedagogy.

124.   The VIPKid Scheme was designed to falsely present VIPKid as a vibrant and active community of teachers building stable economic and professional lives—courtesy the opportunities afforded to them by VIPKid, including and by describing "[t]eaching online" as "the most exciting work opportunity for teachers this century."

15

125.    By means of illustration, VIPKid's English-language Website has described VIPKid as follows:

    a.    "VIPKid provides the North American elementary school experience to Chinese children - all from the comfort of their home. Our sophisticated virtual classroom streams native English speaking teachers into Chinese homes, linking the world through education."

    b.    "Teachers feel supported before, during and after class.

    c.    "At VIPKID, we provide lesson plans, a real-time tech support team and a large operations team to meet our teachers' needs."

    d.    "Teach Every Child" and "Enable Every Teacher."

    e.    "Teach with VIPKid. Work When and Where You Want."

    f.    "Join the Largest Global Teaching Community"

    g.    "Become a Teacher"

    h.    "There is no commitment - you can work as much or as little as you'd like."

    i.    "Can I take a break or go on vacation? Yes, you can! The world is your oyster and flexibility is one of the best perks when teaching with VIPKid."

    j.    "[Y]ou have 100% control over your schedule."

    k.    "VIPKid teachers are ambassadors and mentors, bridging cultures across the globe while forming deep connections with their students."

126.    Defendants knowingly and variously repeated these and other false misrepresentations in public.

127.    All Defendants helped conceal the VIPKid Scheme and omitted to clarify falsehoods.

*Material Misrepresentation and Omission about the VIPKid Platform*

128.    While falsely presenting VIPKid as a human-centered company seeking to support teachers, the VIPKid Platform was systematically harvesting personal data, including from VIPKid Teachers.

129.    The VIPKid Scheme materially misrepresented the VIPKid Platform, presenting it as a platform designed to do nothing more than leverage technology to connect natural people across distance.

16

130.    Significantly, the VIPKid Platform has also been falsely described, by Defendants, as though it were a singular program, software, or application, developed and run entirely by Dami Defendants.

131.    All Defendants have omitted, including before this Court, that the VIPKid Platform is a modular technology formed, powered, accessed, and controlled by various entities including Tencent.

132.    Defendants hid that Tencent facial recognition technology forms part of the VIPKid Platform.

133.    Tencent Defendants appeared before this court claiming to be arm's length investors of VIPKid.

134.    Evidence on public record shows what discovery will confirm. All Defendants entered into an agreement to exploit the VIPKid Platform to harvested valuable and hard to obtain personal and biometric data for the purposes of developing advanced AI technology, including virtual humans.

135.    The VIPKid Scheme went to the extent of extending this deception through fraudulent agreements purported to govern VIPKid Teacher use of the VIPKid Platform.

## Material Misrepresentations and Omissions Made to Induce Reliance

136.    Competing platforms that have not used false language or comparable schemes employ far fewer American teachers, around 10,000 compared to VIPKid's over 100,000.

137.    VIPKid would not have attracted the sheer volume of VIPKid Teachers that it has, if it were not for the VIPKid Scheme and the material misrepresentations and omissions advanced therein.

138.    Further, systematic omission of any reference to commercial or technological exploitation of the VIPKid Platform, even in purported agreements governing VIPKid Teacher use of the VIPKid Platform, only shows that Defendants meant to induce reliance.

## Reasonable Reliance by VIPKid Teachers

139.    Defendants have aggressively curated a false image for VIPKid advancing misrepresentations and omissions of material fact. VIPKid Teachers reasonably relied on this image when deciding to work as VIPKid Teachers because any reasonable investigation into working as a VIPKid Teacher, by a person of average prudence, would not have revealed the VIPKid Scheme or any concerns about VIPKid, to any extent.

17

**Resulting Injury**

140.    While the full extent of damages will be established through trial, the VIPKid Scheme caused

VIPKid Teachers to pay out of pocket for computers, Internet service, and other equipment,

materials, and expenses incurred in preparation for work as a VIPKid Teacher.

**SECOND CAUSE OF ACTION: COMMON LAW FRAUD**

141.    Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

142.    All Defendants designed, supported, agreed to and/or implemented the VIPKid Scheme to

defraud VIPKid Teachers into continuing to work on the VIPKid Platform, once hired.

