RUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
KEVIN MEEHAN,

                                   Plaintiff,

                  -against-                                      **REPORT AND**
                                                                 **RECOMMENDATION**
                                                                 CV 20-6370 (JS) (ARL)
VIPKID, VIPKID INTERNATIONAL, INC. aka
VIPKIDS INTERNATIONAL, INC. aka VIPKID aka
VIPKID INTERNATIONAL, BEIJING DAMI
TECHNOLOGY CO., LTD. aka BEIJING DA MI
TECHNOLOGY CO., LTD. aka VIPKID, BEIJING
DAMI FUTURE TECHNOLOGY CO., LTD. aka
BEIJING DA MI FUTURE TECHNOLOGY CO.,
LTD., TENCENT HOLDINGS LTD., CLOUD &
SMART INDUSTRIES, TENCENT HOLDINGS LTD.
aka CLOUD & SMART INDUSTRIES AT TENCENT
HOLDING LTD., TENCENT AMERICA LLC,
TENCENT CLOUD LLC, CHINA RENAISSANCE
HOLDINGS LTD. aka CHINA RENAISSANCE
SECURITIES aka CHINA RENAISSANCE,
SEQUOIA CAPITAL OPERATIONS LLC, VIPKID
HK LIMITED, VIPKID CLASS HK LIMITED and
VIP TEACH INC.,

                                   Defendants.
------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        The plaintiff, Kevin J. Meehan ("Meehan"), commenced this putative class and collective

action on November 13, 2020, in the Supreme Court of the State of New York, County of

Nassau, against the defendant VIPKid HK Limited ("VIPKid HK") and a dozen entities that he

alleges are related to or in some fashion affiliated with VIPKid HK.  On December 30, 2020, the

defendant VIPKid International, Inc. ("VIPKid Int'l.") removed the action to this Court pursuant

to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  On January 4, 2021,

the defendant Sequoia Capital Operations, LLC ("Sequoia Capital") filed a Notice of Consent to

the removal filed by VIPKid Int'l and noted the existence of additional grounds for federal

jurisdiction under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* On January 29, 2021, Meehan moved to remand the action to the state court. That motion was denied on September 21, 2021.

Two days later, on September 23, 2021, the defendants, who are comprised of four groups of multinational companies, all sought leave to file motions to dismiss. However, by order dated October 25, 2021, District Judge Seybert denied the requests in an omnibus motion and granted Meehan leave to file an amended complaint. The amended complaint was filed on December 3, 2021. On January 20 and 21, 2022, the four defendant groups then filed motions to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6). The VIPKid companies (referred to by the parties as the Dami defendants) also sought to compel arbitration. The motions were referred to the undersigned on April 27, 2023 and are now before the Court. For the reasons set forth below, the undersigned respectfully recommends that all four motions to dismiss be granted.

**BACKGROUND**

A.    **The Parties**

Meehan is a New York resident who contracted with VIPKid HK to provide online services teaching English to children in China between October 2016 and June 2020.[1] Am. Compl. ¶ 13. VIPKid HK is a Hong Kong corporation with its principal place of business in Hong Kong. Dami's Mem. at 2. VIPKid Int'l is a Delaware corporation with its principal place of business in California. *Id.* Beijing Dami Technology Co., Ltd. *("BDT")* and Beijing Dami Future Technology Co., Ltd. ("BDFT") are Chinese corporations with principal places of business in China. *Id.* Meehan contends that BDT openly does business as VIPKid HK and

---

[1] According to the Dami defendants, Meehan was residing in Thailand in 2020. Dami's Mem. at 1.

owns its trademarks.  Am. Compl. ¶ 54.  He also asserts that BDT owns VIPKid's English-language website, www.vipkid.com, and at least nine VIPKid apps on Apple's App Store.  *Id.* ¶ 55.  Meehan alleges that BDFT owns VIPKid's Chinese language website, www.vipkid.com.cn. *Id.* ¶ 59.  As noted above, VIPKid HK, VIPKid Int'l, BDT and BDFT are collectively referred to by the parties as the Dami defendants.[2]

Tencent Holdings is a Chinese holding company incorporated in the Cayman Islands with a principal place of business in the People's Republic of China.  Byun Decl. ¶ 2.  Tencent Holdings claims that it does not conduct business or have offices or employees in New York.  *Id.* ¶¶ 3-5.  Tencent Cloud is a Delaware limited liability company ("LLC") with its principal place of business in Delaware.  *See* Leong Decl. ¶ 2.  Tencent Cloud sells cloud services, which are general computing, storage, and content delivery services provided by a centralized cloud provider.  *Id.* ¶ 4.  Tencent Cloud similarly claims that it has no offices or employees in New York but acknowledges that it does have some limited business activities in the state, including some customers.  *Id.* ¶¶ 5-7.  Tencent America is a Delaware LLC with its principal place of business in Palo Alto, California.  *See* Xu Decl. ¶¶ 2-3.  It is an indirect, wholly-owned subsidiary of Tencent Holdings.  *Id.*  Tencent America performs business development, advertising, and research and development functions for Tencent Holdings.  *Id*. ¶ 4.  As of December 23, 2021, Tencent America had 417 employees, 11 of whom are located in New York. *Id.* ¶ 5.  However, Tencent America claims that it does not sell products or services within New York.  *Id*. ¶¶ 7-8.  It says that its New York activities are limited to (1) reporting and editing articles regarding the financial industry within the United States; (2) developing business for Tencent within the United States; and (3) working with Tencent's customers and clients who are

---

[2] Meehan's caption names other VIPKid entities – VIPKid, VIPKid Class HK Ltd. and VIPTeach Inc.  However, it is clear from the papers that there are only four VIPKid entities at issue in this litigation.

based in the United States. *Id.* ¶ 9. Tencent Holdings, Tencent Cloud and Tencent America are collectively referred to as the Tencent defendants.

Meehan asserts that Tencent Holdings has a multiyear partnership with VIPKid HK. Am. Compl. ¶ 28. In fact, according to the amended complaint, the Tencent divisions/departments that partner with VIPKid HK include: Tencent Youtu Lab, Tencent AI Open Platforms, Tencent Education Business Forum, Tencent AI Labs and Cloud and Smart Industries Group. *Id.* ¶ 35. In addition, Meehan alleges that the "Tencent infrastructure" ensures that the VIPKid platform has a smooth connection for efficient and seamless capture of data and videos, which enhances use of the platform for technological development. *Id.* ¶ 30. Meehan also alleges that VIPKid HK stores data on the Tencent Cloud and streams and stores recordings of VIPKid courses on Tencent software/hardware. *Id.* ¶ 31. Finally, Meehan claims that "Tencent" has infused hundreds of millions of dollars into VIPKid HK and its platform and that the Dami defendants are disseminating the biometric data of VIPKid HK teachers through the Tencent network. *Id.* ¶¶ 34, 36. In sharp contrast, the Tencent defendants contend that Meehan has mistakenly sued them. Tencent Mem. at 1. They claim that none of the Tencent defendants have ever made any investment in or have any relationship of any kind with VIPKid HK. *Id.*

China Renaissance is a corporation organized under the laws of the Cayman Islands with its principal place of business in the People's Republic of China. *See* Yee Decl. ¶ 2. China Renaissance is a financial institution that provides private placement and mergers and acquisitions advisory services, equity underwriting, sales and trading, research, and investment management. *Id.* ¶ 3. China Renaissance claims that it is not registered to do business nor does it own any real property in New York. *Id.* ¶¶ 5, 6. China Renaissance further notes that its executive and control functions are based in China and it has no employees in New York. *Id.* ¶

4

4.  Meehan alleges that China Renaissance is VIPKid HK's exclusive financial advisor and its capital markets partner.  Am. Compl. ¶ 51.  He asserts that China Renaissance supports VIPKid HK by exploring the boundaries and possibilities of online education.  *Id.*  He also asserts that China Renaissance has advanced the "VIPKid Scheme" by actively shaping VIPKid HK so that its activities are responsive to the national policies of the Chinese government.  *Id.*

Sequoia Capital ("Sequoia") is a Delaware corporation with headquarters in California.  Chang Decl. ¶ 3.  According to Sequoia, it does not have a physical location, own assets, have a telephone number, or have any employees "who list their primary addresses as New York."  *Id.* ¶¶ 4-7.  In addition, Sequoia claims that it never negotiated or executed any contracts with VIPKid in New York.  *Id.* ¶ 8.  Meehan claims Sequoia is one of VIPKid's earliest and most important strategic and financial partners.  Am. Compl. ¶ 43.  He alleges that Sequoia has played an active and key role in developing VIPKid HK, the VIPKid Platform and is a large part of the VIPKid Scheme.  *Id.* ¶ 43.  Contrary to Meehan's allegations, Sequoia attests that it has never invested directly in VIPKid HK.  Chang Decl. ¶¶ 8-9.  Rather, it advises two funds that have invested in VIPKid HK.  *Id.*  But Sequoia says those funds also lack any meaningful connection to New York.  *Id.*

Meehan refers to the Tencent defendants, China Renaissance and Sequoia collectively as the "Mastermind Defendants."  Am. Compl. ¶ 25.