***Material Misrepresentations and Omissions Known to be False and made to Induce Reliance***

143.    After VIPKid Teachers were hired, Defendants through the VIPKid Scheme, variously advanced

further material misrepresentations and omissions about VIPKid, particularly by continuing to omit

that VIPKid Teacher personal data was being harvested and used for technological development.

144.    Defendants continued to misrepresent opportunities and benefits of working as a VIPKid Teacher.

145.    Further, Defendants leveraged paid news and other marketing gimmicks to create misinformation

about VIPKid and VIPKid Teachers to ensure a positive public image for the brand.

146.    Most of all, the VIPKid Scheme relied on psychologically profiling VIPKid Teachers to create a

cult-like atmosphere to retain VIPKid Teachers and prevent questions from them.

147.    For example, VIPKid's English-language Website makes several claims about the prospects of

achieving financial stability through work as a VIPKID Teacher and presents as representative a

teacher who was able to consider moving to Asia, allegedly because of the economic flexibility and

stability afforded to him by working as a VIPKID Teacher.

148.   VIPKid co-founder Cindy Mi has openly stated that VIPKid Teachers were mainly from primary and secondary schools in the United States, where they earn around $30,000 to $40,000 annually and that being able to earn an extra $1,000 to $2,000 per month is a significant incentive.

149.   Mi has also been quoted as saying that VIPKid Teachers are very supportive of VIPKid and feel happy and proud to work under strictly regulated conditions, driven by spiritual encouragement.

150.   So-called "spiritual encouragement" is deliberately woven into the VIPKid Brand and activities to hook VIPKid Teachers to the VIPKid Platform. For example, VIPKid figures teaching online as a spiritual calling, claiming spiritual benefits from teaching children from China online.

151.   The VIPKid Scheme deliberately and falsely presented becoming a VIPKid Teacher as a highly exclusive, rigorous, and selective process, to make VIPKid Teachers feel uniquely chosen.

152.   The VIPKid Scheme figures Mi as a charismatic leader. While VIPKid is listed as having three founders, Mi, Jessie Chen, and Victor Zhang, Mi is often presented as the sole founder and introduced by her charismatic backstory as a rebel, rulebreaker, and high school dropout. Mi describes herself as an "educator" despite limited background and experience in the field and often appears in videos or events where she speaks "directly to" and "connects with" VIPKid Teachers.

153.   In these and other ways, the VIPKid Scheme paints a false sense of community to get VIPKid Teachers attached to VIPKid, including by giving VIPKid Teachers empty titles by, for example, referring to VIPKid Teachers as "Teacher Martha," or "Teacher Edison."

154.   Mi has even bragged that VIPKid Teachers pay thousands of dollars out of pocket on VIPKid Swag.

155.   Finally, the VIPKid Scheme intentionally framed expatriation from the United States as a benefit of working as a VIPKID Teacher, while knowing that VIPKid Teachers agreements, though fraudulent, were deliberately crafted to undermine the rights of expatriated Americans.

156.   These and other and further such material misrepresentations were made to induce VIPKid

Teachers to remain on the Platform and become attached or addicted to the VIPKid Platform so

VIPKid, including all Defendants, could benefit from harvesting and exploiting their personal data.

### Justifiable Reliance by VIPKid Teachers

157.   VIPKid Teachers were justified in relying on the material misrepresentations and omissions of the

VIPKid Scheme. VIPKid Teachers were targeted for specific qualities and characteristics that made

them vulnerable to the VIPKid Scheme, which was both comprehensive and tailormade for them.

158.   Moreover, with all Defendants aggressively advancing the VIPKid Scheme, (including before this

Court), the entire environment around VIPKid Teachers reinforced the VIPKid Scheme and left

them with no basis to question VIPKid or discover the truth. Even a Google search for VIPKid

brings up mainly curated information aimed to mislead people about the nature of the brand.

### Resulting Injury

159.   While the full extent of damages will be established through trial, the VIPKid Scheme caused

VIPKid Teachers to pay out of pocket for maintenance and repair of computers, Internet

service, and other materials and equipment required for work on the VIPKid Platform,

160.   VIPKid Teachers also paid for various VIPKid products and services they were directed to purchase

for use as a VIPKid Teachers and for "benefits" of the VIPKid Lifestyle, including travel,

abandoning full-time in-person teaching, and living abroad.