**B.    The Alleged VIPKid Scheme**

The crux of Meehan's complaint is that the defendants engaged in a conspiracy (the "VIPKid Scheme") to fraudulently induce American teachers to work on the VIPKid educational platform in order to harvest their biometric data without their teachers' knowledge or consent.  *Id.* ¶¶ 6-10, 76-8.  In fact, Meehan contends that the end goal of the VIPKid Scheme is to

substitute "virtual humans" for "natural human teachers." *Id.* ¶ 18. To this end, Meehan claims that the Dami defendants represented themselves as a vibrant and active community of teachers offering the most exciting teaching work of the century. *Id.* ¶ 124. He says the defendants targeted American public-school teachers, who are known as being unsupported, low-wage earners, willing to pay out-of-pocket for school supplies. *Id.* ¶ 140; 159. He further claims that the Dami defendants "psychologically profiled" teachers by appealing to their spiritual calling, claiming the teachers would benefit spiritually from teaching Chinese children online. *Id.* ¶¶ 146, 150.

Meehan further alleges that the employment agreements he signed represented that the VIPKid platform would only be used "to enable Students to access the class recordings for educational purposes...[and] by [VIPKid HK] and its subsidiaries, affiliates, related companies and licensees for marketing and promotional purposes."[3] *Id.* ¶ 105. However, he says that the defendants had orchestrated a scheme to surreptitiously record and capture teachers' facial movements and voices in order to develop facial recognition technology and artificial intelligence ("AI") and to discover artificial general intelligence ("AGI") necessary to create virtual humans. *Id.* ¶ 24. Meehan explains that VIPKid teachers were required to use a method of speaking called Total Physical Response, which is a slow, deliberate, exaggerated style of speaking and gesturing ideal for recording and capturing human speech and movements. *Id.* ¶ 90. He also says that VIPKid teachers were required to deliver classes by sticking to a specific script and to use tools like digital stickers that mapped faces for pedagogical value. *Id.* ¶¶ 92-3.

Meehan similarly alleges that the defendants are stockpiling recordings from American public school students through VIPKid's Lingo Bus program, which offers online Mandarin

---

[3] According to VIPKid HK, Meehan signed a series of Independent Contractor Agreements between 2016 and 2020. VIPKid HK Mem. at Ex. A.

6

courses through a game-based curriculum run. *Id*. ¶ 98. Finally, Meehan states that given the number of school-age children in China, the Dami defendants' lack of effort to expand their cohort of natural teachers evinces the defendants' intent to use virtual teachers in the future. *See id*. ¶¶ 95-6.

### C.    Allegations Concerning Meehan's Employment Terms and Work Conditions

The amended complaint, which has been cut down to 25 pages and 201 paragraphs from its original 92-pages and 600 plus paragraphs, still includes employment claims under the Fair Labor Standards Act ("FSLA") and the New York Labor Law ("NYLL") on behalf of a putative class which is defined as "all current and former VIPKid Teachers." However, the amended complaint contains only scant details concerning Meehan's own employment history. Am. Compl. ¶¶ 173-201. Meehan alleges that the defendants represented that VIPKid teachers could work as much or as little as they wanted, could take breaks or go on vacation, could retain complete control over their schedule and could earn $1,000 to $2,000 per month. *Id*. ¶ 148. But he does not specify the number of hours he actually worked or indicate how much or the manner in which he was paid. Instead, he simply includes the following generic statement:

> [The Dami defendants] failed to pay VIPKid Teachers additional or higher wages because of their spread of hours, including overtime wages for all the hours that they worked in excess of 40 hours in a work week and additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

*Id*. ¶ 192.[4]

In addition, without providing specifics as to the actual hours worked, Meehan complains that VIPKid teachers were required to engage in unpaid, off-the-clock work preparing for

---

[4] In his affidavit, submitted in opposition to the motions, Meehan adds that his work schedule as a VIPKid teacher was inflexible and rigid. Meehan Aff. ¶ 14. He also states that he was paid 8 USD and 1-2 USD based on various incentives. *Id*. ¶¶ 14, 15.

courses, producing post-lesson reports, and offering corrections for VIPKID materials and that their wages were subject to deduction if they did not complete tasks. *Id.* ¶ 181, 186-87. Again, without reference to his own employment history, he additionally asserts that the Dami defendants owe each of their employees up to fifty-six hours of paid sick leave for each calendar year they worked. *Id.* ¶ 193. Lastly, Meehan claims that VIPKid teachers were penalized and discharged when they complained about the Dami defendants' conduct but he does not make clear if he was one of the teachers against whom the defendants allegedly retaliated. *Id.* ¶ 194.

### D. The Independent Contractor Agreements

Although Meehan contends that he was wrongfully classified as an independent contractor, he implicitly acknowledges that he entered into a series of agreements, entitled Independent Contractor Agreements (the "ICAs"), with VIPKid HK. *See id.* ¶ 177. The defendants have provided the Court with a copy of the ICA. Among other things, the ICAs provided for the resolution of certain disputes through final and binding arbitration on an individual basis. Specifically, Meehan's most recent ICA stated :

> IMPORTANT: PLEASE REVIEW THIS AGREEMENT FULLY. IN PARTICULAR, PLEASE REVIEW THE ARBITRATION PROVISION IN SECTION 13, AS IT REQUIRES THE PARTIES TO RESOLVE DISPUTES ON AN INDIVIDUAL BASIS, TO THE FULLEST EXTENT PERMITTED BY LAW, THROUGH FINAL AND BINDING ARBITRATION. BY ELECTRONICALLY EXECUTING THIS AGREEMENT, TEACHER ACKNOWLEDGES THAT TEACHER HAS READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT, INCLUDING SECTION 13, AND HAS TAKEN TIME TO CONSIDER THE CONSEQUENCES OF EXECUTING THIS AGREEMENT.
>
> *       *       *
>
> 13. ARBITRATION PROVISION
>
> A. ARBITRATION OF CLAIMS: In the event of a dispute between the parties, the parties agree to resolve the dispute as described in this Section (the "Arbitration Provision'). This Arbitration Provision is governed by the Federal

Arbitration Act (9 U.S.C. § 1, et seq.) and evidences a transaction involving commerce.  The parties expressly agree that this Arbitration Provision shall be governed by the Federal Arbitration Act even in the event [teacher] and/or [VIPKid] are otherwise exempted from the Federal Arbitration Act. Any disputes in this regard shall be resolved exclusively by an Arbitrator. In the event, but only in the event, the Arbitrator determines the Federal Arbitration Act does not apply, the state law governing arbitration agreements in the state in which [teacher] performs the majority of services covered by this Agreement shall apply. This Arbitration Provision applies to any past, existing or future claim, regardless of the date of its accrual, brought by either [teacher] or [VIPKid], arising out of or related to this Agreement, [teacher's] relationship with [VIPKid HK], including without limitation, [teacher's] classification as an independent contractor or termination of the relationship with [VIPKid HK], and [teacher's] provision of services to Students, whether arising under federal, state, or local law. The terms of this Arbitration Provision will remain in force after the parties' contractual relationship ends. Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration. THIS ARBITRATION PROVISION REQUIRES ALL SUCH DISPUTES TO BE RESOLVED ONLY BY AN ARBITRATOR THROUGH FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS, AND NOT BY WAY OF COURT OR JURY.

i. Claims Covered by Arbitration Provision. Unless carved out below, claims involving the following disputes shall be subject to arbitration under this Arbitration Provision regardless of whether brought by [teacher], [VIPKid HK] or any agent acting on behalf of either. (1) disputes arising out of or related to this Agreement; (2) disputes arising out of or related to [teacher's] relationship with [VIPKid HK], including without limitation, disputes concerning [teacher's] classification as an independent contractor, termination of the relationship with [VIPKid HK]; (3) TEACHER's provision of services to Students . . ..  This Arbitration Provision also applies to . . . claims arising under . . .Fair Labor Standard Act . . . and all other federal, state and/or local statutory and legal or common law claims (including, without limitation, torts) arising out of or relating to this Agreement, [and] the [teacher's] relationship with [VIPKid HK] . . ..