### THIRD CAUSE OF ACTION: COMMON LAW CONVERSION

161.   Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

162.   Plaintiff and others similarly situated have possessory rights and/or interests in their personal data,

especially biometric data. Such rights were never ceded or licensed to VIPKid or any Defendant.

163.   By harvesting such data from VIPKid Teachers without notice or consent, and by merging them

into audio, video, images, algorithms, computer programs, databases, reports, and other documents,

20

Defendants unlawfully interfered with and/or assumed ownership over such property in derogation of the rights of Plaintiff and others similarly situated.

164.   VIPKid Teachers are entitled to a judgment for damages in an amount equal to the fair market value of their property, which is a question of fact to be determined through trial and by a jury.

165.   VIPKid Teachers are also entitled to injunctive relief in the form of the destruction of any and all indexes of their personal data, as a means of returning to them their right over their property.

## FOURTH CAUSE OF ACTION: VIOLATION OF N.Y. GEN. BUS. LAW §§ 349 & 350

166.   Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

167.   Plaintiff and others similarly situated are individuals who have suffered actual injury by reason of violation of N.Y. Gen. Bus. Law § 349 and § 350.

168.   VIPKid is a commercial activity that furnishes services from within New York.

169.   VIPKid has engaged in unlawful and deceptive consumer-oriented acts or practices in the conduct of its business, namely omitting to mention wrongful harvesting and use of biometric and other personal data and false advertising on the nature and purpose of VIPKid.

170.   Defendants' conduct affected competition in the AI sector as it allowed Defendants to obtain, for free, highly valuable and hard-to-get personal data for technological development.

171.   VIPKid Teachers suffered injury as a result of these deceptive acts and practices.

172.   Resulting injuries are to be fully determined through trial and include being denied due payment for valuable personal data and other injuries.

## COLLECTIVE ACTION CLAIMS

173.   Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

174.   Plaintiff incorporates herein, *mutatis mutandis*, all relevant allegations supporting class action.

175.   Plaintiff brings the following causes of actions under the Fair Labor Standards Act, 29 U.S.C. § 201,

et seq. ("FLSA") and the New York Labor Law ("NYLL") on behalf of himself and a class

preliminarily defined as:

*all current and former VIPKID Teachers ("VIPKID Collective")*

176.   VIPKid has made deliberate efforts to evade requirements under the FLSA and the NYLL,

including by policies to refuse to hire workers in states where abuses could be easily detected.

177.   Plaintiff and members of the VIPKid Collective were wrongly classified as independent contractors.

## FIFTH CAUSE OF ACTION: BREACH OF NEW YORK LABOR LAW

178.   Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

179.   At all times relevant, Plaintiff and the VIPKID Collective were employed by VIPKid, an

employer under N.Y. Exec. Law § 292(5).

**Off-the-Clock Hours in Breach of NYLL Article 19, §§ 650 et seq.**

180.   VIPKID has a practice and policy of making VIPKID Teachers do unpaid, off-the-clock work.

181.   Such work included time in preparation for courses, post-lesson reports, work offering

corrections for VIPKID materials,

182.    time spent training and seeking certification, time spent repairing essential tools required for

work, time spent interacting with and responding to support services, time spent completing

administrative and maintenance tasks, and other work.

183.   Generally, VIPKid Teachers were also regularly forced to teach more than the 25-minutes for

which they were promised pay. They were forced to do so even though they faced the risk of

wage deduction for arriving late to any subsequent classes.

184.   The practical consequence was that if Plaintiff wanted to "work as much as he wanted," as

VIPKID had guaranteed, he would have to do so without a break by working back-to-back

and by using any free time to acquire difficult to obtain certifications to teach more classes.

**Unlawful Wage Deductions in Breach of NYLL § 193**

185.   VIPKid implemented a unilateral, illegal policy of deducting wages from VIPKid Teachers.

186.   For example, for each class taught VIPKid Teachers are required to submit reports. If a VIPKID Teacher does not complete these and other such tasks, he or she is/was subject to wage deductions up to 100% from wages already earned and potentially liquidated damages.