Dami Mem. Ex. A.

**E.     Meehan's Demand for Arbitration**

According to the Dami defendants, in July 2020, Meehan, from his home in Thailand,

filed a demand for arbitration with JAMS in New York, claiming wrongful termination of his

services by VIPKid HK as well as other mistreatment by the company.  Dami Mem. at 1.  In fact, it is undisputed that Meehan and VIPKid HK jointly selected Caroline Antonacci ("Antonacci" ) to serve as the arbitrator and she issued a Preliminary Order finding that "[t]here [were] no issues as to the arbitrability of [the] dispute." *Id.*  In that same Order, Antonacci directed Meehan to "provide a more definite Statement of Claims or an Amended Demand for Arbitration specifying his claims, the alleged legal violations and governing law, and his damages." *Id.* Ex. C. However, according to the Dami defendants, Meehan did not comply with Antonacci's directives.  *Id.* at 1.  Instead, Meehan commenced this action in the New York State Supreme Court.  *Id.* at 1.

Meehan claims the arbitration has been closed since December 2020.  Meehan Aff. ¶ 17. He states that it is closed because the arbitrator found "no cognizable claims." *Id.* ¶ 18.  Meehan also describes Antonacci's order as leaving the door open for him to submit a new demand letter. *Id.* ¶ 19.

## F.    The Amended Complaint

The operative pleading includes six causes of action.  Specifically, Meehan alleges that:

(1) he was falsely classified as an independent contractor and fraudulently induced to work as a teacher (Fraud in the Inducement);

(2) the defendants defrauded him into continuing as a VIPKid teacher by misrepresenting the opportunities and benefits of working as a VIPKid teacher but omitting that VIPKid teacher's personal data was being harvested (Common Law Fraud);

(3) the defendants took his biometric data while he was working as a VIPKid teacher (Conversion);

(4) the defendants engaged in unlawful and deceptive consumer-oriented practices when they took his biometric data (Violation of N.Y. Gen. Bus. Law §§ 349 & 350);

(5) he was not paid in compliance with the NYLL (Violation of the NYLL); and

(6) he was not paid in compliance with the FLSA (Violation of the FLSA).

*See* Am. Compl ¶¶ 118-201.

## DISCUSSION

**A.    Standards of Review**

**1.    12(b)(1)**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), a federal court must dismiss a claim when it lacks jurisdiction over the subject matter of the action.  *See* Fed. R. Civ. P. 12(b)(1); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.").  The party asserting subject matter jurisdiction has the burden to prove the Court's jurisdiction by a preponderance of the evidence.  *See Vailette v. Lindsay*, No. 11-cv-3610, 2014 WL 4101513, at *3 (E.D.N.Y. Aug. 18, 2014).

In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court must assume that all factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party.  *C.K. v. Bd. of Educ. of the Westhampton Beach Sch. Dist*., 185 F. Supp. 3d 317, 324 (E.D.N.Y. 2016).  However, the Court may refer to evidence outside the pleadings, such as affidavits, to resolve the jurisdictional issue.  *Forbes v. State Univ. of New York at Stony Brook,* 259 F. Supp. 2d 227, 231-32 (E.D.N.Y. 2003).

**2.    Rule 12(b)(2)**

Rule 12(b)(2) authorizes a party to seek dismissal on the ground that the Court lacks personal jurisdiction over it.  *See Eyeking, LLC v. JSS, LLC*, 321 F. Supp. 3d 326, 329 (E.D.N.Y.

2018).  In such cases, "'[t]he plaintiff bears the burden of demonstrating personal jurisdiction over the person or entity being sued.'" *Out of Blue Wholesale, LLC v. Pac. Am. Fish Co. Inc.*, No. 19-CV-0254, 2019 WL 3997393, *3 (E.D.N.Y. Aug. 23, 2019) (quoting *State of N.Y. v. Mountain Tobacco Co.*, No. 12-CV-6276, 2016 WL 324970, at *4 (E.D.N.Y. Jan. 26, 2016)). However, "[w]here, as here, a district court in adjudicating a [Rule 12(b)(2)] motion . . . 'relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, [the plaintiff] need only make a *prima facie* showing of personal jurisdiction.'" *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Porina v. Moward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).

As with the Rule 12(b)(1) motion, the materials presented by the plaintiff should be construed in the light most favorable to the plaintiff and all doubts resolved in the plaintiff's favor.  *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).  In addition, where a case has been brought in federal court based on the diversity of the parties, the law of the forum in which the court sits is determinative.  *See Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998) (declaring that a federal court's personal jurisdiction over a non-resident defendant is governed by the law of the forum state, subject to certain constitutional limitations of due process).  Accordingly, in this case, New York law applies and, in order to establish personal jurisdiction over a defendant, a plaintiff must present evidence to satisfy three elements: "(1) procedurally proper service of process on the defendant; (2) a statutory basis for personal jurisdiction; and (3) the exercise of jurisdiction . . . consistent with constitutional due process principles." *Roxx Allison Ltd. v. Jewelers Inc.*, 385 F. Supp. 3d 377, 380 (S.D.N.Y 2019) (quoting *Quinio v. Aala*, 344 F. Supp. 3d 464, 479–80 (E.D.N.Y. 2018)).

3.    **Rule 12(b)(5)**

12

"Rule 12(b)(5) permits a party to move for dismissal of a complaint based on inadequate service of process." *George v. Pro. Disposables Int'l, Inc*., 221 F. Supp. 3d 428, 432 (S.D.N.Y. 2016)(citing Fed. R. Civ. P. 12(b)(5)). "'In considering a Rule 12(b)(5) motion to dismiss for insufficient service of process, a court must look[ ] to matters outside the complaint to determine whether it has jurisdiction.'" *Id.* (quoting *Cassano v. Altshuler,* 186 F. Supp. 3d 318, 320 (S.D.N.Y. 2016)). In addition, "'[o]nce a defendant challenges the sufficiency of service of process, the burden of proof is on the plaintiff to show the adequacy of service.'" *Id.* (quoting *Vantone Grp. Ltd. Liab. Co. v. Yangpu Ngt Indus. Co.*, No. 13-CV-7639 (LTS), 2016 WL 3926449, at *2 (S.D.N.Y. July 15, 2016)).

### 4.     Rule 12(b)(6)

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient "to raise a right to relief above the speculative level." *See Swiatkowski v. Citibank*, 745 F. Supp. 2d 150, 162 (E.D.N.Y. 2010), aff'd, 446 F. App'x 360 (2d Cir. 2011) (citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 91 (2d Cir. 2010)). The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully."  *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)).

Unlike the first three Rules described above, "[a] court considering a motion to dismiss under Rule 12(b)(6) generally limits its review 'to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'" *Florimon v. Allstate Ins. Co.,* 616 F. Supp. 3d 180, 185 (D. Conn. 2022 (citing *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007)).  However, "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 230–31 (2d Cir. 2016).  "A 'necessary prerequisite' for taking into account materials extraneous to the complaint is that the 'plaintiff rely on the terms and effect of the document in drafting the complaint.'" *Id.* (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).  "This generally occurs when[, as here,] the material considered is a 'contract . . . containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint."[5] *Id.*

### 5.    Motion to Compel Arbitration

Lastly, where a movant manifests an intent to compel arbitration, the Court may treat a motion to dismiss pursuant to Rule 12(b)(6) as a motion to compel arbitration.[6]  *Gilbert v.*

---

[5] Meehan attached two of the ICA's to the original complaint as exhibits and argued that the arbitration provisions were unenforceable.  He choose to omit them from his amended complaint.

[6] Many "courts in this district and elsewhere have held that motions to compel arbitration are properly brought under Rule 12(b)(1), which permits a court to dismiss a case for 'lack of subject-matter jurisdiction.'"