187.   Further, if any technical difficulties interfered with more than three minutes of class time, VIPKid Teachers would be forced to forfeit 100% of their wages for the class.

188.   VIPKID rarely took responsibility for any service failures caused by its software and was in the habit of attributing technical difficulties to VIPKid Teachers without adequate proof.

189.   The deductions, charges, and payment at issue violated §193 because they were applied to wages that were already earned, and deductions were neither for the benefit of VIPKID Teachers nor of the limited type permitted by the statute.

190.   VIPKID's actions are exactly the type of actions that NYLL §193 intends to prohibit.

191.   Illegal deductions forced VIPKid Teachers back on the VIPKid Platform to earn back money.

**Breach of Spread of Hours Requirements**

192.   VIPKID has failed to pay VIPKid Teachers additional or higher wages because of their spread of hours, including overtime wages for all the hours that they worked in excess of 40 hours in a work week and additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

**Breach of Sick Leave Requirements under of NYLL § 196-b**

193.   As an employer with one hundred or more employees in any calendar year, VIPKID owes each employee up to fifty-six hours of paid sick leave each calendar year, accrued at a rate of not less

than one hour per every thirty hours worked from commencement of employment.

194.    VIPKID never gave VIPKid Teachers required paid sick leave.

**Retaliatory Action in Breach of NYLL § 215 et. seq.**

195.    A sub-section of VIPKid Teachers in the VIPKid Collective ("Terminated Teachers") were

wrongfully penalized and discharged because they complained to their employer about conduct that

they reasonably and in good faith, believed violated provision of the New York Labor Law.

## Damages:

196.    Due to VIPKid 's violations of the NYLL,  Plaintiff  and  the members  of the VIPKid  Collective

are entitled to recover from all unpaid wages, liquidation damages, as provided for by NYLL

Article 6, § 198, reasonable attorney's fees, costs, pre-judgement and post-judgement interest, and

other compensation equal to one hundred percent of the total of such underpayments found to

be due,  damages, and  awards as provided  for by NYLL Article 6, § 198, by other applicable

laws, or as deemed appropriate by this Court.

## SIXTH CAUSE OF ACTION: BREACH OF THE FLSA, 28 U.S.C. §§ 201 ET SEQ.

197.    Plaintiff repeats and re-alleges allegations set forth above, as though set forth in full herein.

198.    At all times relevant, Plaintiff and the VIPKID Collective were employed by VIPKid, a New

York employer as defined by 29 U.S.C. § 203(b), (d), and (e) and an enterprise engaged in

interstate commerce with employees engaged incommerce within the meaning of 29 U.S.C. §

203(s)(i) with total annual gross revenue over $500,000.

199.    Violations of the FLSA were willful and a three-year statute of limitations applies.

200.    At all times relevant, VIPKid failed to pay Plaintiffs and the VIPKid Collective the lawful minimum

hourly wage for all hours worked in violation of 29 U.S.C. § 206(a) and deliberately structured

VIPKid Teacher work and working conditions to maximize the potential for unpaid work.

201.    As a result of VIPKid violations of the FLSA, Plaintiff and the members of the VIPKid Collective

have suffered damages under the FLSA in amounts to be determined at trial and are entitled to

recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other

compensation pursuant to 29 U.S.C. § 216(b).

## RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and in favor of those he

represents against all Defendants containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices complained of herein violate the

laws of the State of New York;

B.    An award of all damages, penalties, and costs invoked herein plus prejudgment interest, in an

amount to be determined at trial, including compensatory damages, special damages, and any

other damages permissible under law and/or considered suitable by this Court to compensate

Plaintiffs for all monetary and non-monetary harm, damages, and injuries suffered;

C.    An award of punitive damages as permitted under applicable laws, regulations, and policies;

D.    Injunctive relief requiring Plaintiffs to destroy any and all VIPKid Teacher personal and/or

biometric data and fruits thereof; and

E.    Such other and further relief as the Court may deem just and proper.

F.    This Court has jurisdiction under 28 U.S.C. § 1332(d), as well as 28 U.S.C. § § 2201 and 2202.

Date: December 3, 2021

/s/ *Lakshmi Gopal*
Lakshmi Gopal
Muciri Law PLLC
43 W 43rd Street, Suite 226
New York, NY 10036
*Attorney for Plaintiff Meehan*