*Indeed, Inc.,* 513 F. Supp. 3d 374, 390 (S.D.N.Y. 2021).  "Courts deciding motions to compel arbitration 'apply a 'standard similar to that applicable for a motion for summary judgment.'" *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (citing *Nicosia,* 834 F.3d at 229).  Specifically, "'[i]f the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the Court] may rule on the basis of that legal issue and avoid the need for further court proceedings.'" *Id.* (citing *Meyer v. Uber Techs., Inc.,* 868 F.3d 66, 74 (2d Cir. 2017)).  "If, however, there is an issue of fact as to the making of the agreement for arbitration, . . . a trial is necessary." (citing 9 U.S.C. § 4).

As such, "[w]hen resolving a motion to compel arbitration, a court must first determine whether there is a valid agreement to arbitrate between the parties."  *Mineola Garden City Co., Ltd. Bank of Am.,* No. 13–CV–05615, 2014 WL 2930467, at *2 (E.D.N.Y. June 26, 2014) (citing 9 U.S.C. § 4).  "The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia.,* 834 F.3d at 229.  If the Court finds that such an agreement exists, the Court must then determine whether the dispute at issue falls within the scope of the arbitration clause.  *Id.*; *see also In re Am. Express Fin. Advisors Sec. Litig.,* 672 F.3d 113, 128 (2d Cir. 2011) (setting forth two-part test).

---

*Am. E Grp. LLC v. Livewire Ergogenics Inc.,* 432 F. Supp. 3d 390, 400 (S.D.N.Y. 2020).  However, at least one court in this circuit has suggested that "because the FAA does not confer jurisdiction, a motion to compel is not proper under Rule 12(b)(1)." *Id.*  Nonetheless, an arbitration agreement is most certainly a forum selection clause and, thus, a motion to compel arbitration can, in any case, be treated as a motion to dismiss for failure to state a claim upon which relief can be granted. *Id.* (citing *Palcko v. Airborne Express, Inc.,* 372 F.3d 588, 597 (3d Cir. 2004)).

Finally, on a motion to dismiss and/or compel arbitration, the Court may also take notice of public filings and documents integral to the complaint. *Cortec Indus. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

All of the defendants contend that a number of grounds exist to dismiss the amended complaint. Each of the defendants' motions will be addressed in turn.

### B.    The Dami Defendants' Motion to Dismiss and to Compel Arbitration

The first argument asserted by the Dami defendants is that the claims against them must be dismissed because Meehan agreed to arbitrate his claims. The Court, therefore, begins its analysis with a review of the law governing arbitration provisions. The Federal Arbitration Act ("FAA") "was originally enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as Title 9 of the United States Code." *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991). "Its purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law . . . and to place arbitration agreements upon the same footing as other contracts." *Id.* Indeed, section 1 of the FAA expresses the strong federal policy favoring arbitration. *Siegel v. Milstein*, No. 21-CV-4032 (JS)(SIL), 2021 WL 5052748, at *2 (E.D.N.Y. Nov. 1, 2021) (citing *Ragone v. Atl. Video at Manhattan Ctr.,* 595 F.3d 115, 121 (2d Cir. 2010)).

As noted above, "[t]he threshold question in any arbitration dispute is 'whether an arbitration agreement exists at all.'" *Gonzalez v. Cheesecake Factory Restaurants, Inc.,* No. 21CV5017PKCSIL, 2023 WL 2477697, at *1 (E.D.N.Y. Mar. 13, 2023) (citing *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 223 (2d Cir. 2019)). Meehan does not dispute that the ICAs he signed contain a valid agreement to arbitrate. In fact, implicitly acknowledging the existence of the agreements, he claims that he was misclassified as an independent

contractor.  Accordingly, the sole issue for the Court to determine is whether those arbitration

clauses encompass his claims.

In this case, the arbitration provision contained in each of the ICAs clearly covers a wide

range of disputes including: disputes arising out of or related to the ICA; disputes related to

Meehan's relationship with VIPKid HK (including, disputes concerning his classification as an

independent contractor or the termination of his relationship with the company); disputes under

the Fair Labor Standard Act and disputes governed by federal, state and/or local statutory or

common law claims including torts.  Dami Mem. Ex. A.   To the extent Meehan has asserted

claims for fraud in the inducement, in addition to his statutory and other tort claims, the

defendants correctly note that "claims of fraud in the inducement of the contract [containing the

arbitration provision] generally are for arbitrators to decide." *Dowe v. Leeds Brown Law*, 419 F.

Supp. 3d 748 (S.D.N.Y 2019); *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395,

406 (1967) (finding that arbitration agreement encompassed claim that agreement itself was

procured by fraud).

Moreover, the ICAs at issue provide that the determination of whether a particular claim

falls within the scope of the arbitration provision is to be decided by an arbitrator.  Specifically,

the ICA states:

> Unless carved out below, claims involving the following disputes shall be
> subject to arbitration under this Arbitration Provision . . . (4) . . . disputes
> arising out of or relating to the interpretation or application of this Arbitration
> Provision, including the validity, enforceability, revocability, conscionability,
> scope, or breach of the Arbitration Provision, or any portion of the Arbitration
> Provision.

Dami Mem. Ex. A.  Where "parties explicitly incorporate rules that empower an arbitrator to

decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the

parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol. Co. Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).

Finally, the arbitration provision covers not only disputes between Meehan and VIPKid HK - it also covers disputes between Meehan and VIPKid HK's fiduciaries, administrators, affiliates, subsidiaries, parents and all successors and assigns. Dami Mem. Ex. A, Section 13(A)(i). According to the amended complaint, each of the Dami defendants are affiliated with VIPKid HK. In fact, Meehan argues they are all openly doing business as VIPKid HK. Am. Compl. ¶¶ 53-61. In particular, Meehan alleges that BDT is the principal or core VIPKid company and owner of VIPKid trademarks. *Id.* ¶ 54. Meehan also alleges that BDFT and VIPKid Int'l are wholly owned subsidiaries of VIPKid HK. *Id.* ¶¶ 58, 60. In sum, all of Meehan's claims falls within the scope of the arbitration clauses.

Given Meehan's acknowledgment that he entered into a series of agreements containing an arbitration provision and the Court's determination that those provisions covered his claims, the undersigned respectfully recommends that the Dami defendants' motion to compel arbitration be granted and the amended complaint be dismissed in its entirety as against VIPKid HK, VIPKid Int'l, BDT and BDFT.[7]

## C.    The Tencent Defendants' Motion to Dismiss

A review of the facts at this point is helpful to an understanding of the undersigned's recommendation. Meehan has asserted four causes of action against the Tencent defendants - (1) fraud in the inducement, (2) fraud, (3) conversion, and (4) a violation of New York General Business Law Sections 349 and 350. *See* Am. Compl. ¶¶ 118-72. The crux of Meehan's

---

[7] To the extent Meehan intended to assert separate claims against VIPKid, VIPKid Class HK Ltd. and VIPTeach Inc. the undersigned also recommends that the action be dismissed against them for the same reasons set forth in this section of the report. In addition, the undersigned will not address the Dami defendants' argument that the Court lacks personal jurisdiction over them given this finding.

allegations with respect to the Tencent defendants is that "through its agents, Tencent Holding has infused hundreds of millions of dollars into VIPKid and its platform to deepen collaboration in the online education, artificial intelligence, and cloud services sector." Am. Compl. ¶ 36. More specifically, Meehan alleges that:

> (1) the subsidiaries, affiliates, and divisions of Tencent Holdings are involved in multi-year partnerships with brands like VIPKid[8];
>
> (2) VIPKid stores data on the Tencent Cloud using Tencent software, hardware, and infrastructure;
>
> 3) Tencent uses the VIPKid Platform and recordings of VIPKid teachers to train, test, and improve its technology; and
>
> (4) various departments within the "Tencent Network" are involved in various artificial intelligence projects.

*Id.* ¶¶ 26-36.  Meehan also suggests that, through discovery, he will be able to show that Tencent America, the one named Tencent company that is clearly doing business in New York, supports, contributes to and/or is part of the VIPKid Platform.  *Id.* ¶ 40.

The Tencent defendants insists that this is a case of mistaken identity.  They claim that none of the named Tencent entities have any corporate relationship with VIPKid HK or the Dami defendants.  *See* Byun Decl. ¶ 8; Leong Decl. ¶ 10; Xu Decl. ¶ 12.  In addition, they assert that none of the named Tencent entities have invested in any of the VIPKid companies.  *Id.*  To this end, they explain that the only "Tencent entity" with any relationship to VIPKid HK is a separate subsidiary of Tencent Holdings, Tencent Mobility Limited ("Tencent Mobility"), who was not named in this lawsuit, but according to their records, has invested in VIPKid HK.  *See* Byun Decl. ¶ 7; Leong Decl. ¶ 9; Xu Decl. ¶ 11.  Moreover, the Tencent defendants assert that none of

---

[8] To be clear, the allegation is not that Tencent Holdings "is" involved in multi-year partnerships with VIPKid HK. Meehan alleges that Tencent Holdings and its affiliates are involved in multi-year partnerships with brands "like" VIPKid.

the named defendants have any control over VIPKid HK or the Dami defendant entities; nor are they involved in the design, development, or maintenance of the VIPKid HK platform. *See* Byun Decl. ¶¶ 8, 9; Leong Decl. ¶¶ 10, 11; Xu Decl. ¶¶ 12, 13.

The Tencent defendants have asserted a number of grounds for dismissal, two of which will be addressed, beginning with their claim that Tencent Holdings and Tencent Cloud were not properly served.

### 1.    Service

The Tencent defendants assert that Meehan failed to serve Tencent Holdings and Tencent Cloud properly, violating the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention") and ignoring the statutory requirements for service of process on foreign corporations and limited liability companies in New York.

With respect to Tencent Holdings, Meehan served the corporation pursuant to Section 307 of the New York Business Corporation Law ("BCL"), which permits service on foreign corporations by serving the Secretary of State and mailing a copy of the service to the defendant. *See* Pomerantz Decl. Ex. A, Ex. B.  According to the affidavits of service, Meehan left one copy of the pleadings with the Secretary of State and then completed service by mailing a copy to Tencent Holdings' registered agent at 29/F Three Pacific Place, No. 1 Queens Road, East Wanchai, Hong Kong. *Id.*  Tencent Holdings claims that this service was improper because its principal place of business is in the People's Republic of China, which is a signatory to the Hague Convention and does not allow for service by mail.  *See* Byun Decl. ¶ 2; *see also Zhang v. Baidu.com Inc.,* 932 F. Supp. 2d 561, 565 (S.D.N.Y. 2013).

It is undisputed that the attempts to serve the Tencent defendants occurred prior to the removal of this action to federal court. *See* Pomerantz Decl. ¶¶ 2, 3. As such, "the propriety of service must be determined by reference to state law." *Zeballos v. Tan*, No. 06 CIV. 1268 (GEL), 2006 WL 1975995, at *6 (S.D.N.Y. July 10, 2006). Pursuant to New York State law, where, as here, a defendant is located in a country that is a signatory to the Hague Convention, the defendant must be served through the requirements of the Hague Convention. *See e.g., Mut. Benefits Offshore Fund v. Zeltser,* 140 A.D.3d 444, 445, 37 N.Y.S.3d 1, 2 (2016); *Fernandez v. Univan Leasing*, 15 A.D.3d 343, 344, 790 N.Y.S.2d 155, 156 (2005).

"Under the Hague Convention, service through a country's Central Authority is the primary method of service." *Grp. One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 342–43 (E.D.N.Y. 2021) (citing Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, art. 2, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638). However, there are also several other acceptable forms of service under the Hague Convention, including, "(1) service through consular channels; (2) service by mail if the receiving state does not object; and (3) service pursuant to the internal laws of the state." *Advanced Aerofoil Techs., AG v. Todaro, No.* 11 CIV 9505 ALC DCF, 2012 WL 299959, at *2 (S.D.N.Y. Jan. 31, 2012) (citing *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 300 (2d Cir. 2005)). In this case, China – who the Tencent defendants claim was the receiving state for the transmission[9] – has objected to service by postal mail. *See Smart Study Co. v. Acuteye-Us, 620*

---

[9] Neither party has addressed the fact that Tencent Holdings is doing business in Hong Kong. In fact, Jong won Byun, Tencent' Senior Legal Counsel, signed his affidavit in support of the instant motion in Hong Kong. Although Hong Kong is a Special Administrative Region of the People's Republic of China, it is also a signatory to the Hague Convention regarding service abroad. *In re Coudert Bros. LLP*, No. 16-CV-8237 (KMK), 2017 WL 1944162, at *6 (S.D.N.Y. May 10, 2017). Unlike China, Hong Kong's declarations regarding the Hague Convention do not include objection to service by mail. *Id.* (citing *Altos Hornos de Mexico, S.A.B. de C.V. v. Rock Res. Ltd.,* No. 15-CV-1671, 2015 WL 6437384, at *2 (S.D.N.Y. Oct. 19, 2015)); *see also Hyundai Merch. Marine Co. v. Grand China Shipping (Hong Kong) Co.*, 878 F. Supp. 2d 1252, 1262 (S.D. Ala. 2012).

F. Supp. 3d 1382, 1392 (S.D.N.Y. 2022), appeal dismissed *sub nom. Smart Study Co. v. HAPPY PARTY-001*, No. 22-1810-CV, 2023 WL 3220461 (2d Cir. May 3, 2023); *Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 331 (S.D.N.Y. 2015) (refusing to authorize service by postal mail to defendant in China).  Therefore, Tencent Holding could not have been properly served in China via postal mail.

Meehan does not dispute that China was the receiving state for transmission.  Rather, he argues that service on Tencent Holdings pursuant to Section 307 of the BCL was proper because he was, "operating under reasonable theories grounded in evidence, that [Tencent Holdings], while not authorized to do business in this state, nonetheless [was] subject to the personal or other jurisdiction of the courts of New York because of [its] extensive business activities within the state."  This argument lacks any legal support.  Courts have found service under BCL § 307 to be improper if a receiving country has objected to article 10(a) of the Hague Convention.  *See e.g., Mut. Benefits Offshore Fund*, 140 A.D.3d at 446 (holding service of third-party claims on Swiss company pursuant to BCL § 307 would be improper because Switzerland objected to article 10(a) of the Hague Convention); compare *Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir. 1986)("Since the United States has made no objection to the use of 'postal channels' under Article 10(a), service of process by registered mail remains an appropriate method of service in this country under the Convention); *Grp. One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 343 (E.D.N.Y. 2021) (finding court acting under Rule 4(f)(3) remains free to order alternative means of service like email which is not specifically referenced in Article [10] like postal mail).

With respect to Tencent Cloud, which is a Delaware limited liability company, *see* Leong Decl. ¶ 2, service was purportedly made pursuant to Section 304 of the New York Limited

Liability Company Law.  Pursuant to C.P.L.R. 311-a, service of process on a foreign limited

liability company shall be made by:

> delivering a copy personally to (i) any member of the limited liability company
> in this state, if the management of the limited liability company is vested in its
> members, (ii) any manager of the limited liability company in this state, if the
> management of the limited liability company is vested in one or more
> managers, (iii) to any other agent authorized by appointment to receive
> process, or (iv) to any other person designated by the limited liability company
> to receive process, in the manner provided by law for service of a summons as
> if such person was a defendant. Service of process upon a limited liability
> company may also be made pursuant to article three of the limited liability
> company law.

N.Y. C.P.L.R. 311-a (McKinney)(emphasis added).  However, according to the Practice

Commentaries, "[t]he cross-reference in the last sentence of CPLR 311-a(a) to Article 3 of the

Limited Liability Company Law clarifies that service may be made on the Secretary of State."

*Id.* (citing Limited Liability Company Law §§ 303, 304).

As such, the Tencent defendants do not dispute that service on Tencent Cloud could be

made on the Secretary of State.  Rather, they contend that Meehan failed to follow the full

requirements of Section 304, which also states that:

> c) Such service shall be sufficient if notice thereof and a copy of the process
> are:
>
> (1) delivered personally outside this state to such foreign limited liability
> company by a person and in the manner authorized to serve process by law of
> the jurisdiction in which service is made; or
>
> (2) sent by or on behalf of the plaintiff to such foreign limited liability
> company by registered mail, return receipt requested, at the post office address
> specified for the purpose of mailing process, on file in the department of state, .
> . ..
>
> *            *            *
>
> (e) Where service of a copy of process was effected by mailing in accordance
> with this section, proof of service shall be by affidavit of compliance with this
> section filed, together with the process, within thirty days after receipt of the

return receipt signed by the foreign limited liability company or other official proof of delivery or of the original envelope mailed. *If a copy of the process is mailed in accordance with this section, there shall be filed with the affidavit of compliance either the return receipt signed by such foreign limited liability company or other official proof of delivery or, if acceptance was refused by it, the original envelope with a notation by the postal authorities that acceptance was refused.*

NY Limit Liab Co § 304 (McKinney)(emphasis added). The Affidavit of Delivery of Initiating Documents to the New York Division of Corporations, signed by plaintiff's counsel, provides, in pertinent part:

On December 3, 2020 at 4:15 PM, at the office of the Secretary of State of New York, located at 99 Washington Avenue, 6th Floor, Albany, New York, 12231, I served

**Summons, Notice of Electronic Filing; Complaint, Exhibit A-E, and Notice of Preservation on**

\*       \*       \*

**Tencent Cloud, LLC**

\*       \*       \*

Service was completed by mailing one (1) true copy thereof by registered mail with return receipt requested to each of the above-named defendants. An Affidavit affirming service of process completed by mail is to be filed along with this affidavit.

Pomerantz Decl. Ex. A. Meehan's counsel did, as suggested above, file a second affidavit dated December 15, in which he indicated that he mailed Tencent Cloud the necessary papers on December 11, 2020 but that they were still in transit to Camden Delaware. Accordingly, he did not attach, as required, the return receipt signed by Tencent Cloud or other official proof of delivery. Indeed, Meehan admits in his opposition that his affidavit of compliance only included a tracking number for the package he mailed to Tencent Cloud. *See* Meehan Opp. Mem (ECF No. 79) at 7. He says he took this action to avoid delay in compliance with the requirements of

24

section 304(e) because his counsel was informed that the postal service was experiencing severe delays because of the COVID-19 Pandemic.  Although the Court realizes that the tracking number, if used, was likely to confirm that Meehan did in fact serve Tencent Cloud by registered mail, Meehan's affidavit does not meet the technical requirements of Section 304.  *Glob. Liberty Ins. Co. v. Surgery Ctr. of Oradell, LLC,* 153 A.D.3d 606, 606–07, 59 N.Y.S.3d 751, 753 (2017)(Strict compliance with LLC Law § 304 is required, including as to the filing of an "affidavit of compliance."); *Port Auth. of New York & New Jersey v. Logistics Kone*, 77 Misc. 3d 1143, 1144, 183 N.Y.S.3d 254, 255 (N.Y. Sup. Ct. 2023)("A plaintiff must strictly comply with LLC Law § 304, "including as to the filing of an 'affidavit of compliance.'").[10]  In view of the foregoing, the undersigned reports that Tencent Holdings and Tencent Cloud were not properly served and recommends that the claims against them be dismissed.

### 2. Personal Jurisdiction

The Tencent defendants further argue that, even if Tencent Holdings and Tencent Cloud were properly served, Meehan's claims against them, as well as the claims against Tencent America, must be dismissed with prejudice pursuant to Rule 12(b)(2) because the Court cannot exercise general or specific personal jurisdiction over any of them.  The undersigned agrees. "'To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances.'" *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333, 343 (2d Cir. 2018) (citing *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (internal quotation marks omitted)).  "[A] court may exercise two types of personal

---

[10] It warrants mention that BCL § 307 also provides that if a copy of the process is mailed in accordance with the section, either the return receipt signed by such foreign corporation or other official proof of delivery or, if acceptance was refused by it, the original envelope with a notation by the postal authorities that acceptance was refused shall be filed with the affidavit of compliance.  N.Y. Bus. Corp. Law § 307 (McKinney).

jurisdiction over a corporate defendant properly served with process" - . "specific (also called "case-linked") jurisdiction and general (or "all-purpose") jurisdiction." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016); *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.,* 582 U.S. 255, 262, 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017). "Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state." *Id.* "General jurisdiction, in contrast, permits a court to adjudicate any cause of action against the corporate defendant, wherever arising, and whoever the plaintiff." *Id.* "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's "continuous and systematic general business contacts" in the state. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996). In most instances, a corporate defendant's affiliations with the state only satisfy that heightened minimum contacts standard when the corporate defendant is incorporated or maintains its principal place of business within the state. *See Brown*, 814 F.3d at 627 (citing *In re Roman Catholic Diocese of Albany, N.Y., Inc.,* 745 F.3d 30, 39–41 (2d Cir. 2014)).

Given these standards, Meehan does not suggest that the Court can exercise general jurisdiction over the Tencent defendants. Rather, he argues that the Court may exercise specific jurisdiction over them under New York's long-arm statute. Section 302 of New York's long-arm statute provides:

> (a) . . . a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act. . . .

N.Y. CPLR § 302(a) (McKinney 2010).  Meehan contends the Tencent defendants are both transacting business in New York and have committed torts in the state.  He offers a number of arguments in support of this claim.  First, he claims that VIPKid teachers, like himself, located throughout the state, use the VIPKid platform allegedly belonging to the Tencent defendants in the scope of their employment.  Meehan Mem. (ECF No. 78) at 7.  In other words, Meehan contends that personal jurisdiction can be conferred on the Tencent defendants because Tencent's software is integrated into the VIPKid platform.  *Id*. at 7, 9.  Meehan also argues that this Court can exercise specific personal jurisdiction on Tencent Holdings because Tencent America, which is doing business in New York, is a mere department or agent of Tencent Holdings.  *Id*. at  10.  In a similar vein, Meehan argues that this Court can exercise jurisdiction over Tencent Cloud because it too is an agent of Tencent Holdings.  Lastly, Meehan claims that jurisdiction over Tencent Holdings can be conferred because its unnamed subsidiary, Tencent Mobility, infused capital into VIPKid HK.  These arguments are all misplaced and will each be addressed below.

     As indicated above, Tencent Holdings is a Cayman Islands corporation with its principal place of business in the People's Republic of China.  Byun Decl. ¶ 2.  According to the declaration submitted by its Senior Legal Counsel, it does not conduct business in New York, have offices or employees in New York, and has never invested in VIPKid HK or any of the Dami defendant companies.  *Id.* ¶¶ 3-6.  Similarly, Tencent Cloud is a Delaware limited liability company ("LLC") with a principal place of business in Delaware.  *See* Leong Decl. ¶ 2.  It sells general computing, storage, and content delivery services provided by a centralized cloud provider.  *Id*. ¶ 4. Tencent Cloud also has no offices or employees in New York and claims that its business activities are limited to the sale of cloud services to some customers within the state.

*Id*. ¶¶ 4-7.  Yet, despite the lack of evidence of any "purposeful activity"[11] on the part of Tencent Holdings or Tencent Cloud within the state, Meehan believes that the Court may still exercise personal jurisdiction over them because VIPKid teachers in New York are/were utilizing Tencent's infrastructure and integrating software.  Meehan Mem. (ECF No. 78) at 7.

In making this argument, Meehan points, among other things, to Judge Seybert's decision in *Audiovox Corp. v. S. China Enter., Inc*., No. 11-CV-5142 JS GRB, 2012 WL 3061518, at *3 (E.D.N.Y. July 26, 2012).  He argues, in this regard, that *Audiovox* holds that the use of an interactive website is enough to support a finding of personal jurisdiction over the defendants.  In *Audiovox*, Judge Seybert analyzed whether the defendant's sale of goods on a website rose to the level of purposeful activity sufficient to satisfy Section 302(a)(1).  In doing so, she noted that if a website is interactive and allows a buyer in New York to submit an order online, courts typically find that the website operator is "transacting business" in New York and is therefore subject to the court's jurisdiction.  *Audiovox Corp.,* 2012 WL 3061518, at *3.  Nothing in the motion record explains how Tencent Cloud is selling its cloud services to its "limited" customers in New York. Nor does the *Audiovox* decision stand for the expanded proposition, as Meehan appears to suggest, that personal jurisdiction can be conferred on a software manufacturer/cloud service provider simply because the company's technology is being used by a third party transacting business in the state.  In fact, Meehan has failed to offer any legal support for his assertion that VIPKid HK's purported use of Tencent software in New York or a New York resident's

---

[11] "New York courts define transacting business as 'purposeful activity—' some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Audiovox Corp*. 2012 WL 3061518, at *3 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246–47 (2d Cir.2007)).

transmission over the internet of "computer files" belonging to a Tencent entity alone would be sufficient to confer jurisdiction over Tencent Cloud under Section 302(a)(1).

Meehan's "agency" argument is also without merit. While it is true that a corporation may be deemed present for jurisdictional purposes through the conduct of an affiliate or a subsidiary, the corporation operating in the state must be "a mere department" rather than an "independent entity." *See Liverpool v. Con-Way, Inc*., No. 08-CV-4076 JG JO, 2009 WL 1362965, at *3 (E.D.N.Y. May 15, 2009). For example, Meehan cites to *Taca Intl. Airlines, S.A. v Rolls-Royce of England*, 15 N.Y.2d 97 (1965), in which the court found that Rolls–Royce Ltd. was doing extensive business in the state through its local department separately incorporated as Rolls–Royce Inc. In contrast, the record in this case suggests that the Tencent companies are operating independently. Indeed, other than Meehan's conclusory allegations, there is nothing in the motion record to dispute the defendants' claim that Tencent Cloud, Tencent America and even unnamed Tencent Mobility are "indirect, wholly-owned subsidiaries" of Tencent Holdings.[12] Xu Decl. ¶ 3,  Leong Decl. ¶¶ 3, 9.

More importantly, in order to ensure that the exercise of personal jurisdiction comports with due process, "there must [also] be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Bristol-Myers Squibb Co*., 582 U.S. at 264, 137 S. Ct. at 781; *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 931, n. 6,  131 S. Ct. 2846, 2857, 180 L. Ed. 2d 796 (2011)("even regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales."); *Wilson v. Jord Inc.,* No. 20 CV  1899 LJV

---

[12] Even Meehan states that a plaintiff must allege facts sufficient to support a reasonable inference of authority in order to adequately allege an actual agency relationship.  *See Skanga Energy & Marine Ltd. v. Arevenca S.A*., 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012).  He did not do so in this case.

JJM, 2023 WL 1072513, at *2 (W.D.N.Y. Jan. 5, 2023), report and recommendation adopted, No. 20-CV-1899-LJV-JJM, 2023 WL 1070657 (W.D.N.Y. Jan. 27, 2023)(To satisfy CPLR § 302(a)(1), "there must be an articulable nexus or substantial relationship between the business transaction and the claim asserted."); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 248 (2d Cir. 2007).  In fact, even in instances where a corporations in-state activities are "continuous and systematic," courts have found that those activities must still give rise to the liabilities on which the corporation is being sued.  *See Daimler AG v. Bauman*, 571 U.S. 117, 139, 134 S. Ct. 746, 761, 187 L. Ed. 2d 624 (2014)(citing *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 317, 66 S. Ct. 154, 90 L. Ed. 95 (1945)); *see also Palace Expl. Co. v. Petroleum Dev. Co.,* 41 F. Supp. 2d 427, 432–33 (S.D.N.Y. 1998) (a defendant's physical presence in New York is not always dispositive in determinations of jurisdiction under CPLR § 302(a)(1)).

Meehan has not offered any evidence on which the Court can reasonably infer that a relationship exists between the alleged activities of the Tencent defendants in New York and the claims he has asserted.  At best, Meehan has pointed to the fact that Tencent Cloud sells its cloud services to some customers in New York and that Tencent America has 11 employees working in the state, including its Chief Executive Officer.  However, neither Tencent Cloud nor Tencent America have ever invested in VIPKid HK or any of the Dami defendant companies.[13]  Leong Decl. ¶ 8, Xu Decl. ¶ 10.  In addition, although Meehan hopes that discovery will reveal that Tencent America is part of the VIPKid platform, the current record makes clear that neither of

---

[13] Meehan has attached what appear to be a VIPKid press release to his opposition papers.  Gopal Aff. Ex. D-7. The press release states that "Tencent" co-led VIPKid's Series D financing and was a strategic investor.  It also indicates that Tencent co-led VIPKid's Series E financing.  However, neither the article nor Meehan explain which of the Tencent or VIPKid companies the article is referring to.  Moreover, the fact that representatives from both Tencent Cloud and China Renaissance are quoted in the article does little to advance Meehan's jurisdictional claims.

the companies have any formal corporate relationship with any of the VIPKid entities. Leong Decl. ¶ 10, Xu Decl. ¶ 12. To be sure, other than the fact that VIPKid HK uses Tencent Cloud's software or infrastructure, there is nothing in the amended complaint that links Meehan's claims to the business activities of any named Tencent entity in the state. Accordingly, for all of the reasons set forth above, the undersigned finds that Meehan cannot establish jurisdiction over the Tencent defendants pursuant to CPLR § 302(a)(1).

The same holds true when the Court analyzes whether jurisdiction over the Tencent defendants is appropriate based on Meehan's allegations of tortious conduct. To qualify for jurisdiction under C.P.L.R. § 302(a)(2), "a defendant's act or omission [must have] occur[red] within the State." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999)(citing *Kramer v. Vogl*, 17 N.Y.2d 27, 31, 267 N.Y.S.2d 900, 215 N.E.2d 159 (1966)). Meehan's claim of tortious conduct by the Tencent defendants rests, in large part, on his belief that the "agents" of Tencent Holdings have "infused hundreds of millions of dollars into VIPKid and its Platform." Am. Compl. ¶¶ 26-36. However, even if this allegation were true, there is nothing in the complaint to suggest that Tencent Mobility, the only entity shown to be an investor, was physically present in New York when it invested money in VIPKid HK or that its investment has anything to do with the VIPKid teachers' platform. Section "302(a)(2) typically requires that the defendant have been physically present in New York while committing the tortious act." *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014) (citing *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 28 (2d Cir.1997) (explaining that "C.P.L.R. § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act").

31

Moreover, Meehan's claims are not saved, as he suggests, by the fact that some New York courts have recognized that jurisdiction under § 302(a)(2) may extend to out-of-state individuals who did not themselves commit a tort while physically present in New York but who can be deemed responsible for such a tort based upon theories of conspiracy. *Id.* In such instances "a plaintiff must make a *prima facie* showing of a conspiracy and allege specific facts warranting the inference that the defendants were members of the conspiracy." *Id.* Meehan has not done so. While the amended complaint alleges participation by the Tencent defendants in the "VIPKid Scheme," the Court cannot reasonably infer from the allegations that the Tencent defendants were participants in, or even had an awareness of, the alleged tortious activities of VIPKid HK, that being, the capturing of the biometric data of VIPKID teachers. *Id.* (citing *Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y.2012) (courts must consider whether the out-of-state co-conspirator had an awareness of the effects of the activity in New York).

Nor do any of the allegations in the amended complaint allow for an inference that VIPKid HK was acting at the behest of or under the control of any of the Tencent defendants. *See id.* In fact, the declarations submitted by the Tencent defendants suggest the opposite – none of the Tencent defendants control VIPKid, or had any involvement in the design, development, and/or maintenance of the VIPKid Platform. *See* Byun Decl. ¶¶ 8-9; Leong Decl. ¶¶ 10-11; Xu Decl. ¶¶ 12-13. "[M]ere conclusory claim that an activity is a conspiracy does not make it so especially when the complaint fails to establish that the alleged coconspirators knew their act would have an effect in New York." *Pramer S.C.A. v. Abaplus Int'l Corp.*, 76 A.D.3d 89, 97, 907 N.Y.S.2d 154 (2010). Accordingly, the Court respectfully recommends that the Tencent defendants' motion be granted and the claims against them be dismissed.

32

###### D.    China Renaissance's Motion to Dismiss

For many of the same reasons, the undersigned reports that the Court also lacks personal jurisdiction over China Renaissance.[14]  China Renaissance is only peripherally mentioned in the amended complaint.  Specifically, Meehan alleges that China Renaissance is VIPKid HK's exclusive financial advisor and its capital markets partner.  Am. Compl. ¶ 51.  He also asserts that China Renaissance supports VIPKid HK by exploring the boundaries and possibilities of online education.  *Id*.  In addition, Meehan claims that China Renaissance has advanced the "VIPKid Scheme" by actively shaping VIPKid HK so that its activities are responsive to the national policies of the Chinese government.  *Id*.  To be clear, however, there is no indication that those alleged activities are occurring in this country.

Rather, Meehan's sole allegation connecting China Renaissance for jurisdictional purposes to this state is that China Renaissance is operating in New York through the offices of its subsidiary "China Renaissance US."  *Id*. ¶ 71.  In response to the sole allegation, China Renaissance has provided the Court with information concerning its lack of activities in the state and the nature of its subsidiary in its motion papers.  According to the Company Secretary, Ming Cheung Lawrence Yee ("Yee"), China Renaissance is organized under the laws of the Cayman Islands and has principal places of business in Beijing, China and Hong Kong.  *See* Yee Decl. ¶ 2.  It has no employees in New York, is not registered to do business in New York, does not have property in New York and does not transact business in New York.  *Id*. ¶¶ 4-6.  In fact, all of China Renaissance's chief executive, financial, accounting departments, legal department, and executive and control functions are based in China.  *Id*. ¶ 4.

---

[14] Just like the Tencent defendants, China Renaissance was included in four of Meehan's six causes of action - (1) fraud in the inducement, (2) fraud, (3) conversion, and (4) a violation of New York General Business Law Sections 349 and 350.  See Am. Compl. ¶¶ 118-72.

Moreover, China Renaissance has clarified that the subsidiary to which Meehan refers in the amended complaint does not exist. *See* Yee Decl. ¶ 8. It seems Meehan intended to reference China Renaissance Securities US, which is a wholly owned subsidiary of China Renaissance, incorporated in New York.[15] *See* Yee Decl. ¶ 9. Disregarding the typographical error in the pleading, Meehan, nonetheless, has only asserted, in the most general sense, that China Renaissance is operating in New York through a subsidiary. Notably, the amended complaint lacks any facts concerning the actual activities of the subsidiary that are being conducted in the state or how those activities are connected to China Renaissance's alleged relationship with VIPKid HK. Without more, the "[m]ere ownership by a parent company of a subsidiary that is subject to personal jurisdiction is insufficient to establish jurisdiction over the parent." *Moreau v. RPM, Inc*., 20 A.D.3d 456, 457, 799 N.Y.S.2d 113, 114 (2005).

Similarly, although Meehan now alleges, in his opposition, that VIPKid HK is receiving "cooperation" from China Renaissance Securities (US), Inc., standing alone, this allegation falls short of what would be needed to establish long arm jurisdiction. The only information offered by Meehan regarding the nature of this cooperation is that, according to his research, China Renaissance Securities US was formed to provide third-party research to institutional customers in the United States on companies based in China and Hong Kong. Meehan Mem. (ECF No. 78) at 15. However, he offers no suggestion as to how that "research" may be connected to the conduct of VIPKid HK that caused his alleged injuries. *See Daimler AG* , 571 U.S. at 139, 134 S. Ct. at 761. As noted above, there must be an articulable nexus or substantial relationship between the business transaction and the claim asserted. *See Wilson,* 2023 WL 1072513, at *2; *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333, 343-44 (2d Cir. 2018)("Where the defendant has had

---

[15] According to China Renaissance, China Renaissance Securities US maintains its own books and records and has never contracted with or employed Meehan. Yee Decl. ¶¶ 9-12.

only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts."). Whatever connection there may be between China Renaissance, China Renaissance Securities (US), Inc., VIPKid HK and New York, the allegations in the amended complaint as to that relationship are far too tenuous to support the exercise of specific jurisdiction under section 302(a)(1).

Similarly, even if the Court were to accept Meehan's allegations as true, Meehan cannot establish jurisdiction over China Renaissance for the alleged torts that occurred in New York. As explained above, section 302(a)(2) typically requires that a defendant be physically present in New York while committing the tortious act. *See LaChapelle*, 1 F. Supp. 3d at 169. There is absolutely no evidence that China Renaissance was present in New York when it provided financial advice to or capital support for VIPKid HK. In addition, while C.P.L.R. § 302(a)(3) can extend jurisdiction to non-domiciliaries who commit tortious acts outside of the state, a plaintiff relying on § 302(a)(3) must make a showing that the non-domiciliary expected or should reasonably have expected the act to have consequences in the state. *Bank Brussels Lambert*, 171 F.3d at 790. Again, there is nothing in the record upon which the Court could infer that China Renaissance should have reasonably expected that their political and financial support for VIPKid HK would result in the consequences alleged in the complaint, that being, the ability of VIPKid HK to trick American teachers into working on its teaching platform in order to surreptitiously record and capture the teachers' facial movements and voices. For these reasons, the undersigned further recommends that the claims against China Renaissance be dismissed.

### E.    Sequoia's Motion to Dismiss

Finally, the undersigned addresses the motion to dismiss filed by Sequoia, in which it too argues that there is no basis for personal jurisdiction. As previously indicated, Sequoia is a

Delaware venture capital firm headquartered in California. Chang Decl. ¶¶ 2, 3.   Like many of its co-defendants, Sequoia does not have a physical location, own assets, have a telephone number, have a bank account, or have any employees who list their primary addresses as New York.  *Id*. ¶¶ 4-7.   In fact, while Meehan describes Sequoia as one of "VIPKid's earliest and most important strategic and financial partners," *see* Am. Compl. ¶ 43, its Deputy Chief Compliance Officer has attested that Sequoia has never interacted, executed contracts or communicated with VIPKid HK in New York.  Chang Decl. ¶ 8.  In addition, contrary to the broad suggestion that it is a financial partner, Sequoia insists it has never invested directly in VIPKid HK.  To this end, Sequoia attests that its sole involvement with VIPKid HK lies in the fact that it advises two investment funds that have invested in the company.  *Id*. ¶ 9.

As the undersigned has now repeated several times, in order to be subject to personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1), a defendant has to have "performed purposeful acts in New York." *Jonas v. Est. of Leven*, 116 F. Supp. 3d 314, 325 (S.D.N.Y. 2015) (citing *Bonsey v. Kates*, 13 Civ. 2708, 2013 WL 4494678, at *4 (S.D.N.Y. Aug. 21, 2013)).  "Purposeful activities are volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Paterno v. Laser Spine Inst.,* 24 N.Y.3d 370, 376, 998 N.Y.S.2d 720, 23 N.E.3d 988 (2014)).  In other words, more than limited contacts are required to establish that the nondomiciliary transacted business in the state.  *Id*.

Notably, the Second Circuit has established four factors for courts to consider when determining whether a defendant's contacts with New York are sufficient to confer jurisdiction under section 302(a)(1):

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether [a] contract was negotiated or executed in New

> York and whether, after executing a contract with a New York business, the
> defendant has visited New York for the purpose of meeting with parties to the
> contract regarding the relationship; (iii) what the choice-of-law clause is in any
> such contract; and (iv) whether the contract requires . . . payments into the
> forum state or subjects [defendants] to supervision . . . in the forum state.

*Id.* (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir.2004)).  None of these

factors weigh in Meehan's favor.  Meehan does not allege that Sequoia has an ongoing

contractual relationship with VIPKid HK or that any meeting with it took place in New York.

Even with respect to Sequoia's funds, it is not clear if the money was invested in New York or in

Hong Kong where VIPKid HK has its principle place of business.  In fact, Sequoia attests that

the funds also lack any meaningful connection to the state.  Chang Decl. ¶ 9.  Similarly, there are

no allegations in the complaint that explain the nature of the investment, whether it was governed

by an agreement with VIPKid HK and, if so, whose law governed the relationship.  Indeed, other

than the plaintiff's conclusory contention that "Sequoia's investment" was utilized to support the

VIPKid Scheme, there is nothing in the amended complaint that supports a finding of jurisdiction

pursuant to section 302(a)(1).[16]

Lastly, nothing in the amended complaint supports a finding that Sequoia committed a

tortious act within the state or that it directed the commission of a tortious act, through an agent,

from outside of the state.  As previously stated, in order to establish jurisdiction under section

302(a)(3), Meehan would have to establish that when Sequoia provided its fund with advice, it

somehow knew that one of the entities in which it was investing was going to surreptitiously

record and capture the teachers' facial movements and voices.  No such showing can be made

based on the facts in the amended complaint.  Accordingly, the undersigned finds that the Court

---

[16] Meehan argues that Sequoia should have done more to explain its relationship with the funds and the relationship the funds have with VIPKid HK.  He says, had they done so, he could have advanced more arguments in favor of jurisdiction.  However, it Meehan, not the defendants, who bears the burden of demonstrating personal jurisdiction. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).

may not exercise personal jurisdiction over Sequoia and respectfully recommends that the claims against it be dismissed.

### F.    The Defendants' Arguments Under Rule 12(b)(6)

Each of the defendants has also argued that the facts alleged by Meehan are insufficient to support a claim that would entitle him to relief.  Given the Court's determination with respect to both the Dami defendants' motion to compel arbitration and the remaining defendants' motion to dismiss for lack of personal jurisdiction, the undersigned will not address the 12(b)(6) arguments.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served by the Court on the parties.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days.  Failure to file objections within this period waives the right to appeal the District Court's Order.  See 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997).

Dated: Central Islip, New York
       August 29, 2023

                                    _____/s/_____
                                    ARLENE R. LINDSAY
                                    United States Magistrate Judge